Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone:   (213) 785-2610
Facsimile:   (213) 226-4684
Email:        lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone:   (215) 600-2817
Facsimile:   (212) 202-3827
Email:        pkim@rosenlegal.com
               lheifetz@rosenlegal.com

Lead Counsel for the Class

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL FARHAR, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> ONTRAK, INC., TERREN S. PEIZER, BRANDON H. LAVERNE, and CURTIS MEDEIROS, <br><br> Defendants. | Master Docket No. 2:21-cv-01987-FLA-E (consolidated with Case No. 2:21-cv-02460-FLA) <br><br> **CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

1

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Ibinabo Dick ("Plaintiff"), by and through his attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ontrak, Inc. ("Ontrak" or "Company"), analysts' reports and advisories about the Company, interviews with and documents obtained from former employees of the Company, and information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities that purchased Ontrak publicly traded common stock on U.S. Exchanges between August 5, 2020 and February 26, 2021, inclusive (the "Class Period"), against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the class are Defendants, the officers and directors of the Company, at all relevant times,

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

2.    Throughout the Class Period, defendants Ontrak, Terren S. Peizer ("Peizer"), its Chief Executive Officer ("CEO"), Chairman of the Board of Directors, and majority shareholder, Brandon H. LaVerne ("LaVerne"), its Chief Financial Officer ("CFO"), and Curtis Medeiros ("Medeiros"), its President and Chief Operating Officer ("COO") (collectively, "Defendants") knowingly or recklessly disseminated materially false and misleading statements about the Company's relationship with its largest customer, Aetna.

3.    Ontrak is a healthcare company incorporated in Delaware and headquartered in Santa Monica, California. Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs.

4.    Ontrak's most important and largest client was Aetna. Ontrak recruited Aetna health plan members who had a history of chronic medical conditions, behavioral health issues, and high healthcare costs into a 52-week program designed to reduce their healthcare costs. The program could include appointments with psychiatrists, dietitians, counselors, or other specialists in Ontrak's network. Aetna accounted for 63.9% of Ontrak's its revenue for the three months ended September

3

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

30, 2020. Accordingly, Ontrak's business with Aetna was core to the Company's business and was closely monitored by the Individual Defendants.

5.      Prior to the start of the Class Period, Aetna began questioning Ontrak's billing practices and whether Ontrak really provided any added value. In May 2020, prior to the start of the Class Period, Aetna stopped providing Ontrak with names of new potential health plan members to enroll in its programs. By July 2020, Aetna asked Ontrak to complete a Corrective Action Plan ("CAP"), responding to questions about billing and providing meaningful measures of the benefits that Ontrak's services provided.

6.      Ontrak submitted a materially incomplete response to Aetna's CAP. Nevertheless, on August 5, 2020, the Company issued a press release announcing its second quarter results that mentioned nothing about Ontrak's problems with Aetna. Instead, it touted its pipeline of new clients. On an earnings call the same day, Defendant Peizer talked about his excitement about the Company's future possibility, specifically mentioning possible "further expansions with Aetna."

7.      Ontrak's stock jumped in value in response to its second quarter 2020 results, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. The Company then quickly launched an offering of its preferred stock. On August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of preferred stock, which closed on August 26, 2020

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

and, after a full exercise of the underwriters' over-allotment option in the offering, ultimately raised gross proceeds of $48.9 million and net proceeds of $45.3 million.

8.    After Ontrak failed to satisfy Aetna's concerns and fully answer its questions in the CAP, negotiations to renew Aetna's contract stalled. Nevertheless, on November 5, 2020, Ontrak misled investors by telling them that universal compliance reviews for vendors that had nothing to do with Ontrak specifically were the reason that Aetna turned off the data feed that provided names of Aetna members for the Company to contact and potentially enroll in its programs. Defendants falsely reassured investors that they expected not only that the pipeline of names would resume flowing, but that the Company was on its way to expanding its business with Aetna.

9.    Even as negotiations between Ontrak and Aetna were falling apart, Defendants used the false promise of expanding business with Aetna to raise money. On December 15, 2020, Ontrak announced that it had commenced a follow-on offering of its preferred stock. That offering closed on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million for the Company.

10.    On March 1, 2020, Ontrak shocked the market when it announced that Aetna had terminated its contract with Ontrak, effective June 26, 2021. This adverse

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

news caused the Company's stock price to fall $27.32/share or 46%, to close at $31.62/share on March 1, 2021, devastating investors.

11.   As a result of Aetna's termination of the contract, Ontrak lowered its revenue guidance for 2021 to $100 million from $165 million.  Conveniently, the proceeds of the Company's offerings, carried out while the Company's stock was artificially inflated from Defendants' misstatements and omissions concerning Ontrak's ongoing problems with Aetna, made up for this shortfall.

12.   In the wake of these disclosures revealing the fraud, Defendants Peizer and Medeiros were both forced to step down from their management roles. On March 16, 2021, Ontrak announced that Jonathan Mayhew would become Ontrak's CEO. While Peizer, who is Ontrak's majority shareholder, would become its Executive Chairman, he was forced to give up day-to-day control of the Company. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros.

**JURISDICTION AND VENUE**

13.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

14.   This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

15.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

16.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in the certification filed with his Motion to Consolidate Related Actions, for Appointment as Lead Plaintiff, and Approval of Choice of Counsel (ECF No. 17-2), purchased Ontrak common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Defendant Ontrak, which is incorporated in Delaware and headquartered in Santa Monica, California, is a healthcare company. Its core business is providing national and regional health plans' high-cost members with services designed to reduce their healthcare costs. Ontrak common stock is listed on NASDAQ under the ticker symbol "OTRK."

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

19.   Defendant Peizer is the founder of Ontrak. Peizer served as CEO and Chairman of the Board of Directors since the Company's inception in 2003 through April 11, 2021. Effective April 12, 2021, Peizer stepped down as CEO and was appointed to serve as the Executive Chairman. He continues to serve as Chairman of the Company's Board of Directors.  Upon information and belief, Peizer was forced to resign as result of the fraud.

20.   Defendant LaVerne has been the Company's Chief Financial Officer ("CFO") since March 2020.

21.   Defendant Medeiros served as the Company's President and Chief Operating Officer from December 2019 until April 2021. Upon information and belief, Medeiros was forced to resign as a result of the fraud.

22.   Defendants Peizer, LaVerne, and Medeiros are sometimes referred to herein as the "Individual Defendants."

23.   Each of the Individual Defendants:

a.  directly participated in the management of the Company;

b.  was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.  approved or ratified these statements in violation of the federal securities laws.

24.    Ontrak is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

25.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Ontrak under *respondeat superior* and agency principles.

26.    Defendant Ontrak and the Individual Defendants are referred to herein, collectively, as the "Defendants."

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background

27.     Ontrak, is a healthcare company that connects its customer health plans' high-cost members to programs designed to reduce their healthcare costs. Ontrak claims that its technology platform organizes and automates healthcare data integration and analytics to engage members using a coaching model and enroll them in appropriate programs. Its clients are national and regional health plans in 31 states and in Washington, D.C.

28.     Before and during the Class Period, Ontrak's largest customer was Aetna. The Company's quarterly report, filed on Form 10-Q on November 5, 2020 for the period ended September 30, 2020 (the "3Q 2020 10-Q"), provided a table [summarizing] concentration of credit risk by customer revenues as a percentage of [Ontrak's] total revenue, showing that Aetna accounted for 63.9% of its revenue for the three months ended September 30, 2020:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| **Percentage of Revenue** | **2020** | **2019** | **2020** | **2019** |
| Largest customer [Aetna] | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer | 13.6 | 15.2 | 15.1 | 20.1 |
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

10

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

2
## Former Employee Witnesses

3

4
29.     Former Employee 1 ("FE1") was Ontrak's Director of Quality and

5
Organizational Performance from February 2017 until December 2020. FE1 was a

6
member of the compliance team, and reported to Joshua Fischer ("Fischer"), the

7
Company's Senior Vice President of Operations and Compliance. FE1 regularly

8

9
met with Defendant Medeiros.

10
30.     Former Employee 2 ("FE2") was the Director of Operations at Ontrak

11
from January 2019 until July 2021. FE2 oversaw billing, claims, and accounts

12
receivable. FE2 ran a team of 12 people who processed claims, both Medicare and

13

14
commercial, for Aetna, as well as other Ontrak customers. FE2 regularly met with

15
Defendant Medeiros.

16

17
31.     Former Employee 3 ("FE3") was the principal design researcher and

18
strategist at Ontrak from 2019 until March 2021. FE3's primary job was to develop

19
a way to quantify the benefit that Aetna was receiving by using Ontrak's services.

20

21
FE3 reported to Joanne Mendel, Ontrak's Senior Director of User Experience.

22

23
32.     Former Employee 4 ("FE4") was Ontrak's Director of Member

24
Engagement Specialists Training from September 2016 until March 18, 2021. FE4

25
reported to Greg Gilroy, Ontrak's Director of Training.

26

27

28

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

33.   Former Employee 5 ("FE5") worked at Ontrak as a member engagement specialist from February 2020 until March 2021.

34.   Former Employee 6 ("FE6") was a quality assurance analyst at Ontrak from August 2017 until March 2021. FE6 originally worked as a member engagement specialist until April 2020, before moving into the quality assurance function. FE6 reported to Julie Smith, a quality assurance supervisor.

35.   Former Employee 7 ("FE7") was a member engagement specialist who worked at Ontrak from January 2018 until March 2021.

36.   Former Employee 8 ("FE8") was a member engagement specialist at Ontrak for four years, until September 2019. FE8 reported to Wolfgang Berger, the Company's call center supervisor.

37.   Former Employee 9 ("FE9") was the Company's Director of Community Care Training from July 2016 until March 18, 2021. FE9 was in a leadership role and trained care coaches, nutritional supervisors, and care coordinators within the Company. FE9 reported to Sara Armstrong, a Senior Vice President at Ontrak.

### Ontrak's Business Model and Loss of Aetna Business

38.   Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs. Ontrak markets itself as a technology-

12

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

enabled healthcare company that combines predictive analytics with human engagement to treat health plan members with unaddressed behavioral health conditions.

39.    In reality, Ontrak targets potential members by simply having member engagement specialists call names on lists provided by its customer health plans. FE4 explained that member engagement specialists would receive lists of names of people to contact that were generated by Ontrak's customer health plans. To qualify for a referral to Ontrak, members had to have a chronic medical condition, along with some history of substance abuse or mental health problems. In addition, the member must have generated at least $7,500 in health plan benefits.

40.    According to FE4, a member engagement specialist would reach out to the patient and tell them that there were some new benefits available to them, and that their insurer wanted to be proactive in regard to their health. A person who enrolled would be referred to as an "Ontrak member."

41.    FE5 explained that because of medical privacy rules, the Company would provide each member engagement specialist with a list of people to contact, but could not reveal what kind of health problems they experienced or what kind of program might help. The member engagement specialists' job would be to call the people on the list and "probe" to see if they could help, by asking questions such as

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

"Is there anything you are looking to improve in your life?" It was up to the member engagement specialists to figure out what each member might need.

42.     If an Ontrak member was interested in a program, the member engagement specialist would refer them to a care coach, who was a nurse or certified health coach. The care coach would talk further with the member and create some type of plan. According to FE4, the next step was a referral to a clinical operations coordinator, who would set up appointments with a psychiatrist, dietitian, counselor, or other specialist in Ontrak's network, generally within the health plan customer's network. Ontrak members could not make their own appointments with these specialists. If an Ontrak member did not have transportation, a community care coordinator would pick them up, provided there was one in the area. FE1 explained that Ontrak's program was 52 weeks long.

43.     According to FE4, the largest source of Ontrak members was Aetna. FE4 stated that Aetna made up more than 85% of Ontrak's outreach pool.

44.     According to FE4, Aetna paid Ontrak $750 for each member that Ontrak enrolled in a program. Aetna was deeply involved in Ontrak's strategy with its Ontrak members. For example, Aetna was the only Ontrak customer that provided scripts for member engagement specialists to use with potential members.

45.     According to FE6, a quality assurance analyst at Ontrak, Ontrak billed Aetna for every interaction that an Ontrak member had with a care coach, who

14

would check in with each member once per month. FE7, who worked as a member engagement specialist, explained that Ontrak routinely enrolled members who were later determined to be ineligible. According to FE7, this was normally because the program that was appropriate for them would not be covered by their health insurance plan. But Ontrak would keep these members enrolled for 90 days or longer anyway. This practice enabled Ontrak to bill Aetna for three months of contacts with care coaches, even as Ontrak employees knew from the outset that the member would eventually have to be unenrolled. In other words, Ontrak would enroll Aetna members who the Company knew were not actually eligible for programs in order to collect fees for their contacts with care coaches until Aetna made the final determination that they were not eligible.

46. FE8 confirmed that Ontrak was enrolling members who were not actually eligible for services. FE8 was appointed to a data algorithm team that was set up to find out why so many of Aetna's enrolled members were then deemed to be ineligible for services. According to FE8, this often happened because the Aetna Medicare plans did not include mental health coverage. FE8 learned that Ontrak was billing for services that patients were ineligible to receive because sometimes Aetna would still pay Ontrak after it submitted its first bill, even if there was no coverage, and that because of those payments, the Company's management did not want to fix this problem.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

47.    FE1 also confirmed that Ontrak was enrolling members who then quickly fell off the Company's radar. From reviewing and monitoring records and escalated complaints, FE1 saw that member engagement specialists and care coaches were just enrolling people who would never complete programs, and who sometimes did not even consent to enrollment, so that Ontrak had a chance to temporarily collect payments from Aetna for contacts with care coaches.

48.    FE3, whose job was to develop a way to quantify the benefit that Aetna was receiving by using Ontrak's services, explained that by May 2020, Ontrak's relationship with Aetna was in dire straits because Aetna had serious questions about the value that Ontrak provided. According to FE3, in May 2020, Aetna turned off its data feed of records, which had been generating new potential contacts for member engagement specialists. This was a serious development. Without that data feed, member engagement specialists could not reach out to new potential members. Indeed, FE5 reported that he stopped receiving new Aetna members to contact by approximately September 2020, and was instead asked to recontact the same people over and over.

49.    FE2 participated in conference calls every Friday between Aetna and Ontrak personnel to discuss ongoing issues. Other Ontrak personnel who participated included Fisher, Charles Polatsek ("Polatsek") and the Company's Vice President of Sales and Strategic Partnerships.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

50.     FE2 reported that the tone of the Friday meetings changed after Dr. Bill Gillis ("Gillis") began joining them. Gillis, the Clinical Director of Behavioral Health Operations and Program Design at Aetna, was suspicious of Ontrak's billing and skeptical about whether Aetna was getting a return on its investment in Ontrak's services. According to FE2, Gillis would regularly "tear us a new one" on the Friday calls.

51.     According to FE2, the biggest point of contention was that Aetna objected to being billed for months when services were not provided, even though the contract technically allowed Ontrak to bill for the months starting with enrollment and going forward. Ontrak argued that the members did get to talk to care coaches, but Aetna started to request records and determined that Ontrak members were not contacted by care coaches for two or three months, even as the Company continued to bill Aetna. Gillis and his Aetna colleagues were raising this issue even before the CAP, which was issued in July 2020.

52.     FE2 suspected long before the CAP that Ontrak was in danger of losing the Aetna contract. When Medeiros joined the Company as President and COO in December 2019, FE2 met with him one-on-one weekly for his first two months. In those meetings, FE2 expressed her concerns about Aetna and told Medeiros that the billing model was bad, and that Ontrak could not sustain it.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

53.     FE1, FE2, and FE3 confirmed that in July 2020, Aetna transmitted the CAP to Ontrak, seeking meaningful measures of the benefits created by using Ontrak's services. The CAP asked Ontrak to answer questions about billing and required Ontrak to correct a list of things, including providing evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members. Aetna was also seeking to recoup some of the money it had paid for the enrollment of Ontrak members who never received any services. According to FE2, Aetna gave Ontrak 60 days to answer the CAP.

54.     After seeing the CAP, FE1 was convinced that Ontrak was going to lose the Aetna contract. FE2 stated that she considered the CAP the beginning of the end of Ontrak's relationship with Aetna.

55.     In July 2020, FE1 participated in three days of Zoom meetings with the corporate executives to discuss Aetna's CAP. Defendant Medeiros ran the meetings from a hotel room in Florida. Ontrak put Julia Wright, the Company's Chief Medical Officer and Senior Vice President ("Wright") in charge of the CAP working group. The CAP working group also included senior executive vice president of product portfolio Bryan Kelly, Polatsek, vice president of provider network management Kim Moore, chief information technology officer Jeremiah Stoke, senior vice president Sarah Armstrong, and customer success manager Aidan Koch.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

56.     According to FE1, the Company executives in the CAP working group did not take the situation seriously and essentially decided to do the bare minimum to address Aetna's concerns, even though she, Fischer, and Christopher Cirigliano (the Company's Director of Compliance) told them that the CAP was serious. FE1 recalled that Polatsek said that Aetna was just trying to scare Ontrak, and would not really take any action. FE1 told Polatsek that perhaps he knew more as the account representative, but that there were problems that needed to be fixed.

57.     FE2 was responsible for nearly half of the deliverables required for Ontrak's CAP response. The CAP included 11 items, five from FE2's function. After providing Medeiros and Kelly with the needed data, she and her team were excluded from further work on the response.

58.     According to FE1, Ontrak never fully completed the CAP or answered Aetna's questions, giving Aetna an incomplete response. FE2 stated that after Ontrak made its response, three months went by without Aetna even acknowledging it.

59.     According to FE7, in the summer of 2020, Aetna began posting member engagement specialists position jobs on sites such as Indeed and Glassdoor. Member engagement specialists at Ontrak who saw these postings and knew that Aetna made up much of Ontrak's business, became concerned that Aetna was going to replace Ontrak with an in-house department. The Company had monthly Zoom

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

calls for all employees, and according to FE7, at an all-hands Zoom call in late summer or early autumn of 2020, an employee asked members of senior management during a question and answer session if they should be nervous about their jobs. Members of management did not answer the question.

60.     FE3 stated that by the end of 2020, she was uneasy about the Aetna contract renewal, since the Company still had not satisfied the CAP. FE7 stated that in the Company's January or February monthly all-employees Zoom call, Defendant Peizer commented that he would "pray" that Aetna signed.

61.     FE6 stated that in January or February 2020, Defendant Peizer sent a Company-wide email to say that he had just found out that Aetna was not going to be renewing. In a follow-up meeting, Peizer told Ontrak employees that there were no plans to lay anyone off, and that Ontrak could recover.

62.     FE9 also recalled the Company-wide meeting about the loss of the Aetna contract. FE9 stated that this was a Zoom meeting held in late January or early February. FE9 stated that Peizer was actually crying throughout his presentation, as he told employees that Ontrak would survive and there would be no layoffs.

### False and Misleading Statements

63.     On August 5, 2020, Ontrak announced its second quarter 2020 financial results. In a press release, Defendant Peizer stated that during the quarter,

20

Ontrak "grew [its[ pipeline of potential new customers to its most robust level in the company's history."

64. This statement was false and misleading. Defendants knew at the time that they issued this press release that Ontrak's pipeline of customers was threatened by the fact that Aetna, Ontrak's largest customer, had turned off its data feed of records to Ontrak in May, after Aetna's Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment, and then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. Defendants also knew that they were not preparing a serious response to the CAP fully addressing Aetna's questions. When Defendants touted Ontrak's customer pipeline, they rendered themselves duty-bound to disclose the material danger to Ontrak's relationship with its largest customer.

65. Ontrak's quarterly report, filed on Form 10-Q on August 5, 2020 for the period ended June 30, 2020 (the "2Q 2020 10-Q"), omitted any mention of the CAP or Ontrak's problems with Aetna. Defendants Peizer and LaVerne signed the 2Q 2020 10-Q.

66. This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally

21

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

67.     Also on August 5, 2020, the Individual Defendants held a conference call to discuss the Company's second quarter 2020 results. Defendant Peizer implied that Ontrak's business with Aetna was actually growing, stating:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights.

68.     This statement was false and misleading. By telling analysts and investors that Ontrak expected to achieve "new heights" while mentioning possible further expansions of its Aetna business and omitting that Aetna had turned off its data feed of records to Ontrak in May and then transmitted a CAP to Ontrak, looking

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

for meaningful measures of the benefits of Ontrak's services, Peizer materially misled investors about the state of the Company's relationship with its largest customer. In addition, by touting "enhancements to our algorithms feeding the outreach pool," Peizer materially misled investors about what Ontrak's outreach pool actually was: lists of names of people to contact that were generated by Ontrak's customer health plans. More, by discussing "enhancements to our algorithms feeding the outreach pool" without disclosing that the Company's largest customer, Aetna, which made up more than 85% of Ontrak's outreach pool, had actually stopped providing potential new members to Ontrak, Peizer materially misled investors about Ontrak's current and near-term business.

69.     Defendants' material false statements and omissions were able to inflate the value of Ontrak's stock. Ontrak's stock rose sharply in value, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. Then, on August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of 1,700,000 shares of its 9.50% Series A Cumulative Perpetual Preferred Stock (the "Series A Preferred Stock") with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $25.00 per share.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

70.     Ontrak announced on August 26, 2020 that it had closed the Series A Preferred Stock Offering, after raising gross proceeds of approximately $42.5 million and net proceeds of approximately $39.3 million.

71.     On August 31, 2020, Ontrak announced that its common stock, which had previously been traded on the NASDAQ Capital Market, had been uplisted on the NASDAQ Global Market.

72.     On September 8, 2020, Ontrak announced that it had closed the full exercise of the underwriters' over-allotment option regarding its Series A Preferred Stock Offering, resulting in aggregate gross proceeds of $48.9 million and aggregate net proceeds of $45.3 million to the Company from the public offering.

73.     On November 5, 2020, Ontrak issued a press release announcing its third quarter 2020 financial results. Defendants stated that "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak."

74.     This statement was materially false and misleading. Ontrak did not stop receiving new lists of contacts from Aetna because of compliance reviews that Aetna was carrying out for all its vendors despite having no compliance issues or concerns with Ontrak. Defendants knew or recklessly disregarded that Aetna had serious compliance concerns specifically about Ontrak. Aetna had turned off its data

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

feed of records to Ontrak in May (not July), after Aetna's Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, seeking to investigate the Company's billing and looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits.

75.    Also on November 5, 2020, Defendants held a conference call to discuss its third quarter 2020 results. After telling analysts that the Company expected 2021 revenue growth in excess of 100%, Defendant Peizer specifically addressed the impact of "disrupted data refreshes" at Ontrak's largest customer, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak…. ***Importantly, this is one of the plans for which we anticipate continued significant expansion.***

(Emphasis added.)

76.    This statement was materially false and misleading. By stating that the company's large customer, Aetna, was conducting compliance reviews of all its vendors, Peizer materially misled investors about the reason that Aetna shut off its

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

data feed of new potential members to Ontrak, as well as its timing. In fact, Aetna had turned off its data feed of records to Ontrak in *May,* not July, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Indeed, later on the call, Peizer said that Aetna had previously provided data "on a monthly refresh," but by November, had not provided new data to Ontrak in five months. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value. More, Peizer knew or recklessly disregarded that the statement that the Company anticipated "continued significant expansion" of its Aetna business was materially false. In fact, Aetna was questioning Ontrak's billing and investigating its added value, not discussing potential expansion.

77.     In response to a question from Charles Rhee, an analyst at Cowen and Company, LLC, Defendant Medeiros stated:

> So as far as timing with the expected data refreshes to be turned back on, we have a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year.

78.     This statement was materially false and misleading. Medeiros knew or recklessly disregarded that Ontrak and Aetna did not have a mutual agreement for

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

the data feed to be turned back on. Aetna had turned off its data feed of records to Ontrak in May, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value. Medeiros misled investors into believing that Aetna had told Ontrak that it would soon again provide new potential members to the Company.

79.    Later in the call, Medeiros stated that "with Aetna, we have scheduled multiple geography expansions that we hope to sign in the fourth quarter and roll out early in the year."

80.    This statement was false and misleading. Medeiros knew or recklessly disregarded that Ontrak's relationship with Aetna was in dire straits. Aetna had stopped providing potential new members to the Company and was questioning Ontrak's billing and investigating its added value, not discussing potential expansion. Medeiros nevertheless told investors, even as the Company's relationship with Aetna was in serious danger, that he anticipated expansions of its Aetna business.

27

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

81.     Referring to an expansion with Aetna into potential new members with depression and anxiety, Defendant Peizer stated that while Ontrak was not including such an expansion in its projections, "I would be surprised, and we would all personally be surprised and disappointed, if the expansions that we are alluding to don't happen in 2021."

82.     This statement was false and misleading. Peizer knew or recklessly disregarded that Ontrak's relationship with Aetna was in serious trouble. Aetna had stopped providing potential new members to the Company and was questioning Ontrak's billing and investigating its added value, not discussing potential expansions. By stating that he would be "surprised" if Aetna expansions did not happen, Peizer materially misrepresented the state of Ontrak's relationship with Aetna.

83.     Peizer repeatedly stated that what he called the Aetna "data refresh" was not a performance issue. In response to a question from Richard Collamer Close of Cannacord Genuity Corp., Peizer stated that "it really has nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is."

84.     This statement was false and misleading. Peizer knew or recklessly disregarded that Ontrak's Aetna business was in danger precisely because of a performance problem that had everything to do with the Company. Aetna had

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

turned off its data feed of records to Ontrak in May, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value.

85.     Ontrak's 3Q 2020 10-Q omitted any mention of the CAP. While the Company stated that a substantial percentage of its revenues were attributable to four large customers, any of which could terminate its services at any time, it omitted that Aetna was questioning its billing practices and added value. Defendants Peizer and LaVerne signed the 3Q 2020 10-Q.

86.     This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or

29

uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

87.    The market accepted Defendants' false and misleading explanations for why Ontrak was not enrolling new Aetna members. In its November 5, 2020 report, Cannacord Genuity Corp. explained that the Aetna data delay was because "CVS required all 3rd party vendors, including those for Aetna, to be reviewed for compliance requirements," and wrote that despite this issue, Ontrak "continued to execute." In its November 5, 2020, Cowen and Company wrote that it remained positive on Ontrak, since it had grown enrollment overall despite "a data feed issue from [Aetna]."

88.    Defendants continued to mislead investors in meetings with analysts. On November 25, 2020, Cowen and Company published a report entitled "Takeaways From Investor Meetings with Management," relating information from recent meetings with Ontrak management. Cowen wrote that "OTRK expects the data feed issue with AET to be resolved in Dec.," and reported a planned "***expansion*** with AET (already in late stages)." (Emphasis added.)

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

89.     This statement shows that Defendants continued to make materially false and misleading statements, materially misrepresenting the state of Ontrak's relationship with Aetna. Defendants knew or recklessly disregarded that they had no reasonable expectation of Aetna turning its data feed back on in December. Aetna had turned off its data feed of records after questioning Ontrak's billing practices and whether the Company provided a return on Aetna's investment and transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of the Company's services. Ontrak submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as the Company failed to provide proof of Ontrak's value. Aetna was questioning continuing its business with Ontrak, not discussing potential expansion, and much less in the late stages of an expansion of its Ontrak contract.

90.     Defendants continued to raise money after misleading the market. On December 15, 2020, Ontrak announced that it had commenced a follow-on underwritten public offering of 1,730,000 shares of the Series A Preferred Stock with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $24.75 per share.

91.     Ontrak closed the follow-on Series A Preferred Stock offering on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million

31

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

92.     Ontrak explained in its 3Q 2020 10-Q that its cash was largely raised through offering Series A Preferred Stock. Defendants were motivated to conceal the Company's problems with Aetna so that the Company could sell preferred stock at artificially inflated prices.

### **The Truth Emerges But Defendants Continue to Lie**

93.     On March 1, 2021 at 8:00 a.m., Ontrak issued a press release announcing preliminary financial results for fourth quarter and full year 2020. Therein, the Company stated that its largest customer had terminated its contract with Ontrak, effective June 26, 2021. The Company stated that this customer "evaluated Ontrak on a provider basis" and "[a]s such, the customer evaluated [Ontrak's] performance based on [its] ability to achieve the lowest possible cost per medical visit, and not on [its] clinical outcomes data or medical cost savings." The Company also stated that "the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics." Specifically, the Company's press release stated, in relevant part:

> Mr. Peizer continued, "After a long process with our largest customer where we believed we were working towards an extended and expanded contract, we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021. We were advised to stop enrollment of new members for this customer and await guidance from the customer on transition plans for the 8,400 members who are currently benefiting from the Ontrak program. We remain fully committed to the health plan and to its members, and will ensure that every member receives quality care through the transition, so that

32

pandemic-related anxiety is not heightened by the change in the member's care team."

Mr. Peizer added, "The relationship with our Ontrak-A customer was unique, because they evaluated Ontrak on a provider basis, not as a vendor as do all of our other health plan partners. As such, the customer evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings, which were meaningful and significant. Unlike our other health plan partners, we interacted only with the behavioral health division, with no involvement from the medical division of the plan. We believe that the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics. We have consistently found that our care coaches have a tremendously positive impact on member experience and readiness to engage with the healthcare system. This is the reason that many digital healthcare apps are now building care coaching into their products. We have a strategy in place to regain the Ontrak-A business and are currently in late stage discussions with other customers whose metrics align with our value proposition of an integrated approach to whole health that delivers an average ROI of 3.7, average cost savings of 40% to 50%, and durable clinical outcomes with exceptionally high program retention and member experience scores. Collectively, we have a market opportunity of over $30 billion."

94.    As a result, Ontrak noted that it expected revenue of $100 million for 2021, rather than the $165 million it would have expected without the loss of Aetna as a customer. Conveniently, the preferred stock offerings that raised a total of $91.7 million while the Company's stock was artificially inflated from the alleged misstatements and omissions more than filled the shortfall of expected revenue.

95.    In this statement, however, Defendants continued to materially mislead investors. Defendant Peizer's statement that "we were notified after market

33

close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021" was false and misleading. Defendants Peizer told Company employees by early February at the latest that Aetna would not be renewing its contract with Ontrak.

96.     Defendant Peizer's explanation that Aetna had decided to terminate the contract because it "evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings" was also materially false and misleading. Aetna terminated the contract with Ontrak after Ontrak failed to materially complete a CAP that 1) required answers to questions about billing, including billing for members who had been improperly enrolled in programs for which they were not eligible, 2) provide evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members, and 3) provide meaningful measures of the benefits created by using Ontrak's services.

97.     On this news, Ontrak's share price fell $27.32, or more than 46%, to close at $31.62 per share on March 1, 2021.

98.     In a conference call held on March 1, 2020, Defendants LaVerne and Medeiros continued to mislead investors about the events that resulted in Aetna's termination of its contract. Medeiros told analysts:

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

> In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time.

99.     This statement was false and misleading because it effectively told investors that in December, Aetna had completed the general audit of all its vendors that had caused the data feed to Ontrak to be shut down. This was materially false. Aetna turned off the data feed to Ontrak in May 2020 because of problems with Ontrak, not a general audit of all vendors. In fact, in July 2020, Aetna had transmitted a CAP to Ontrak, which required Ontrak to justify its billing practices, demonstrate proper enrollment procedures, and provide meaningful measures of the benefits of Ontrak's services before it renewed its contract. Ontrak submitted a materially incomplete response to Aetna. Medeiros knew or recklessly disregarded that Aetna's demand to renegotiate was a response to being dissatisfied with Ontrak's answers to its questions and skeptical of its billing practices and ability to add any value.

100.   Indeed, if, as Medeiros claimed, Aetna told Ontrak in mid-December that it would have to immediately renegotiate its contract, that would mean that Ontrak's late-December follow-on Series A Preferred Stock offering was a direct response to Defendants' growing realization that Ontrak was about to lose the Aetna business.

35

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

101.   Medeiros further stated that "when I received the call late Friday that talked about the termination, it was a surprise. We were working towards a new agreement and an expanded relationship."

102.   This statement was false and misleading. Medeiros knew or recklessly disregarded that, in fact, Aetna had notified Ontrak that it was terminating its contract materially earlier. According to FE6 and FE9, Defendant Peizer told Ontrak employees that he had just found out that Aetna would not be renewing its contract in late January or early February 2021, first in a Company-wide email and then in a follow-up Zoom meeting.

103.   Defendants Peizer and Medeiros were both forced out of their management roles as a result of this fraud. On March 16, 2021, Ontrak announced that Jonathan Mayhew would become Ontrak's CEO, while Peizer would instead become Executive Chairman. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros.

## CLASS ACTION ALLEGATIONS

104.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased Ontrak publicly traded common stock on U.S. Exchanges between August 5, 2020 and February 26, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

105.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ontrak's shares actively traded on the NASDAQ markets. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Ontrak shares were traded publicly during the Class Period on the NASDAQ markets. Record owners and other members of the Class may be identified from records maintained by Ontrak or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

106.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

107.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

108.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ontrak; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

109.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

110.   The market for Ontrak securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, Ontrak securities traded at

38

artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Ontrak securities and the market information relating to Ontrak, and have been damaged thereby.

111.   During the Class Period, the artificial inflation of Ontrak stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ontrak's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Ontrak and its business and financial condition, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Ontrak's securities at such artificially inflated prices, and each of them has been damaged as a result.

112.   At all relevant times, the market for Ontrak securities was an efficient market for the following reasons, among others:

a) Ontrak stock met the requirements for listing, and was listed and actively traded on the NASDAQ Capital Market and the NASDAQ Global Market, highly efficient and automated markets;

b) As a regulated issuer, Ontrak filed periodic public reports with the SEC;

c) Ontrak regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

d) Ontrak was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

113.   As a result of the foregoing, the market for Ontrak securities promptly digested current information regarding Ontrak from all publicly available sources and reflected such information in Ontrak's stock price. Under these circumstances, all purchasers of Ontrak securities during the Class Period suffered similar injury

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

through their purchase of Ontrak securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

114.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

115.   Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

116.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

41

117.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ontrak securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Ontrak securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

118.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ontrak securities. Such reports, filings, releases and statements were materially false and misleading in that

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

they failed to disclose material adverse information and misrepresented the truth about Ontrak's business and operations.

119. By virtue of their positions at Ontrak, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

120. Defendants were motivated to make false statements and omit material information necessary to make the statements not misleading in order to carry out an offering of preferred stock that raised gross proceeds of approximately $42.8 million for the Company.

121. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Ontrak, the Individual Defendants had knowledge of the details of Ontrak's internal affairs.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

122.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ontrak. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ontrak's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ontrak securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ontrak's business which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ontrak securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

123.   During the Class Period, Ontrak securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ontrak securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other

44

members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ontrak securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ontrak securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

124.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been materially misleading investors about its relationship with Aetna.

## **COUNT II**

## **Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

126.   Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

127.   During the Class Period, the Individual Defendants participated in the operation and management of Ontrak, and conducted and participated, directly and indirectly, in the conduct of Ontrak's business affairs. Because of their senior positions, they knew the adverse non-public information about Ontrak's current and future business prospects.

128.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ontrak's business practices, and to correct promptly any public statements issued by Ontrak which had become materially false or misleading.

129.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ontrak disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ontrak to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ontrak within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ontrak securities.

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

130.   Each of the Individual Defendants, therefore, acted as a controlling person of Ontrak. By reason of their senior management positions and/or being directors of Ontrak, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ontrak to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ontrak and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

131.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ontrak.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2021          Respectfully submitted,

                                **THE ROSEN LAW FIRM, P.A.**

                                /s/ Laurence Rosen
                                Laurence M. Rosen, Esq. (SBN 219683)
                                355 S. Grand Avenue, Suite 2450
                                Los Angeles, CA 90071
                                Telephone:  (213) 785-2610
                                Facsimile:   (213) 226-4684
                                Email:         lrosen@rosenlegal.com

                                Phillip Kim, Esq.
                                Leah Heifetz-Li, Esq.
                                101 Greenwood Avenue, Suite 440
                                Jenkintown, PA 19046
                                Telephone:  (215) 600-2817
                                Facsimile:   (212) 202-3827
                                Email:         pkim@rosenlegal.com
                                                 lheifetz@rosenlegal.com

                                and

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brian Schall, Esq.
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone:   (424) 303-1964
Email:        brian@schallfirm.com

Lead Counsel for Lead Plaintiff

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On August 23, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 13, 2021, at New York, New York.

<u>/s/ Laurence Rosen</u>

Laurence M. Rosen

CONSOLIDATED FIRST AMENDED CLASS ACTION COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS