Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL FARHAR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONTRAK, INC., TERREN S. PEIZER, BRANDON H. LAVERNE, CURTIS MEDEIROS, and JONATHAN MAYHEW,<br><br>Defendants. | ) | Master Docket No. 2:21-cv-01987-FLA-E (consolidated with Case No. 2:21-cv-02460-FLA)<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Ibinabo Dick ("Plaintiff"), by and through his attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, United States Department of Justice ("DOJ") filings, wire and press releases published by and regarding Ontrak, Inc. ("Ontrak" or "Company"), analysts' reports and advisories about the Company, interviews with and documents obtained from former employees of the Company, and information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities that purchased Ontrak publicly traded common stock on U.S. Exchanges between August 5, 2020 and August 19, 2021, inclusive (the "Class Period"), against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the class

are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

2. Throughout the Class Period, defendants Ontrak, Terren S. Peizer ("Peizer"), its Chief Executive Officer ("CEO") until March 16, 2021 and again beginning August 12, 2022, Chairman of the Board of Directors, and majority shareholder, Brandon H. LaVerne ("LaVerne"), its Chief Financial Officer ("CFO"), Curtis Medeiros ("Medeiros"), its President and Chief Operating Officer ("COO"), and Jonathan Mayhew ("Mayhew"), its CEO from April 12, 2021 until August 12, 2022 (collectively, "Defendants") knowingly or recklessly disseminated materially false and misleading statements about the Company's relationships with its two largest customers: Aetna and Cigna.

3. Ontrak is a healthcare company incorporated in Delaware and headquartered in Santa Monica, California. Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs.

4. Ontrak's most important and largest client was Aetna. Ontrak recruited Aetna health plan members who had a history of chronic medical conditions, behavioral health issues, and high healthcare costs into a 52-week program designed

to reduce their healthcare costs. The program could include appointments with psychiatrists, dietitians, counselors, or other specialists in Ontrak's network. Aetna accounted for 63.9% of Ontrak's its revenue for the three months ended September 30, 2020. Accordingly, Ontrak's business with Aetna was core to the Company's business and was closely monitored by the Individual Defendants.

5. Cigna was Ontrak's second largest client. Beginning in or about July 2020, Ontrak provided services to Cigna's insured patients under a $90 million three-year contract. Cigna had the right to terminate that contract upon 30 days' notice. By August 2021, Ontrak had billed Cigna approximately $42 million under this contract.

6. Prior to the start of the Class Period, Aetna began questioning Ontrak's billing practices and whether Ontrak really provided any added value. In May 2020, prior to the start of the Class Period, Aetna stopped providing Ontrak with names of new potential health plan members to enroll in its programs. By July 2020, Aetna asked Ontrak to complete a Corrective Action Plan ("CAP"), responding to questions about billing and providing meaningful measures of the benefits that Ontrak's services provided.

7. Ontrak submitted a materially incomplete response to Aetna's CAP. Nevertheless, on August 5, 2020, the Company issued a press release announcing its second quarter results that mentioned nothing about Ontrak's problems with

Aetna. Instead, it touted its pipeline of new clients. On an earnings call the same day, Defendant Peizer talked about his excitement about the Company's future possibility, specifically mentioning possible "further expansions with Aetna."

8. Ontrak's stock jumped in value in response to its second quarter 2020 results, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. The Company then quickly launched an offering of its preferred stock. On August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of preferred stock, which closed on August 26, 2020 and, after a full exercise of the underwriters' over-allotment option in the offering, ultimately raised gross proceeds of $48.9 million and net proceeds of $45.3 million.

9. After Ontrak failed to satisfy Aetna's concerns and fully answer its questions in the CAP, negotiations to renew Aetna's contract stalled. Nevertheless, on November 5, 2020, Ontrak misled investors by telling them that universal compliance reviews for vendors that had nothing to do with Ontrak specifically were the reason that Aetna turned off the data feed that provided names of Aetna members for the Company to contact and potentially enroll in its programs. Defendants falsely reassured investors that they expected not only that the pipeline of names would resume flowing, but that the Company was on its way to expanding its business with Aetna.

10. Even as negotiations between Ontrak and Aetna were falling apart, Defendants used the false promise of expanding business with Aetna to raise money. On December 15, 2020, Ontrak announced that it had commenced a follow-on offering of its preferred stock. That offering closed on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million for the Company.

11. On March 1, 2021, Ontrak shocked the market when it announced that Aetna had terminated its contract with Ontrak, effective June 26, 2021. This adverse news caused the Company's stock price to fall $27.32/share or 46%, to close at $31.62/share on March 1, 2021, devastating investors.

12. As a result of Aetna's termination of the contract, Ontrak lowered its revenue guidance for 2021 to $100 million from $165 million. Conveniently, the proceeds of the Company's offerings, carried out while the Company's stock was artificially inflated from Defendants' misstatements and omissions concerning Ontrak's ongoing problems with Aetna, made up for this shortfall.

13. In the wake of these disclosures revealing the fraud, Defendants Peizer and Medeiros were both forced to step down from their management roles. On March 16, 2021, Ontrak announced that Defendant Mayhew would become Ontrak's CEO. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros. While Peizer, who is Ontrak's majority shareholder, was

forced to give up day-to-day control of the Company, he became its Executive Chairman and remained Chairman of the Board, and maintained regular contact with the Company's new CEO, Defendant Mayhew.

14. By February 2021, Cigna was also reducing the number of its members that it referred per month to Ontrak for services. By April 2021, Cigna informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, because Cigna had determined that its contract with Ontrak was not resulting in the cost savings it had expected. Cigna halted discussions on any potential expansion of Ontrak's services to Cigna. By May 2021, Cigna had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month. On May 18, 2021, Cigna informed Ontrak of its intent to terminate their contract by the end of the year.

15. Defendants knew that, after the loss of Aetna as a customer, the serious jeopardy facing Ontrak's relationship with its next biggest customer, Cigna, would be of particular importance to investors. Nevertheless, even after Cigna told Ontrak that it was terminating the contract, they did not disclose this to investors. Instead, Peizer used his insider knowledge to engage in an insider trading scheme, fraudulently using two Rule 10b5-a trading plans to sell his Ontrak stock and avoid more than $12.5 million in losses. He has now been charged with insider trading by both the SEC and DOJ.

16. On or about August 18, 2021, Cigna formally notified Ontrak that it would terminate its contract with Ontrak. The next day, Ontrak filed a Form 8-K with the SEC disclosing for the first time the termination of its relationship with Cigna. This adverse news caused the Company's stock price to fall $9.37/share or over 44%, to close at $11.68/share on August 19, 2021, materially harming investors.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

20. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

21. Plaintiff, as set forth in the certification filed with his Motion to Consolidate Related Actions, for Appointment as Lead Plaintiff, and Approval of Choice of Counsel (ECF No. 17-2), purchased Ontrak common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

22. Defendant Ontrak, which is incorporated in Delaware and headquartered in Santa Monica, California, is a healthcare company. Its core business is providing national and regional health plans' high-cost members with services designed to reduce their healthcare costs. Ontrak common stock is listed on NASDAQ under the ticker symbol "OTRK."

23. Defendant Peizer is the founder of Ontrak. Peizer served as CEO and Chairman of the Board of Directors since the Company's inception in 2003 through April 11, 2021. Effective April 12, 2021, Peizer stepped down as CEO and was appointed to serve as the Executive Chairman. He continues to serve as Chairman of the Company's Board of Directors. Upon information and belief, Peizer was forced to resign as result of the fraud.

24. Defendant LaVerne has been the Company's Chief Financial Officer ("CFO") since March 2020.

25. Defendant Medeiros served as the Company's President and Chief Operating Officer from December 2019 until April 2021. Upon information and belief, Medeiros was forced to resign as a result of the fraud.

26. Defendants Peizer, LaVerne, Medeiros, and Mayhew are sometimes referred to herein as the "Individual Defendants."

27. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

28. Ontrak is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

29. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Ontrak under *respondeat superior* and agency principles.

30. Defendant Ontrak and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

31. Ontrak, is a healthcare company that connects its customer health plans' high-cost members to programs designed to reduce their healthcare costs. Ontrak claims that its technology platform organizes and automates healthcare data integration and analytics to engage members using a coaching model and enroll them in appropriate programs. Its clients are national and regional health plans in 31 states and in Washington, D.C.

32. Before the Class Period and until it terminated its contract with Ontrak, the Company's largest customer was Aetna. Ontrak's quarterly report, filed on Form 10-Q on November 5, 2020 for the period ended September 30, 2020 (the "3Q

2020 10-Q”), provided a table [summarizing] concentration of credit risk by customer revenues as a percentage of [Ontrak’s] total revenue, showing that Aetna accounted for 63.9% of its revenue for the three months ended September 30, 2020. Its second largest customer, Cigna, accounting for 13.6% of its revenue for the same time period.

| | **Three Months Ended September 30,** | | **Nine Months Ended September 30,** | |
|---|---|---|---|---|
| **Percentage of Revenue** | **2020** | **2019** | **2020** | **2019** |
| Largest customer [Aetna] | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer [Cigna] | 13.6 | 15.2 | 15.1 | 20.1 |
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

## Former Employee Witnesses

33. Former Employee 1 (“FE1”) was Ontrak’s Director of Quality and Organizational Performance from February 2017 until December 2020. FE1 was a member of the compliance team, and reported to Joshua Fischer (“Fischer”), the Company’s Senior Vice President of Operations and Compliance. FE1 regularly met with Defendant Medeiros.

34. Former Employee 2 (“FE2”) was the Director of Operations at Ontrak from January 2019 until July 2021. FE2 oversaw billing, claims, and accounts

receivable. FE2 ran a team of 12 people who processed claims, both Medicare and commercial, for Aetna, as well as other Ontrak customers. FE2 regularly met with Defendant Medeiros.

35. Former Employee 3 ("FE3") was the principal design researcher and strategist at Ontrak from 2019 until March 2021. FE3's primary job was to develop a way to quantify the benefit that Aetna was receiving by using Ontrak's services. FE3 reported to Joanne Mendel, Ontrak's Senior Director of User Experience.

36. Former Employee 4 ("FE4") was Ontrak's Director of Member Engagement Specialists Training from September 2016 until March 18, 2021. FE4 reported to Greg Gilroy, Ontrak's Director of Training.

37. Former Employee 5 ("FE5") worked at Ontrak as a member engagement specialist from February 2020 until March 2021.

38. Former Employee 6 ("FE6") was a quality assurance analyst at Ontrak from August 2017 until March 2021. FE6 originally worked as a member engagement specialist until April 2020, before moving into the quality assurance function. FE6 reported to Julie Smith, a quality assurance supervisor.

39. Former Employee 7 ("FE7") was a member engagement specialist who worked at Ontrak from January 2018 until March 2021.

40. Former Employee 8 ("FE8") was a member engagement specialist at Ontrak for four years, until September 2019. FE8 reported to Wolfgang Berger, the Company's call center supervisor.

41. Former Employee 9 ("FE9") was the Company's Director of Community Care Training from July 2016 until March 18, 2021. FE9 was in a leadership role and trained care coaches, nutritional supervisors, and care coordinators within the Company. FE9 reported to Sara Armstrong, a Senior Vice President at Ontrak.

**Ontrak's Business Model and Loss of Aetna Business**

42. Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs. Ontrak markets itself as a technology-enabled healthcare company that combines predictive analytics with human engagement to treat health plan members with unaddressed behavioral health conditions.

43. In reality, Ontrak targets potential members by simply having member engagement specialists call names on lists provided by its customer health plans. FE4 explained that member engagement specialists would receive lists of names of people to contact that were generated by Ontrak's customer health plans. To qualify for a referral to Ontrak, members had to have a chronic medical condition, along

with some history of substance abuse or mental health problems. In addition, the member must have generated at least $7,500 in health plan benefits.

44. According to FE4, a member engagement specialist would reach out to the patient and tell them that there were some new benefits available to them, and that their insurer wanted to be proactive in regard to their health. A person who enrolled would be referred to as an "Ontrak member."

45. FE5 explained that because of medical privacy rules, the Company would provide each member engagement specialist with a list of people to contact, but could not reveal what kind of health problems they experienced or what kind of program might help. The member engagement specialists' job would be to call the people on the list and "probe" to see if they could help, by asking questions such as "Is there anything you are looking to improve in your life?" It was up to the member engagement specialists to figure out what each member might need.

46. If an Ontrak member was interested in a program, the member engagement specialist would refer them to a care coach, who was a nurse or certified health coach. The care coach would talk further with the member and create some type of plan. According to FE4, the next step was a referral to a clinical operations coordinator, who would set up appointments with a psychiatrist, dietitian, counselor, or other specialist in Ontrak's network, generally within the health plan customer's network. Ontrak members could not make their own appointments with

these specialists. If an Ontrak member did not have transportation, a community care coordinator would pick them up, provided there was one in the area. FE1 explained that Ontrak's program was 52 weeks long.

47. According to FE4, the largest source of Ontrak members was Aetna. FE4 stated that Aetna made up more than 85% of Ontrak's outreach pool.

48. According to FE4, Aetna paid Ontrak $750 for each member that Ontrak enrolled in a program. Aetna was deeply involved in Ontrak's strategy with its Ontrak members. For example, Aetna was the only Ontrak customer that provided scripts for member engagement specialists to use with potential members.

49. According to FE6, a quality assurance analyst at Ontrak, Ontrak billed Aetna for every interaction that an Ontrak member had with a care coach, who would check in with each member once per month. FE7, who worked as a member engagement specialist, explained that Ontrak routinely enrolled members who were later determined to be ineligible. According to FE7, this was normally because the program that was appropriate for them would not be covered by their health insurance plan. But Ontrak would keep these members enrolled for 90 days or longer anyway. This practice enabled Ontrak to bill Aetna for three months of contacts with care coaches, even as Ontrak employees knew from the outset that the member would eventually have to be unenrolled. In other words, Ontrak would enroll Aetna members who the Company knew were not actually eligible for

programs in order to collect fees for their contacts with care coaches until Aetna made the final determination that they were not eligible.

50. FE8 confirmed that Ontrak was enrolling members who were not actually eligible for services. FE8 was appointed to a data algorithm team that was set up to find out why so many of Aetna's enrolled members were then deemed to be ineligible for services. According to FE8, this often happened because the Aetna Medicare plans did not include mental health coverage. FE8 learned that Ontrak was billing for services that patients were ineligible to receive because sometimes Aetna would still pay Ontrak after it submitted its first bill, even if there was no coverage, and that because of those payments, the Company's management did not want to fix this problem.

51. FE1 also confirmed that Ontrak was enrolling members who then quickly fell off the Company's radar. From reviewing and monitoring records and escalated complaints, FE1 saw that member engagement specialists and care coaches were just enrolling people who would never complete programs, and who sometimes did not even consent to enrollment, so that Ontrak had a chance to temporarily collect payments from Aetna for contacts with care coaches.

52. FE3, whose job was to develop a way to quantify the benefit that Aetna was receiving by using Ontrak's services, explained that by May 2020, Ontrak's relationship with Aetna was in dire straits because Aetna had serious questions

about the value that Ontrak provided. According to FE3, in May 2020, Aetna turned off its data feed of records, which had been generating new potential contacts for member engagement specialists. This was a serious development. Without that data feed, member engagement specialists could not reach out to new potential members. Indeed, FE5 reported that he stopped receiving new Aetna members to contact by approximately September 2020, and was instead asked to recontact the same people over and over.

53. FE2 participated in conference calls every Friday between Aetna and Ontrak personnel to discuss ongoing issues. Other Ontrak personnel who participated included Fisher, Charles Polatsek ("Polatsek") and the Company's Vice President of Sales and Strategic Partnerships.

54. FE2 reported that the tone of the Friday meetings changed after Dr. Bill Gillis ("Gillis") began joining them. Gillis, the Clinical Director of Behavioral Health Operations and Program Design at Aetna, was suspicious of Ontrak's billing and skeptical about whether Aetna was getting a return on its investment in Ontrak's services. According to FE2, Gillis would regularly "tear us a new one" on the Friday calls.

55. According to FE2, the biggest point of contention was that Aetna objected to being billed for months when services were not provided, even though the contract technically allowed Ontrak to bill for the months starting with

enrollment and going forward. Ontrak argued that the members did get to talk to care coaches, but Aetna started to request records and determined that Ontrak members were not contacted by care coaches for two or three months, even as the Company continued to bill Aetna. Gillis and his Aetna colleagues were raising this issue even before the CAP, which was issued in July 2020.

56. FE2 suspected long before the CAP that Ontrak was in danger of losing the Aetna contract. When Medeiros joined the Company as President and COO in December 2019, FE2 met with him one-on-one weekly for his first two months. In those meetings, FE2 expressed her concerns about Aetna and told Medeiros that the billing model was bad, and that Ontrak could not sustain it.

57. FE1, FE2, and FE3 confirmed that in July 2020, Aetna transmitted the CAP to Ontrak, seeking meaningful measures of the benefits created by using Ontrak's services. The CAP asked Ontrak to answer questions about billing and required Ontrak to correct a list of things, including providing evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members. Aetna was also seeking to recoup some of the money it had paid for the enrollment of Ontrak members who never received any services. According to FE2, Aetna gave Ontrak 60 days to answer the CAP.

58. After seeing the CAP, FE1 was convinced that Ontrak was going to lose the Aetna contract. FE2 stated that she considered the CAP the beginning of the end of Ontrak's relationship with Aetna.

59. In July 2020, FE1 participated in three days of Zoom meetings with the corporate executives to discuss Aetna's CAP. Defendant Medeiros ran the meetings from a hotel room in Florida. Ontrak put Julia Wright, the Company's Chief Medical Officer and Senior Vice President ("Wright") in charge of the CAP working group. The CAP working group also included senior executive vice president of product portfolio Bryan Kelly, Polatsek, vice president of provider network management Kim Moore, chief information technology officer Jeremiah Stoke, senior vice president Sarah Armstrong, and customer success manager Aidan Koch.

60. According to FE1, the Company executives in the CAP working group did not take the situation seriously and essentially decided to do the bare minimum to address Aetna's concerns, even though she, Fischer, and Christopher Cirigliano (the Company's Director of Compliance) told them that the CAP was serious. FE1 recalled that Polatsek said that Aetna was just trying to scare Ontrak, and would not really take any action. FE1 told Polatsek that perhaps he knew more as the account representative, but that there were problems that needed to be fixed.

61. FE2 was responsible for nearly half of the deliverables required for Ontrak's CAP response. The CAP included 11 items, five from FE2's function. After providing Medeiros and Kelly with the needed data, she and her team were excluded from further work on the response.

62. According to FE1, Ontrak never fully completed the CAP or answered Aetna's questions, giving Aetna an incomplete response. FE2 stated that after Ontrak made its response, three months went by without Aetna even acknowledging it.

63. According to FE7, in the summer of 2020, Aetna began posting member engagement specialists position jobs on sites such as Indeed and Glassdoor. Member engagement specialists at Ontrak who saw these postings and knew that Aetna made up much of Ontrak's business, became concerned that Aetna was going to replace Ontrak with an in-house department. The Company had monthly Zoom calls for all employees, and according to FE7, at an all-hands Zoom call in late summer or early autumn of 2020, an employee asked members of senior management during a question and answer session if they should be nervous about their jobs. Members of management did not answer the question.

64. FE3 stated that by the end of 2020, she was uneasy about the Aetna contract renewal, since the Company still had not satisfied the CAP. FE7 stated that

in the Company's January or February monthly all-employees Zoom call, Defendant Peizer commented that he would "pray" that Aetna signed.

65. FE6 stated that in January or February 2020, Defendant Peizer sent a Company-wide email to say that he had just found out that Aetna was not going to be renewing. In a follow-up meeting, Peizer told Ontrak employees that there were no plans to lay anyone off, and that Ontrak could recover.

66. FE9 also recalled the Company-wide meeting about the loss of the Aetna contract. FE9 stated that this was a Zoom meeting held in late January or early February. FE9 stated that Peizer was actually crying throughout his presentation, as he told employees that Ontrak would survive and there would be no layoffs.

**False and Misleading Statements Concerning Aetna**

67. On August 5, 2020, Ontrak announced its second quarter 2020 financial results. In a press release, Defendant Peizer stated that during the quarter, Ontrak "grew [its[ pipeline of potential new customers to its most robust level in the company's history."

68. This statement was false and misleading. Defendants Ontrak, Peizer, LaVerne, and Medeiros knew at the time that they issued this press release that Ontrak's pipeline of customers was threatened by the fact that Aetna, Ontrak's largest customer, had turned off its data feed of records to Ontrak in May, after

Aetna's Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment, and then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. Defendants also knew that they were not preparing a serious response to the CAP fully addressing Aetna's questions. When Defendants touted Ontrak's customer pipeline, they rendered themselves duty-bound to disclose the material danger to Ontrak's relationship with its largest customer.

69. Ontrak's quarterly report, filed on Form 10-Q on August 5, 2020 for the period ended June 30, 2020 (the "2Q 2020 10-Q"), omitted any mention of the CAP or Ontrak's problems with Aetna. Defendants Peizer and LaVerne signed the 2Q 2020 10-Q.

70. This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

71. Also on August 5, 2020, Defendants Peizer, LaVerne, and Medeiros held a conference call to discuss the Company's second quarter 2020 results. Defendant Peizer implied that Ontrak's business with Aetna was actually growing, stating:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights.

72. This statement was false and misleading. By telling analysts and investors that Ontrak expected to achieve "new heights" while mentioning possible further expansions of its Aetna business and omitting that Aetna had turned off its data feed of records to Ontrak in May and then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services, Peizer materially misled investors about the state of the Company's relationship with its largest customer. In addition, by touting "enhancements to our algorithms feeding the outreach pool," Peizer materially misled investors about what Ontrak's outreach

pool actually was: lists of names of people to contact that were generated by Ontrak's customer health plans. More, by discussing "enhancements to our algorithms feeding the outreach pool" without disclosing that the Company's largest customer, Aetna, which made up more than 85% of Ontrak's outreach pool, had actually stopped providing potential new members to Ontrak, Peizer materially misled investors about Ontrak's current and near-term business.

73. These material false statements and omissions were able to inflate the value of Ontrak's stock. Ontrak's stock rose sharply in value, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. Then, on August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of 1,700,000 shares of its 9.50% Series A Cumulative Perpetual Preferred Stock (the "Series A Preferred Stock") with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $25.00 per share.

74. Ontrak announced on August 26, 2020 that it had closed the Series A Preferred Stock Offering, after raising gross proceeds of approximately $42.5 million and net proceeds of approximately $39.3 million.

75. On August 31, 2020, Ontrak announced that its common stock, which had previously been traded on the NASDAQ Capital Market, had been uplisted on the NASDAQ Global Market.

76. On September 8, 2020, Ontrak announced that it had closed the full exercise of the underwriters' over-allotment option regarding its Series A Preferred Stock Offering, resulting in aggregate gross proceeds of $48.9 million and aggregate net proceeds of $45.3 million to the Company from the public offering.

77. On November 5, 2020, Ontrak issued a press release announcing its third quarter 2020 financial results. Defendants stated that "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak."

78. This statement was materially false and misleading. Ontrak did not stop receiving new lists of contacts from Aetna because of compliance reviews that Aetna was carrying out for all its vendors despite having no compliance issues or concerns with Ontrak. Defendants Ontrak, Peizer, LaVerne, and Medeiros knew or recklessly disregarded that Aetna had serious compliance concerns specifically about Ontrak. Aetna had turned off its data feed of records to Ontrak in May (not July), after Aetna's Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, seeking to investigate the Company's billing and looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a

materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits.

79. Also on November 5, 2020, Defendants Peizer, LaVerne, and Medeiros held a conference call to discuss its third quarter 2020 results. After telling analysts that the Company expected 2021 revenue growth in excess of 100%, Defendant Peizer specifically addressed the impact of "disrupted data refreshes" at Ontrak's largest customer, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak…. ***Importantly, this is one of the plans for which we anticipate continued significant expansion.***

(Emphasis added.)

80. This statement was materially false and misleading. By stating that the company's large customer, Aetna, was conducting compliance reviews of all its vendors, Peizer materially misled investors about the reason that Aetna shut off its data feed of new potential members to Ontrak, as well as its timing. In fact, Aetna had turned off its data feed of records to Ontrak in *May,* not July, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Indeed, later on the call, Peizer said that Aetna had

previously provided data "on a monthly refresh," but by November, had not provided new data to Ontrak in five months. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value. More, Peizer knew or recklessly disregarded that the statement that the Company anticipated "continued significant expansion" of its Aetna business was materially false. In fact, Aetna was questioning Ontrak's billing and investigating its added value, not discussing potential expansion.

81. In response to a question from Charles Rhee, an analyst at Cowen and Company, LLC, Defendant Medeiros stated:

> So as far as timing with the expected data refreshes to be turned back on, we have a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year.

82. This statement was materially false and misleading. Medeiros knew or recklessly disregarded that Ontrak and Aetna did not have a mutual agreement for the data feed to be turned back on. Aetna had turned off its data feed of records to Ontrak in May, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By

November, Ontrak had submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value. Medeiros misled investors into believing that Aetna had told Ontrak that it would soon again provide new potential members to the Company.

83. Later in the call, Medeiros stated that "with Aetna, we have scheduled multiple geography expansions that we hope to sign in the fourth quarter and roll out early in the year."

84. This statement was false and misleading. Medeiros knew or recklessly disregarded that Ontrak's relationship with Aetna was in dire straits. Aetna had stopped providing potential new members to the Company and was questioning Ontrak's billing and investigating its added value, not discussing potential expansion. Medeiros nevertheless told investors, even as the Company's relationship with Aetna was in serious danger, that he anticipated expansions of its Aetna business.

85. Referring to an expansion with Aetna into potential new members with depression and anxiety, Defendant Peizer stated that while Ontrak was not including such an expansion in its projections, "I would be surprised, and we would all personally be surprised and disappointed, if the expansions that we are alluding to don't happen in 2021."

86. This statement was false and misleading. Peizer knew or recklessly disregarded that Ontrak's relationship with Aetna was in serious trouble. Aetna had stopped providing potential new members to the Company and was questioning Ontrak's billing and investigating its added value, not discussing potential expansions. By stating that he would be "surprised" if Aetna expansions did not happen, Peizer materially misrepresented the state of Ontrak's relationship with Aetna.

87. Peizer repeatedly stated that what he called the Aetna "data refresh" was not a performance issue. In response to a question from Richard Collamer Close of Cannacord Genuity Corp., Peizer stated that "it really has nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is."

88. This statement was false and misleading. Peizer knew or recklessly disregarded that Ontrak's Aetna business was in danger precisely because of a performance problem that had everything to do with the Company. Aetna had turned off its data feed of records to Ontrak in May, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of Ontrak's services. By November, Ontrak had submitted

a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value.

89. Ontrak's 3Q 2020 10-Q omitted any mention of the CAP. While the Company stated that a substantial percentage of its revenues were attributable to four large customers, any of which could terminate its services at any time, it omitted that Aetna was questioning its billing practices and added value. Defendants Peizer and LaVerne signed the 3Q 2020 10-Q.

90. This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

91. The market accepted these false and misleading explanations for why Ontrak was not enrolling new Aetna members. In its November 5, 2020 report, Cannacord Genuity Corp. explained that the Aetna data delay was because "CVS required all 3rd party vendors, including those for Aetna, to be reviewed for compliance requirements," and wrote that despite this issue, Ontrak "continued to execute." In its November 5, 2020, Cowen and Company wrote that it remained positive on Ontrak, since it had grown enrollment overall despite "a data feed issue from [Aetna]."

92. Defendants Peizer, LaVerne, and Medeiros continued to mislead investors in meetings with analysts. On November 25, 2020, Cowen and Company published a report entitled "Takeaways From Investor Meetings with Management," relating information from recent meetings with Ontrak management. Cowen wrote that "OTRK expects the data feed issue with AET to be resolved in Dec.," and reported a planned "***expansion*** with AET (already in late stages)." (Emphasis added.)

93. This statement shows that Defendants Peizer, LaVerne, and Medeiros continued to make materially false and misleading statements, materially misrepresenting the state of Ontrak's relationship with Aetna. Defendants Peizer, LaVerne, and Medeiros knew or recklessly disregarded that they had no reasonable expectation of Aetna turning its data feed back on in December. Aetna had turned

off its data feed of records after questioning Ontrak's billing practices and whether the Company provided a return on Aetna's investment and transmitted a CAP to Ontrak, looking for meaningful measures of the benefits of the Company's services. Ontrak submitted a materially incomplete response to Aetna's CAP, and negotiations to renew Aetna's contract were in dire straits, as the Company failed to provide proof of Ontrak's value. Aetna was questioning continuing its business with Ontrak, not discussing potential expansion, and much less in the late stages of an expansion of its Ontrak contract.

94. Defendants Ontrak, Peizer, LaVerne, and Medeiros continued to raise money after misleading the market. On December 15, 2020, Ontrak announced that it had commenced a follow-on underwritten public offering of 1,730,000 shares of the Series A Preferred Stock with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $24.75 per share.

95. Ontrak closed the follow-on Series A Preferred Stock offering on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million

96. Ontrak explained in its 3Q 2020 10-Q that its cash was largely raised through offering Series A Preferred Stock. Defendants were motivated to conceal

the Company's problems with Aetna so that the Company could sell preferred stock at artificially inflated prices.

**The Truth About Aetna Emerges But Defendants Continue to Lie**

97. On March 1, 2021 at 8:00 a.m., Ontrak issued a press release announcing preliminary financial results for fourth quarter and full year 2020. Therein, the Company stated that its largest customer had terminated its contract with Ontrak, effective June 26, 2021. The Company stated that this customer "evaluated Ontrak on a provider basis" and "[a]s such, the customer evaluated [Ontrak's] performance based on [its] ability to achieve the lowest possible cost per medical visit, and not on [its] clinical outcomes data or medical cost savings." The Company also stated that "the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics." Specifically, the Company's press release stated, in relevant part:

> Mr. Peizer continued, "After a long process with our largest customer where we believed we were working towards an extended and expanded contract, we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021. We were advised to stop enrollment of new members for this customer and await guidance from the customer on transition plans for the 8,400 members who are currently benefiting from the Ontrak program. We remain fully committed to the health plan and to its members, and will ensure that every member receives quality care through the transition, so that pandemic-related anxiety is not heightened by the change in the member's care team."

> Mr. Peizer added, "The relationship with our Ontrak-A customer was unique, because they evaluated Ontrak on a provider basis, not as a vendor as do all of our other health plan partners. As such, the customer evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings, which were meaningful and significant. Unlike our other health plan partners, we interacted only with the behavioral health division, with no involvement from the medical division of the plan. We believe that the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics. We have consistently found that our care coaches have a tremendously positive impact on member experience and readiness to engage with the healthcare system. This is the reason that many digital healthcare apps are now building care coaching into their products. We have a strategy in place to regain the Ontrak-A business and are currently in late stage discussions with other customers whose metrics align with our value proposition of an integrated approach to whole health that delivers an average ROI of 3.7, average cost savings of 40% to 50%, and durable clinical outcomes with exceptionally high program retention and member experience scores. Collectively, we have a market opportunity of over $30 billion."

98. As a result, Ontrak noted that it expected revenue of $100 million for 2021, rather than the $165 million it would have expected without the loss of Aetna as a customer. Conveniently, the preferred stock offerings that raised a total of $91.7 million while the Company's stock was artificially inflated from the alleged misstatements and omissions more than filled the shortfall of expected revenue.

99. In this statement, however, Defendants Ontrak, Peizer, LaVerne, and Medeiros continued to materially mislead investors. Defendant Peizer's statement that "we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021" was false and

misleading. Defendants Peizer told Company employees by early February at the latest that Aetna would not be renewing its contract with Ontrak.

100. Defendant Peizer's explanation that Aetna had decided to terminate the contract because it "evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings" was also materially false and misleading. Aetna terminated the contract with Ontrak after Ontrak failed to materially complete a CAP that 1) required answers to questions about billing, including billing for members who had been improperly enrolled in programs for which they were not eligible, 2) provide evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members, and 3) provide meaningful measures of the benefits created by using Ontrak's services.

101. On this news, Ontrak's share price fell $27.32, or more than 46%, to close at $31.62 per share on March 1, 2021.

102. In a conference call held on March 1, 2020, Defendants LaVerne and Medeiros continued to mislead investors about the events that resulted in Aetna's termination of its contract. Medeiros told analysts:

> In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time.

103. This statement was false and misleading because it effectively told investors that in December, Aetna had completed the general audit of all its vendors that had caused the data feed to Ontrak to be shut down. This was materially false. Aetna turned off the data feed to Ontrak in May 2020 because of problems with Ontrak, not a general audit of all vendors. In fact, in July 2020, Aetna had transmitted a CAP to Ontrak, which required Ontrak to justify its billing practices, demonstrate proper enrollment procedures, and provide meaningful measures of the benefits of Ontrak's services before it renewed its contract. Ontrak submitted a materially incomplete response to Aetna. Medeiros knew or recklessly disregarded that Aetna's demand to renegotiate was a response to being dissatisfied with Ontrak's answers to its questions and skeptical of its billing practices and ability to add any value.

104. Indeed, if, as Medeiros claimed, Aetna told Ontrak in mid-December that it would have to immediately renegotiate its contract, that would mean that Ontrak's late-December follow-on Series A Preferred Stock offering was a direct response to Defendants' growing realization that Ontrak was about to lose the Aetna business.

105. Medeiros further stated that "when I received the call late Friday that talked about the termination, it was a surprise. We were working towards a new agreement and an expanded relationship."

106. This statement was false and misleading. Medeiros knew or recklessly disregarded that, in fact, Aetna had notified Ontrak that it was terminating its contract materially earlier. According to FE6 and FE9, Defendant Peizer told Ontrak employees that he had just found out that Aetna would not be renewing its contract in late January or early February 2021, first in a Company-wide email and then in a follow-up Zoom meeting.

107. Defendants Peizer and Medeiros were both forced out of their management roles as a result of this fraud. On March 16, 2021, Ontrak announced that Defendant Mayhew would become Ontrak's CEO, while Peizer would instead become Executive Chairman. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros.

**False and Misleading Statements Concerning Cigna**

108. By February 2021, Cigna was also reducing the number of its members that it referred per month to Ontrak for services.

109. By April 2021, Cigna informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, because Cigna had determined that its contract with Ontrak was not resulting in the cost savings it had expected. Cigna halted discussions on any potential expansion of Ontrak's services to Cigna.

110. Between March and May 2021, Defendant Peizer learned that Cigna had raised numerous issues concerning its relationship with Ontrak and that Ontrak was in serious danger of Cigna terminating its agreement with Ontrak.

111. On or about March 31, 2021, Defendant Peizer described himself as "fixated" on Cigna in a text message to an Ontrak consultant. On or about April 2 and 14, 2021, Defendant Peizer wrote in text messages with the same consultant that Ontrak's management needed to "save Cigna." On or about April 15, 2021, Peizer wrote in a text message to Defendant Mayhew: "Please just save Cigna…then we will get back 'OnTrak.'"

112. On or about April 24, 2021, in response to an update on the relationship between Ontrak and Cigna, Defendant Peizer wrote that "This feels eerily like Aetna" and that "Baby is losing his hair from chemo," which was a reference to Ontrak's potential loss of Cigna as a customer.

113. On or about April 30, 2021, in response to another update on the Ontrak-Cigna relationship, Defendant Peizer wrote in a text message to the consultant, "Doesn't sound optimistic". The next day, he wrote in another text message to the consultant concerning Cigna, "What a nightmare."

114. By May 2021, Cigna had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month.

115. By May 4, 2021, a meeting with Cigna's Chief Medical Officer – who was managing the Ontrak-Cigna relationship on Cigna's side – had been scheduled for May 18, 2021, to discuss the status of the relationship.

116. On May 6, 2021, Ontrak announced its first quarter 2021 financial results. In a press release, Defendant Mayhew touted Ontrak's growth, stating that the Company had "expand[ed] our network of behavioral health providers to a total of over 15,000 clinicians, in anticipation of surging demand for outpatient care in the aftermath of the pandemic."

117. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time that they issued this press release that Ontrak's pipeline of customers was threatened by the fact that Cigna, Ontrak's largest remaining customer after the loss of Aetna, had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month. When Defendants Ontrak, Peizer, LaVerne, and Mayhew touted Ontrak's growth, they rendered themselves duty-bound to disclose the material danger to Ontrak's relationship with its largest remaining customer.

118. Also on May 6, 2021, Ontrak filed a Form 10-Q quarterly report with the SEC ("1Q 2021 10-Q") for the quarterly period ended March 31, 2021, omitting any mention of Cigna's reduction of the number of patients it was referring to

Ontrak and stating, among other things, that "[o]ur business currently depends upon four large customers; the loss of any one such customers would have a material adverse effect on us."

119. This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." Defendants Mayhew and LaVerne signed the 1Q 2021 10-Q.

120. Also on May 6, Ontrak held a conference call to discuss its first quarter 2021 results. Defendant Mayhew, in his first earnings call as CEO, told analysts that "we continue to have both revenue visibility and a robust pipeline as evidenced by the recent renewal of our customer contracts."

121. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time of the conference call that Ontrak's pipeline of customers was threatened by the fact that Cigna, Ontrak's largest remaining customer after the loss of Aetna, had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month. By touting Ontrak's growth, Defendants Ontrak, Peizer, LaVerne, and Mayhew rendered themselves duty-bound to disclose the material danger to Ontrak's relationship with its largest remaining customer.

122. On the May 6 call, RBC Capital Markets analyst Thomas Keller asked for a "sense of how Cigna is tracking me relative to the 40 million expected in the first year," as well for an update on timing of expansions of the Cigna business. Defendant LaVerne stated that while "we're not really commenting that specifics on individual customers….[we] ultimately expect that – believe and expect that we're going to be within [the $90 million over three years] range at least." Colliers Securities

123. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time of the conference call that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, halted discussions on any potential

expansion of Ontrak's services to Cigna, and materially reduced the number of patients that it referred to Ontrak.

124. Also on the May 6, 2021 earnings call, Colliers Securities analyst Gene Mannheimer asked: "[H[ow much of the sequential decline in the outreach pool was driven by the loss of a large customer? Was it all of it?" Defendant Mayhew responded that "[i]t was nearly all of it."

125. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time of the conference call that Cigna had also materially reduced the number of patients it referred to Ontrak, from several thousand members per month to approximately 50 members per month.

126. On May 18, 2021, Cigna informed Ontrak's management of its intent to terminate their contract by the end of the year. Defendant Mayhew notified Defendant Peizer about this information on the same day. Defendants Ontrak, Peizer, LaVerne, and Mayhew did not disclose this information to investors.

127. After informing Ontrak that intended to terminate their contract by the end of 2021, Cigna continued to reduce the number of patients that it referred to Ontrak. For example, on or about July 15, 2021, an Ontrak consultant informed Defendant Peizer that Cigna was "really throttling members being sent to us. It's a trickle at this point."

128. On August 5, 2021, Ontrak announced its second quarter 2021 financial results. In a press release, Defendant Mayhew touted "important progress on our growth initiatives to expand our addressable market…. Customers, prospects, providers and members have provided encouraging feedback on our product roadmap and care pathways."

129. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time that they issued this press release that Ontrak's growth was threatened by the fact that Cigna, its largest remaining customer, had told Ontrak that it would terminate its contract by the end of the year. When Defendants Ontrak, Peizer, LaVerne, and Mayhew touted Ontrak's growth, they rendered themselves duty-bound to disclose that Ontrak's relationship with its largest remaining customer was imminently ending.

130. Also on August 5, 2021, Ontrak filed a Form 10-Q quarterly report with the SEC ("2Q 2021 10-Q") for the quarterly period ended June 30, 2021, omitting any mention of Cigna's reduction of the number of patients it was referring to Ontrak and stating, among other things, that "[o]ur business currently depends upon four large customers; the loss of any one such customers would have a material adverse effect on us."

131. This omission was materially false and misleading. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as

a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." Defendants Mayhew and LaVerne signed the 1Q 2021 10-Q.

132. Also on August 5, 2021, Ontrak held a conference call to discuss its second quarter 2021 results. Defendant Mayhew again stated that during the quarter, "we made important progress on our growth initiatives to expand our addressable market." Despite describing in detail a "listening tour" with Ontrak customers, he did not disclose that Cigna had told Ontrak on May 18, 2021 that it would terminate their contract by the end of the year.

133. This statement was materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time of the conference call that Cigna would be terminating its contract by the end of the year. When Defendants

Ontrak, Peizer, LaVerne, and Mayhew touted Ontrak's growth and claimed to describe in detail customer feedback, they rendered themselves duty-bound to disclose that Ontrak's relationship with its largest remaining customer was imminently ending.

134. Even more specifically, Defendant Mayhew told analysts and investors:

> "Key account leaders within our customer organizations tell us that their major accounts value the Ontrak program. We're well positioned to heighten the value that health plans create for commercial populations by building trust, engagement and readiness with employees so that their employers experience higher enterprise loyalty and commitment levels.
>
> As we've begun testing receptivity to the growth initiatives, not only with our customers, but with prospects and providers, the feedback has been very positive. We've seen an increase in initial discussions in recent weeks in our sales pipeline. While it's still early, we're encouraged by dialogue we are having with health plans, provider groups and employer organizations."

135. This statement was materially false and misleading because it omitted that Cigna, Ontrak's largest customer, had told the Company it was terminating its contract by the end of the year. When Defendants Ontrak, Peizer, LaVerne, and Mayhew touted Ontrak's growth and claimed to describe in detail customer responses and feedback, they rendered themselves duty-bound to disclose that Ontrak's relationship with its largest remaining customer was imminently ending.

136. In response to a question from Sean Dodge of RBC Capital Markets, Defendant Mayhew stated, "our pipeline is growing, the quality of the pipeline is very good and it's very balanced."

137. This statement was materially false and misleading because it omitted that Cigna, Ontrak's largest customer, had told the Company it was terminating its contract by the end of the year, and had already reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month.

**The Truth About Cigna Emerges**

138. On August 18, 2021, during a scheduled call, Cigna formally notified Ontrak that it would terminate its contract with the Company.

139. On August 19, 2021, Ontrak filed a form 10-K with the SEC disclosing, for the first time, the termination of its business with Cigna. On this news, the Company's stock price fell by $9.37/share or over 44%, to close at $11.68/share on August 19, 2021, materially harming investors.

**Defendant Peizer's Insider Stock Sales**

140. Between May 2021 and August 2021, Defendant Peizer carried out an insider trading scheme to avoid personal losses when the truth about Cigna would eventually be revealed to the market.

141. On or about May 4, 2021, in advance of Ontrak's May 18, 2021 meeting with Cigna, Defendant Peizer contacted a broker ("Broker A") to set up a Rule 10b5-1 plan in order to sell shares of Ontrak valued at approximately $19 million. After being informed that Broker A required the 10b5-1 plan to have a cooling-off period, Peizer contacted another broker ("Broker B)" instead. While Broker B did not require a cooling-off period, they did warn Peizer that not following the industry best-practice of a 30-day cooling-off period, together with "rapid transaction executions subsequent to plan adoption" might "create an appearance of impropriety and call into question whether a plan adopter had MNPI [material non-public question whether a plan adopter had MNPI [material non-public." Defendant Peizer insisted that the plan not have a cooling-off period and and that he be allowed to start selling his shares as soon as possible.

142. To obtain approval of the 10b5-1 plan, Defendant Peizer falsely certified that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy."

143. On or about May 10, 2021, eight days before Cigna told Ontrak that it would terminate their contract by the end of the year, Defendant Peizer entered into a Rule 10b5-1 plan (the "May Trading Plan") through Broker B. The May Trading Plan was in the name of Acuitas Group Holdings, an investment company wholly

owned by Peizer, which he used to hold his interests in various companies, including Ontrak. As part of the May Trading Plan, defendant PEIZER falsely certified to Broker B that he was not in possession of material nonpublic information. Peizer directed Broker B to begin selling his Ontrak shares the next day.

144. Pursuant to the May Trading Plan, Defendant Peizer exercised approximately 686,000 Ontrak stock warrants on a cashless basis, resulting in his acquisition of approximately 585,000 shares. He then began selling these shares on or about May 11, 2021, and continued to do so until on or about July 20, 2021. The sales from on or about May 11, 2021, to on or about July from on or about May 11, 2021, to on or about July.

145. After learning on May 18, 2021 that Cigna would terminate its contract with Ontrak by the end of the year, Peizer continued to receive updates about the situation. For example, on or about July 15, 2021, an Ontrak consultant sent a text message informing Defendant Peizer that Cigna was "really throttling members being sent to us. It's a trickle at this point."

146. On or about August 13, 2021, Ontrak's Senior Vice President and General Manager of Customer Strategy and Solutions, who was leading the contract renegotiations with Cigna, told Peizer that he believed Cigna was likely to formally terminate its relationship with Ontrak. Approximately one hour after that phone

call, Defendant Peizer entered into a second Rule 10b5-1 plan (the "August Trading Plan") with Broker B to sell more of his Ontrak shares.

147. Prior to implementing the August Trading Plan, Defendant Peizer falsely certified to Defendant LaVerne the that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." He also falsely certified to Broker B that he was not in possession of material nonpublic information.

148. Like the May Trading Plan, Defendant Peizer began selling Ontrak shares the next trading day after the plan was implemented. He increased the daily number of shares sold pursuant to his plan to 15,000 per day from 11,000 shares per day under the May Trading Plan.

149. Prior to Ontrak's public announcement that Cigna had terminated its contract with Ontrak, Defendant Peizer sold approximately 45,000 Ontrak shares over the course of three trading days, from on or about August 16 to on or about August 18, 2021, resulting in approximately $900,000 in proceeds.

150. Through the May Trading Plan, Defendant Peizer avoided approximately $12,069,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares. Through the August Trading Plan, Defendant Peizer avoided approximately $463,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares.

151. The cooperation of Defendants Mayhew and LaVerne was a necessary part of Defendant Peizer's insider trading scheme. Defendant Mayhew regularly provided Peizer with updates on Ontrak's relationship with Cigna during the time that he was carrying out his scheme, and in order to enter into each of the trading plans, Defendant Peizer made certifications to Defendant LaVerne that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." Mayhew and LaVerne permitted Peizer to carry out his plans, even as they knew that he knew that Cigna would terminate its contract with Ontrak by the end of 2021.

## CLASS ACTION ALLEGATIONS

152. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased Ontrak publicly traded common stock on U.S. Exchanges between August 5, 2020 and August 19, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

153. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ontrak's shares actively traded on

the NASDAQ markets. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Ontrak shares were traded publicly during the Class Period on the NASDAQ markets. Record owners and other members of the Class may be identified from records maintained by Ontrak or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

155. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

156. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ontrak; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

157. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

158. The market for Ontrak securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, Ontrak securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Ontrak securities and the market information relating to Ontrak, and have been damaged thereby.

159. During the Class Period, the artificial inflation of Ontrak stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ontrak's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Ontrak and its business and financial condition, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Ontrak's securities at such artificially inflated prices, and each of them has been damaged as a result.

160. At all relevant times, the market for Ontrak securities was an efficient market for the following reasons, among others:

a) Ontrak stock met the requirements for listing, and was listed and actively traded on the NASDAQ Capital Market and the NASDAQ Global Market, highly efficient and automated markets;

b) As a regulated issuer, Ontrak filed periodic public reports with the SEC;

c) Ontrak regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

d) Ontrak was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

161. As a result of the foregoing, the market for Ontrak securities promptly digested current information regarding Ontrak from all publicly available sources and reflected such information in Ontrak's stock price. Under these circumstances, all purchasers of Ontrak securities during the Class Period suffered similar injury through their purchase of Ontrak securities at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

162. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements

pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

163. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

164. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

165. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ontrak securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Ontrak securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

166. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ontrak securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ontrak's business and operations.

167. By virtue of their positions at Ontrak, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of

the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

168. Defendants Ontrak, Peizer, LaVerne, and Medeiros were motivated to make false statements and omit material information necessary to make the statements between August 5, 2020 and March 1, 2021 not misleading in order to carry out an offering of preferred stock that raised gross proceeds of approximately $42.8 million for the Company.

169. Defendants Ontrak, Peizer, LaVerne, and Mayhew were motivated to make false statements and omit material information necessary to make the statements between March 1, 2021 and August 19, 2021 not misleading so that Peizer could carry out an insider trading scheme to avoid personal losses.

170. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Ontrak, the Individual Defendants had knowledge of the details of Ontrak's internal affairs.

171. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ontrak. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ontrak's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ontrak securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ontrak's business which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ontrak securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

172. During the Class Period, Ontrak securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ontrak securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other

members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ontrak securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ontrak securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

173. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

174. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been materially misleading investors about its relationship with Aetna.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

175. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

176. During the Class Period, the Individual Defendants participated in the operation and management of Ontrak, and conducted and participated, directly and indirectly, in the conduct of Ontrak's business affairs. Because of their senior positions, they knew the adverse non-public information about Ontrak's current and future business prospects.

177. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ontrak's business practices, and to correct promptly any public statements issued by Ontrak which had become materially false or misleading.

178. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ontrak disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ontrak to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ontrak within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ontrak securities.

179. Each of the Individual Defendants, therefore, acted as a controlling person of Ontrak. By reason of their senior management positions and/or being directors of Ontrak, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ontrak to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ontrak and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

180. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ontrak.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 27, 2023 Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

and

Brian Schall, Esq.
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

Lead Counsel for Lead Plaintiff

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On March 27, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 27, 2023, at New York, New York.

/s/ Laurence Rosen

Laurence M. Rosen