Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq. (pro hac vice)
Leah Heifetz-Li, Esq. (pro hac vice)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for the Class

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL FARHAR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONTRAK, INC., TERREN S. PEIZER, BRANDON H. LAVERNE, CURTIS MEDEIROS, and JONATHAN MAYHEW,<br><br>Defendants. | ) | Master Docket No. 2:21-cv-01987-FLA-E (consolidated with Case No. 2:21-cv-02460-FLA)<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

| | | |
|---|---|---|
| | | Judge: Hon. Fernando L. Aenlle-Rocha<br>Date: July 28, 2023<br>Time: 1:30 p.m.<br>Courtroom: 6B<br><br>Complaint Filed: March 3, 2021 |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

A. Ontrak's Practice of Improperly Billing Aetna ..... 2

B. Immediately Prior to the Class Period, Aetna Starts Investigating Ontrak and Stops its Data Feed ..... 3

C. The Class Period Begins As Defendants Mislead Investors ..... 3

D. Defendants Continue to Mislead Investors About Cigna ..... 5

III. ARGUMENT ..... 7

A. Legal Standard ..... 7

B. Defendants' Misrepresentations Are Material and Actionable ..... 7

i. The Former Employees Are Credible and Reliable Confidential Witnesses ..... 8

ii. Facts From the Peizer Indictment Are Sufficiently Pled ..... 12

iii. Defendants' Omissions of Critical Context Are Actionable ..... 12

iv. Defendants' False and Misleading Statements Are Not Protected By The Safe Harbor ..... 15

v. No Statement Is Inactionable Puffery or Opinion ..... 16

C. The Complaint Raises a Strong Inference of Scienter ..... 17

D. The Complaint Pleads Loss Causation ..... 23

E. The Complaint Adequately Pleads Control Person Liability ..... 25

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .......... 17, 19

*Braun v. Ontrak, Inc.*,
No. 22STCV07174, 2022 WL 5265052 .......... 14

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) .......... 8

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) .......... 16

*Chiarella v. United States*,
445 U.S. 222 (1980) .......... 22

*Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007) .......... 18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 23

*Farrar v. Workhorse Grp., Inc.*,
No. CV2102072CJCPVCX, 2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) .......... 10

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .......... 13

*Greenfield v. Pro. Care, Inc.*,
677 F. Supp. 110 (E.D.N.Y. 1987) .......... 12

*Hemmer Grp. v. SouthWest Water Co.*,
527 F. App'x 623 (9th Cir. 2013) .......... 8

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................................................13, 14

*In re Amgen Inc. Sec. Litig.*,
No. CV072536PSGPLAX, 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........24

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)..........................................................................24

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
No. 3:12-CV-1737 JM WMC, 2013 WL 5206216
(S.D. Cal. Sept. 13, 2013) ..............................................................................17

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..........................................................11

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................ 9, 12, 18, 20

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ........................................................................24

*In re Gilead Scis. Sec. Litig.*,
No. C 03-4999 SI, 2009 WL 1561584 (N.D. Cal. June 3, 2009) .......................13

*In re Gilead Scis. Sec. Litig.*,
No. C 03-0100 SI, 2009 WL 3320492 (N.D. Cal. Oct. 13, 2009)......................10

*In re Hienergy Techs., Inc.*,
No. SACV04-1226DOC(JTLX), 2005 WL 3071250
(C.D. Cal. Oct. 25, 2005) ..............................................................................22

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..............................................................7

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ....................................................................14, 23

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................15

*In re Questcor Sec. Litig.*,
*No. SA CV* 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013).........13

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012)....................21

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002)....................23

*In re UBS AG Sec. Litig.*,
No. 07 CIV. 11225 RJS, 2012 WL 4471265....................12, 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)....................20

*In re Zillow Grp., Inc. Sec. Litig.*,
No. C17-1387-JCC, 2018 WL 4735711 (W.D. Wash. Oct. 2, 2018)....................10, 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)....................23

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012)....................22

*Lambert v. Baker Tilly Hong Kong Ltd.*,
No. 2:14-cv-9959–CBM-(MANx), 2016 WL 6272465
(C.D. Cal. May 23, 2016)....................24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)....................7

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)....................24

*Longo v. OSI Sys., Inc.*,
No. CV 17-8841 FMO (SKX), 2021 WL 1232678
(C.D. Cal. Mar. 31, 2021)....................19

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009)....................18

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................7, 8, 12

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008)....................8, 12

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .................................................... 15, 16, 17

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)..........................................................................25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) .......................................................................19

*Oh v. Hanmi Fin. Corp.*,
621 F. Supp. 3d 1075 (C.D. Cal. 2022) ......................................................17, 21

other grounds by *City of Dearborn Heights 345 Police & Fire Retirement Sys. v. Align Technology*,
856 F.3d 605 (9th Cir. 2017).........................................................................19

*Owens v. Kaiser Found. Health Plan, Inc.*,
244 F.3d 708 (9th Cir. 2001)..........................................................................25

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014).....................................................................19, 21

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001)..........................................................................11

*S. Ferry LP No. 2 v. Killinger*,
399 F. Supp. 2d 1121 (W.D. Wash. 2005)...................................................15, 17

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008).....................................................................18, 19

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ..........................................................21

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)..............................................................................14

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...................................................................................7, 18

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)...........................................................................................8

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ....................15

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
655 F.3d 1039 (9th Cir. 2011) ....................25

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009).................... passim

**Statutes**

15 U.S.C. § 78t(a) ....................25

**Rules**

Fed. R. Civ. P. 15....................25

**Regulations**

17 C.F.R. § 229.303 ....................14

Lead Plaintiff Ibinabo Dick ("Plaintiff") opposes Defendants'[1] motions to dismiss the Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint")[2] and states the following:

## I. INTRODUCTION

During (and before) the Class Period, Ontrak misled investors about the state of its relationships with its two largest customers, Aetna and Cigna. At the beginning of the Class Period, Ontrak was improperly billing Aetna. When Aetna raised questions and ordered the Company to complete a Corrective Action Plan ("CAP") addressing billing, Defendants Peizer, LaVerne, and Medeiros failed to disclose this material risk to Ontrak's revenue. Instead, they misled investors, claiming that the only reason that Ontrak was no longer receiving new referrals from Aetna was a standard compliance review for all its vendors. They never disclosed the CAP. While Ontrak's stock was artificially inflated by their omissions and misstatements, it raised over $85 million in offerings of preferred stock.

After the disclosure of the loss of Aetna, Peizer, LaVerne, and Mayhew further misled investors. After Ontrak's largest remaining client, Cigna, told the Company on May 18, 2021 that it planned to terminate its contract by the end of 2021, they did not tell investors until August 19, 2021. Instead, Peizer traded on that material non-public information, fraudulently using two Rule 10b5-1 trading plans to avoid more than $12.5 million in losses when the loss of Cigna finally came out. On March 1, 2023, the U.S. Department of Justice ("DOJ") and U.S. Securities

---

[1] Defendants are Ontrak, Inc. ("Ontrak" or "Company"), former Chief Executive Officer ("CEO") Terren S. Peizer ("Peizer"), Chief Financial Officer ("CFO") Brandon H. LaVerne ("LaVerne"), former President and Chief Operating Officer Curtis Medeiros ("Medeiros"), and former CEO Jonathan Mayhew ("Mayhew"). Peizer, LaVerne, Medeiros, and Mayhew are the "Individual Defendants." Plaintiff cites to Ontrak, Laverne, and Medeiros' Memorandum of Points and Authorities in Support of their Motion to Dismiss (Dkt. No. 100), which Defendant Peizer joined (Dkt. No. 101) as "Def. Br __." Plaintiff cites to Mayhew's Supplemental Memorandum in Support of Motion to Dismiss and Joinder (Dkt. No. 108) as "Mayhew Br. __."

[2] References to "¶__" are to the Complaint.

and Exchange Commission ("SEC") announced charges against Peizer and unsealed an indictment that detailed his scheme.

The Complaint sufficiently pleads that Defendants materially misled investors, raises a strong inference of scienter, and alleges loss causation. Defendants' motions to dismiss should be denied.

## II. STATEMENT OF FACTS

Ontrak markets itself as a technology-enabled healthcare company that uses predictive analytics to connect with members of its customer health plans who generate high healthcare costs with cost-reducing programs. ¶¶31, 42. In reality, its member engagement specialists simply enroll members by calling them from lists provided by the Company's customers. ¶43. Ontrak relied on stock sales to finance its operations, raising cash primarily through offering shares of its 9.50% Series A Cumulative Perpetual Preferred Stock ("Preferred Stock"). ¶96.

### A. Ontrak's Practice of Improperly Billing Aetna

At the beginning of the Class Period, Ontrak's largest customer was Aetna. Aetna generated 63.9% of Ontrak's revenue for the three months ended September 30, 2020. ¶32. According to Former Employee 4 ("FE4")[3], Aetna members were more than 85% of Ontrak's outreach pool. ¶¶36, 47. Aetna paid Ontrak $750 for each member that it enrolled in a program. ¶48. According to Former Employee 6 ("FE6")[4], Ontrak also billed Aetna for every interaction that a member had with a care coach, who would check in with each member monthly. ¶¶49.

It was routine practice at Ontrak to enroll Aetna members that Ontrak staff knew were actually ineligible for the programs they were enrolled in, typically because the program would not be covered by their health plan. *Id.* Ontrak would keep these members enrolled for 90 days or longer anyway before disenrolling

---

[3] FE4 was Ontrak's director of member engagement specialists training until March 2021.

[4] FE6 was a quality assurance analyst at Ontrak until March 2021.

them, enabling the Company to bill Aetna for the $750 enrollment fee and three months of contacts with care coaches. *Id.*

### B. Immediately Prior to the Class Period, Aetna Starts Investigating Ontrak and Stops its Data Feed

Due to these issues, by May 2020, Aetna was questioning Ontrak's value. ¶52. Former Employee 2 ("FE2")[5] attended weekly meetings with Dr. Bill Gillis, Aetna's Clinical Director of Behavioral Health Operations and Program Design. According to FE2, Dr. Gillis was particularly suspicious of Ontrak's billing. ¶54.

In May 2020, Aetna turned off the data feed that had been generating names for Ontrak's member engagement specialists to call. Without that feed, Ontrak would soon start running out of new potential members to enroll, and would not be able to sign new members up and make money. ¶52. Then, in July 2020, Aetna transmitted the CAP to Ontrak, seeking answers to questions about Ontrak's billing practices. ¶57. The CAP required Ontrak to provide evidence it was using proper procedures to enroll and retain members. *Id.* Aetna also sought to recoup some money it had paid for the enrollment of members who never received any services. *Id.* Aetna gave Ontrak 60 days to answer the CAP. *Id.*

After receiving the CAP, Ontrak's senior management convened three days of meetings to discuss it, led by Medeiros. ¶59. Former Employee 1 ("FE1")[6] participated, along with Medeiros and other executives. Medeiros appointed a CAP working group, which decided to do the bare minimum to address the CAP. ¶¶60-62. Ontrak never fully completed the CAP or answered Aetna's questions. ¶¶62.

### C. The Class Period Begins As Defendants Mislead Investors

The Class Period begins on August 5, 2020, when Ontrak announced its second quarter 2020 financial results, touting its pipeline of potential new customers

---

[5] FE2 was Ontrak's director of operations until July 2021.

[6] FE1 was Ontrak's director of quality and organizational performance until December 2020.

as at “the most robust level in the Company’s history.” ¶67. Yet the data feed from Aetna had been off since May 2020. ¶52. Nor was there any disclosure about the CAP. *See, e.g.*, ¶¶55, 68. Instead, on the Company’s August 5, 2020 earnings call, Peizer referred to potential expansions of Ontrak’s business with Aetna. ¶71.

Ontrak’s stock rose sharply in response, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. Then, on August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of 1,700,000 shares of its Preferred Stock. ¶73. The offering raised aggregate net proceeds of $45.3 million to Ontrak. ¶¶74-76.

On November 5, 2020, Ontrak announced its third quarter 2020 financial results. ¶77. In a press release, Ontrak disclosed that Aetna had stopped providing new outreach targets, but explained the problem away, stating: “New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak.” ¶77. On an earnings call, Peizer downplayed the impact of “disrupted data refreshes” by Aetna, stating that the Company still anticipated an expansion of its Aetna business and that the disruption was not a performance issue. ¶¶79, 87. Medeiros stated that Ontrak and Aetna had a “mutual agreement” that the data feed would be turned back on by the end of 2020. ¶81. No one mentioned the CAP. ¶89.

Analysts accepted this explanation for why Ontrak was not enrolling new Aetna members, including it in their reports. ¶¶91-92. On December 15, 2020, Ontrak announced that it had commenced a follow-on offering of 1,730,000 shares of Preferred Stock, raising net proceeds of approximately $39.7 million. ¶¶94, 95.

In January or February 2021, Peizer wrote in a Company-wide email that he had just found out that Aetna was not going to renew its contract. In a follow-up Company-wide Zoom meeting held in late January or early February, Peizer told employees that Ontrak would survive the loss of Aetna. ¶¶65-66.

Investors finally learned about the loss of Aetna on March 1, 2021, when Ontrak issued a press release announcing preliminary results for fourth quarter and full year 2020 and disclosing that Aetna had terminated its contract, effective June 26, 2021. ¶¶32, 97. The release did not mention the CAP. ¶97. On this news, Ontrak's share price fell $27.32, more than 46%, closing at $31.62 per share on March 1, 2021. ¶101.

On a call with analysts that day, Medeiros stated that Aetna told Ontrak in mid-December that it would not turn the data feed back on without a new contract. ¶102. In other words, as soon as Peizer, LaVerne, and Medeiros learned that Aetna would not resume the data feed, Ontrak commenced its follow-on Preferred Stock offering. ¶94. Medeiros claimed that Aetna had notified him that it would not renew on February 26. ¶¶102-105. But Peizer had told Ontrak employees about the loss in January or early February. ¶¶66-66, 99. Ontrak noted that the loss of Aetna lowered its expected revenue to $100 million for 2021, rather than the $165 million it would have expected with Aetna. Conveniently, the offerings that raised a total of $85 million while the Company's stock was artificially inflated from Defendants' misstatements and omissions more than filled the shortfall. ¶98.

In the wake of this news, Peizer and Medeiros were both forced to step down. On March 16, 2021, Ontrak announced that Mayhew would become Ontrak's new CEO. While Peizer, who is Ontrak's majority shareholder, became its Executive Chairman, he was forced to give up day-to-day control. On April 8, 2021, Ontrak announced the resignation of Medeiros. ¶107.

### D. Defendants Continue to Mislead Investors About Cigna

After the loss of Aetna, Cigna became Ontrak's largest customer. But at the same time that Ontrak lost Aetna, it ran into trouble with Cigna. By February 2021 (approximately the same time Ontrak learned Aetna was not renewing), Cigna was also reducing the number of members it referred to Ontrak. ¶108. By April 2021, Cigna informed Ontrak that its contract would have to be renegotiated, because

Ontrak's services were not providing the value Cigna had expected. ¶109. By May, Cigna had reduced the number of patients that it referred from several thousand members per month to approximately 50. ¶114.

Peizer learned that Ontrak was in danger of losing Cigna's business in March 2021. ¶110. Then, on May 18, 2021, Mayhew, LaVerne, and Peizer learned that the business was lost. At a meeting, Cigna informed Ontrak's management that it intended to terminate the contract by the end of 2021. ¶126. Mayhew and LaVerne failed to disclose this even as they touted customer growth and expansion. For example, during an earnings call on August 5, 2021, Mayhew described a "listening tour" with customers and cited progress in growth initiatives. ¶¶132, 134. These misstatements were especially egregious since Ontrak had revealed it lost Aetna on March 1, 2021, and the investment community was hyper focused on Ontrak's remaining business.

Meanwhile, Peizer carried out a criminal insider trading scheme. On or about May 4, 2021, in advance of Ontrak's May 18, 2021 meeting with Cigna, Peizer contacted a broker to set up a Rule 10b5-1 plan to sell approximately $19 million of Ontrak shares. After learning that this broker required the plan to have a 30-day cooling-off period, Peizer turned to another broker who did not, and set up the plan on or about May 10. ¶¶141-143. Peizer used this plan to sell Ontrak shares. On or about August 13, 2021, an Ontrak executive told Peizer that he believed Cigna was likely to formally terminate its contract. ¶146. Approximately one hour after that call, Peizer entered into a second Rule 10b5-1 plan to sell more shares. *Id.*

Peizer could not have carried out his scheme without Mayhew and LaVerne. Mayhew provided Peizer with updates on Cigna while he was illegally trading on this information. To enter into each plan, Peizer had to certify to LaVerne that his proposed dealing was not a result of access to material nonpublic information. ¶151.

On August 18, 2021, Cigna formally notified Ontrak that it was terminating

its contract. ¶138. After the Company disclosed this news the following day, Ontrak's stock price fell by $9.37/share, over 44%, closing at $11.68/share on August 19, 2021. ¶139. Peizer has been charged with insider trading. ¶15.

## III. ARGUMENT

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To plead a plausible claim, "detailed factual allegations" are not required. *Id.* In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320–22 & n.4 (2007).

More, "[a] factual determination by the court is inappropriate in a Rule 12(b)(6) dismissal." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950 (9th Cir. 2005). "[T]he [Private Securities Litigation Reform Act of 1995 ("PSLRA")] in no way turns [Rule] 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008). Indeed, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

### B. Defendants' Misrepresentations Are Material and Actionable

Materiality depends on a contextual analysis of facts and circumstances.

Information is material when "a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. 27, 28. Courts will determine materiality at the pleading stage from the source, content, and context of the reports at issue. *Id.* Materiality is a mixed question of law and fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449–50 (1976)). Materiality should be resolved on the pleadings in a defendant's favor "only if the omitted fact is so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the 'total mix' of information made available to stockholders." *Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013).

"[T]o properly allege falsity, a securities fraud complaint must… specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief… state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, "statements literally true on their face may nonetheless be misleading in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

Defendants argue that Plaintiff's allegations based on the Company's former employees and filings by the DOJ and SEC are not well-pled, and characterize some statements as puffery and forward-looking statements. They are wrong on each count. The Complaint pleads that Defendants materially misled investors.

#### i. The Former Employees Are Credible and Reliable Confidential Witnesses

Defendants argue that Plaintiff's allegations concerning Aetna should be discounted because "[t]he [Complaint] does not contain any reports or other

documentary evidence supporting its allegations, but instead relies entirely on statements from unnamed FEs." Def. Br. 18. In fact, the Complaint's allegations from nine former employees ("FEs") are well-pled and support a strong inference that Defendants lied with requisite fraudulent intent.

A complaint may rely on statements from confidential witnesses to plead scienter if the statements pass two hurdles: the witness must be described with sufficient particularity to establish reliability and personal knowledge, and the statements must be indicative of scienter. *Zucco*, 552 F.3d at 995 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015–16, 1022 (9th Cir. 2005). The FEs' statements satisfy this standard, and Defendants' request that this Court ignore their allegations is meritless.

The Complaint provides sufficient details to ensure that Defendants know the identities of the FEs, and describes how they gained personal knowledge of the details they report. FE1 reviewed records and escalated complaints and saw that member engagement specialists and care coaches were enrolling people who would never complete programs, and who sometimes did not even consent to enrollment. ¶¶33, 51. FE1 participated in three days of meetings led by Medeiros to discuss how to address the CAP, and saw that the CAP working group decided not to respond substantively. ¶¶59-60. FE1 saw that Ontrak never fully completed the CAP or answered Aetna's questions. ¶62. FE2 oversaw Ontrak's billing process, and witnessed Aetna staff discovering and objecting to Ontrak's inappropriate billing. ¶¶54-55. FE2 personally told Medeiros that Ontrak's Aetna billing practices were not sustainable. ¶56. Former Employee 3 ("FE3")[7], was tasked with developing a way to quantify the benefit that the Company provided to Aetna.[8] FE3 knew from

---

[7] FE3 was Ontrak's principal design researcher and strategist during the Class Period.

[8] Defendants' argument that the Complaint's description of FE3's job title and role is insufficient (Def. Br. at 19-20) is meritless. The Complaint states FE3's title, describes her function, and names her supervisor. Nothing about this is "cryptic." *Id.* at 20. It sufficiently

her role in addressing Aetna's concerns that Aetna turned off the data feed of new customer records in May 2020.[9] ¶52. FE3 also knew that in July 2020, Aetna transmitted the CAP to Ontrak, and that Ontrak never satisfied the CAP. ¶¶57, 64.

Defendants argue that FE1 was not an account representative and FE2 was not part of business discussions between Aetna and Ontrak. Def. Br. at 22. But the Complaint does not rest on the theory that Defendants misled investors about contract negotiations.[10] Rather, it alleges that they failed to disclose a material risk to Ontrak's revenue. Because Aetna generated over 60% of Ontrak's revenue (¶32), a CAP investigating the Company's billing is material ***whether or not it threatened the contract,*** because even if Ontrak had retained Aetna, it would have had to stop billing Aetna for services it was not providing. FE2 was in charge of billing, and FE1 monitored records that showed that Ontrak was billing Aetna improperly. ¶¶51, 56-59. FE1 and FE2 regularly met with Medeiros regarding these issues. ¶¶33-34, 56. Both, along with FE3, worked on Ontrak's response to the CAP. ¶¶57-62, 64.

Defendants fail to account for the FEs' allegations holistically. See *Gilead*, 2009 WL 3320492, at *2 (underlying fraud sufficiently alleged where confidential witnesses' allegations were combined). FEs' allegations should not be scrutinized

---

describes FE3 as someone whose position provided her with working knowledge of Aetna's evaluation of Ontrak. More, her statements are corroborated by multiple other FEs. *See, e.g., In re Zillow Grp., Inc. Sec. Litig.*, No. C17-1387-JCC, 2018 WL 4735711, at *12 (W.D. Wash. Oct. 2, 2018); *In re Gilead Scis. Sec. Litig.*, No. C 03-0100 SI, 2009 WL 3320492, at *3 (N.D. Cal. Oct. 13, 2009).

[9] FE5's report that he stopped receiving new Aetna members to contact by approximately September 2020 in no way contracts FE3's statement that the data feed was turned off in May. *See* Def. Br. at 18 n.3. FE3, whose job was proving Ontrak's value to Aetna, knows exactly when the data feed was turned off; FE5, a member engagement specialist, knows when he noticed that he was calling the same prospective new members over and over again.

[10] *See also Farrar v. Workhorse Grp., Inc.*, No. CV2102072CJCPVCX, 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021) (holding that a former employee can have personal knowledge of facts even if they appear on the surface to be in a different department). In *Farrar*, Judge Carney held that the plaintiffs plausibly alleged that a human resources director would have personal knowledge regarding manufacturing because of their knowledge of the qualifications needed for various positions within the company.

in isolation; rather, the Court should draw inferences from all sources cited in the Complaint, including "public sources" and "corroboration furnished by… confidential witness accounts." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008); see also ¶28 (establishing the materiality of Aetna to Ontrak's revenue). FE4, Former Employee 5 ("FE5"), Former Employee 7 ("FE7"), and Former Employee 8 ("FE8")[11], Former Employee 9 ("FE9")[12], and FE6 each saw and took part in Ontrak's enrollment of, and billing for, ineligible Aetna members. ¶¶36-41, 43-51. FE1 corroborated this. ¶51. *See Zillow*, 2018 WL 4735711, at *12. Together with the description by FE1, FE2, and FE3 of Aetna's investigation, Ontrak's failure to complete the CAP, and the fact that Aetna was responsible for the majority of Ontrak's revenue, their statements show that there was a material, undisclosed risk to Ontrak's revenue.[13] FE6 and FE9 also recalled learning that Aetna would not renew its contract in January and February 2020, well before it became public. ¶¶65-66, 97-106.

Defendants' argument that the FEs' statements are not probative of scienter also fails. Defendants did not commit fraud by being "bad managers, or bad forecasters." Def. Br. at 20, quoting *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). They committed fraud by concealing a material risk to Ontrak's revenue. The FEs describe exactly how Ontrak improperly billed Aetna, Aetna investigated, and Ontrak failed to respond. Their specific, detailed allegations are indicative of

[11] FE5, FE7, and FE8 were all member engagement specialists at Ontrak.

[12] FE9 was Ontrak's director of community care training until March 2021.

[13] Defendants' argument that the FE3 and FE5 contradict each other regarding when Aetna turned off the data feed to Ontrak is without merit. *See* Def. Br. at 20 n. 11. FE3 reported that Aetna turned off the feed in May 2020, which meant that Aetna was no longer generating new potential contacts for member engagement specialists. ¶52. FE5, a member engagement specialist, reported that he ran out of Aetna members to contact by approximately September 2020. *Id.* It is entirely reasonable to infer that because there were already names in the system, member engagement specialists could continue to reach out to Aetna members for some time when the feed was first turned off.

scienter.[14] *See*, e.g., *Daou*, 411 F.3d at 1022 (confidential witnesses adequately described, and their allegations probative of scienter); *Zucco*, 552 F.3d at 995.

**ii. Facts From the Peizer Indictment Are Sufficiently Pled**

Defendants' argument that the Court should not consider allegations concerning Cigna that are drawn from the DOJ indictment and SEC action against Peizer is without merit. Def. Br. at 18-19. Defendants rely on *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *17 n. 17 (S.D.N.Y. Sept. 28, 2012), in which the Court found allegations from a civil lawsuit to be insufficient to support the plaintiffs' allegations. But those were self-interested allegations in a civil lawsuit about a business dispute. By contrast, the SEC and DOJ filings plead specific facts based on an FBI investigation, including Peizer's own text and email communications. *See, e.g.,* ¶111-113. Based on these facts, DOJ achieved an indictment and arrested Peizer. ¶15. Information from an indictment can be pleaded on information and belief to support allegations in a securities fraud claim. *See, e.g., Greenfield v. Pro. Care, Inc.*, 677 F. Supp. 110, 115 (E.D.N.Y. 1987).

**iii. Defendants' Omissions of Critical Context Are Actionable**

Because Aetna and Cigna generated the majority of the Company's revenue, the CAP, Aetna's data feed, and Cigna's decision to terminate its contract by the end of 2021 were material to investors. Failing to disclose these facts is actionable.

"Disclosure [of material information] is required… when necessary 'to make… statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 131 S.Ct. 1309, 1321. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller*, 519 F.3d at 886.

---

[14] Section III(C), *infra,* discusses the Complaint's scienter allegations in detail.

In *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG, 2013 WL 5486762, at *13–14 (C.D. Cal. Oct. 1, 2013), the Court held that reported sales and forecasts, while not literally false, were materially misleading, citing *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010) (once a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information."). *See also In re Gilead Scis. Sec. Litig.*, No. C 03-4999 SI, 2009 WL 1561584, at *3 (N.D. Cal. June 3, 2009) (rejecting argument that defendants had no duty to disclose off-label marketing when statements regarding sales and revenue were factually accurate and company met forecasted revenue, because off-label marketing misled the market regarding true demand); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (plaintiffs alleged falsity where, even though statements were literally accurate, defendants "promoted unapproved uses and increased per-patient dosages through improper means," "misled investors by implicitly and falsely warranting that there were no illegal practices contributing to that success," and thus "deceived investors as to the quality and nature of Amgen's earnings and revenues.").

Ontrak made disclosures that put the source of its revenues at issue (for example, by disclosing how much of Ontrak's revenue Aetna and Cigna generated, ¶32). Because Aetna was a material portion of Ontrak's revenues, Peizer, LaVerne, and Medeiros were obliged not to "deceive[] investors as to the quality and nature" of the revenues generated by Aetna, including that some resulted from enrolling members who were actually ineligible, and that Aetna had responded to this practice by stopping the data feed and issuing the CAP. *Amgen*, 544 F.Supp.2d at 1034 ("[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually

exists.").[15] Because Cigna was a material portion of Ontrak's revenues, Mayhew and LaVerne were obligated not to "deceive[] investors as to the quality and nature" of the revenues generated by Cigna[16], particularly that by May 2021, Cigna had materially reduced the number of patients that it referred to Ontrak, and that on May 18, 2021, Cigna told Ontrak that it would terminate its contract by the end of 2021. ¶¶114, 126.

Accordingly, the Complaint pleads that the failures by Peizer, LaVerne, and Medeiros to disclose that Aetna had turned off the data feed and issued the CAP, their subsequent misleading statements about the reason for the data feed shutdown, their failure to disclose why Aetna terminated its contract, the failure by Mayhew and LaVerne to disclose that Cigna had throttled its referrals, and their subsequent failure to disclose that Cigna told Ontrak on May 18, 2021 that it would terminate its contract by the end of 2021 are actionable omissions.[17]

---

[15] Defendants' failure to disclose that Aetna had shut down the data feed and issued the CAP in Ontrak's August 5, 2020 Form 10-Q, omission of the CAP in Ontrak's November 5, 2020 Form 10-Q, omission of Cigna's reduction of referrals in Ontrak's May 6, 2021 Form 10-Q, and omission of Cigna's reduction of referrals and its May 18, 2021 notice that it intended to terminate its contract by the end of 2021 in Ontrak's August 5, 2021 Form 10-Q thus also violated Item 303 of Regulation S-K, 17 C.F.R. § 229.303, which required disclosure of any "known trend[] or uncertain[y]" Ontrak faced. They also violated the requirement of Regulation S-K to disclose: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." Defendants note that *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) holds that Item 303's disclosure duty is not inevitably actionable under Section 10(b) and Rule 10b–5. Def. Br. at 18. n.9. This is the subject of a circuit split. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section 10(b)."). Plaintiff's claim recognizes that the law on this issue is not clear-cut.

[16] *Amgen*, 544 F.Supp.2d at 1034.

[17] Indeed, in *Braun v. Ontrak, Inc.*, No. 22STCV07174, 2022 WL 5265052, at *5 and *8 (Cal.Super. Oct. 04, 2022), which asserts securities fraud claims against Defendants Ontrak, Peizer, and LaVerne on behalf of holders of the Preferred Stock for material false statements and

**iv. Defendants' False and Misleading Statements Are Not Protected By The Safe Harbor**

Defendants' material false statements and omissions are not protected as forward-looking statements. Their own cited authority, *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021) makes this clear.

"[S]tatements about the future that also function as communications of current expectations… are actionable as such." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1133– 34 (W.D. Wash. 2005). In addition, "statements of past or present facts are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 965 (N.D. Cal. 2014). Some statements about the future may combine non-actionable forward-looking statements with actionable, non-forward looking statements. *Tesla*, 985 F.3d at 1190 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

Defendants' statements about future expansions with Aetna (*see, i.e.,* ¶¶71, 79) and Cigna (*see, i.e.,* ¶¶122, 128, 132) were not forward looking because, as the Ninth Circuit wrote in *Tesla*, they went "*beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contain[ed] an express or implied 'concrete' assertion concerning a specific 'current or past fact[].'" *Id.* at 1191 (emphasis in original). On November 5, 2020, Peizer stated that Defendants anticipated continued expansion with Aetna ***in the context of Aetna's disrupted data feed.*** ¶79. By touting expansion at the same time that he lied about the reason that Aetna had turned off the feed, Peizer falsely told investors that Aetna had no problem with Ontrak. *Id.* More, his omission of the then-current fact that Aetna was investigating Ontrak's billing was material in the context of expansions with Aetna

---

omissions in the registration statements, Judge Rice held that the shutdown of the Aetna data feed and CAP were material and their omissions were actionable in the context of Ontrak's disclosures and the nature of its business.

because even if those expansions happened, Aetna's discovery of improper billing would materially impact revenue from any new business. Similarly, on May 6, 2021, LaVerne stated that he expected the Cigna contract to hit the budgeted amount over three years, even though Cigna had materially reduced its referrals and halted any discussion of expansions. ¶¶122-123.[18] More, on August 5, 2021, Mayhew described a "listening tour" with customers and stated that the Company had made important progress on growth initiatives, but omitted that Cigna had told Ontrak on May 18, 2021 that it would terminate its contract by the end of 2021. ¶132.

Because these statements asserted expansions even as the defendants who made them knew that the customers involved were not just not expanding, but reducing and/or terminating their business, they are not forward-looking. The Court should hold Defendants accountable for these material misrepresentations.

**v. No Statement Is Inactionable Puffery or Opinion**

Defendants argue that Peizer's August 5, 2020 and November 5, 2020 comments about Ontrak's pipeline and expansions and Mayhew's May 6, 2021 and August 5, 2021 comments about Ontrak's pipeline, expansions, and customer response are puffery. Def. Br. at 13-14. In context, however, they misrepresented existing facts. "Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts." *Impax*, 36 F.Supp.3d 942, 966. "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance[.]" *Id.* (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)). Similarly actionable are positive

[18] Defendants attempt to explain this away by stating, with no support whatsoever, that the reduction in referrals was because Ontrak's program had somehow been *too* successful. Def. Br. at 18. The Court should not credit this unsupported assertion.

statements that "either immediately precede[] or follow[]… very specific statements of fact that supposedly justify or supply a foundation for the optimism." *Killinger*, 399 F.Supp.2d at 1130.

Accordingly, "[w]hen determining whether statements amounted only to puffery, the court must analyze the context in which the statements were made," *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 3:12-CV-1737 JM WMC, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013). Because "determining whether a given statement is material 'entails fact-intensive assessments that are more properly left to the jury[,] courts must exercise great caution." *Impax*, 36 F.Supp.3d 942, 966. A court should only dismiss on puffery grounds if the statements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.*

In this context, these statements were not puffery, but actionable misrepresentations. At the time that Peizer described Ontrak's pipeline of potential new customers as historically robust, ¶67, its largest customer had already cut off the feed that generated new member leads. At the time that Mayhew touted Ontrak's "important progress" on growth initiatives, ¶128, it had already learned that its largest remaining customer would be terminating its contract by the end of 2021. The omissions of these facts rendered such statements materially misleading. *See Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1087–88 (C.D. Cal. 2022) (statements touting "excellent" and "strong" asset quality metrics were not puffery in the context of objectively false statements concerning Hanmi's business).

### C. The Complaint Raises a Strong Inference of Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even

the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. Although an evaluation of whether a "strong inference" of scienter has been pled "must take into account plausible opposing inferences," the only "opposing" inferences to be considered are those that "one could draw from the facts alleged." *Id.* at 323–24; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 253–54 (5th Cir. 2009).[19]

The Court should "consider the totality of circumstances[.]" *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id.*

Aetna and Cigna's importance to Ontrak, as well as the personal involvement of Peizer, LaVerne, and Medeiros with Aetna and Mayhew and LaVerne with Cigna, raise a strong inference of scienter. Aetna was responsible for more than 60% of the Company's revenues, and Peizer, LaVerne, and Medeiros were personally involved in responding to Aetna's investigation. ¶32, 59. After losing Aetna, Cigna was Ontrak's largest remaining customer, and Mayhew and LaVerne personally took part in managing the relationship. ¶¶111, 132. Peizer, as Executive Chairman, monitored the Cigna business closely. ¶¶111-113. "Allegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances": the allegations (1) may be "viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter" under *Tellabs*; (2) "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," as in *Daou*,

[19] Following *Tellabs*, "a tie goes to the Plaintiff." *Commc'ns Workers of Am. Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007).

411 F.3d at 1023, and *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004); and (3) "may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 574–75 (9th Cir. 2014)[20]; see also *Zucco*, 552 F.3d at 1000 ("falsity may itself be indicative of scienter" in circumstances (2) and (3) above). The Complaint raises a sufficiently strong inference of scienter in all three circumstances.

First, Defendants' management roles are sufficient, by themselves, to raise an inference of scienter, because Aetna and Cigna were each of "such prominence" to the Company that the falsity of their statements regarding these customers is itself indicative of scienter. *Berson*, 527 F.3d at 987–88, held that the allegation that defendants were responsible for the company's day-to-day operations was sufficient to support the inference that they would have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work, even without specific facts showing knowledge. "In *Berson*… only two government agencies made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company." *Killinger*, 542 F.3d at 785 n.3. Aetna comprised over 60% of Ontrak's revenue. Cigna became Ontrak's largest customer after the loss of Aetna. Defendants were each directly responsible for day-to-day operations. It is "absurd" to suggest that Peizer, LaVerne, and Medeiros were unaware of Ontrak's improper billing and Aetna's investigation, or that Mayhew and LaVerne were unaware that Cigna told Ontrak management on May 18, 2021

---

[20] *Reese* was abrogated on other grounds by *City of Dearborn Heights 345 Police & Fire Retirement Sys. v. Align Technology*, 856 F.3d 605 (9th Cir. 2017). Its scienter analysis, however, remains Ninth Circuit law. *See, e.g., Longo v. OSI Sys., Inc.*, No. CV 17-8841 FMO (SKX), 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) (plaintiffs sufficiently alleged scienter through a core operations theory).

that it would terminate its contract by the end of 2021.

Second, Ontrak's FEs' allegations support a strong inference of scienter with respect to misstatements concerning Aetna. FE1 and FE2's accounts from meetings show that Medeiros knew that Aetna was investigating Ontrak's billing. *See*, e.g., *Daou*, 411 F.3d at 1022; *Zucco*, 552 F.3d at 995. Defendants' argument that "the Amended Complaint makes *no* attempt to connect a statement-maker's knowledge of falsity at the time the statement was made to any individual statement alleged," (Def. Br. at 21) is wrong. The Complaint pleads, based on Medeiros and Peizer's conversations with FEs and statements in company-wide calls, that they knew that Ontrak was improperly billing Aetna, that Aetna cut off the data feed and issued the CAP, and that Aetna terminated Ontrak's contract before Ontrak announced it. *See* ¶¶56 (FE2 telling Medeiros about problems with Ontrak's billing of Aetna)[21], 59-60 (FE1 meeting with Medeiros about the CAP)[22], 102 (Medeiros admitting that in December, Aetna told Ontrak that it would not turn the data feed back on without a different contract), 64-66 (FE3 stating that by the end of 2020, Ontrak still had not completed the CAP and FE6, FE7, and FE9 recalling that Peizer announced the termination of the Aetna contract to employees in January or February). It also pleads that Peizer was communicating with other Ontrak insiders, including Mayhew, concerning the imminent loss of Cigna's business. *See, e.g.,* ¶111.[23]

---

[21] In this context, especially, Defendants' argument that FE2's information is questionable because she was involved with billing and accounts receivable, not discussions between Ontrak and Aetna, makes no sense. *See* Def. Br. at 22. Billings and accounts receivable were exactly the subject of Aetna's investigation.

[22] Again, Defendants' dismissal of FE1's information because she was a compliance officer, not a customer relationship team member (Def. Br. at 21) is without merit. Compliance included compliance with Aetna's contract and expectations for Ontrak as a vendor.

[23] Ontrak's senior executives' failure to take Aetna's concerns seriously (*see* Def. Br. at 22) is not an anti-scienter fact. Defendants omitted and then misrepresented the shutting down of Aetna's data feed and omitted the CAP, two events that were material to investors. Any optimism that Aetna might renew its contract anyway, even if it was genuine, does not excuse those material misrepresentations and omissions. The issue is whether Defendants knew or recklessly disregarded that their statements were false. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d

Third, the "actual access" analysis also gives rise to a strong inference of scienter because Defendants' statements are specific and reflect their access to the disputed information. *See, e.g.,*¶59 (Medeiros convening meetings to discuss and respond to the CAP); ¶79 (Peizer addressing the impact of the shutdown of the Aetna data feed); ¶81 (Medeiros discussing the data feed); ¶122 (LaVerne stating expectations concerning Cigna billing); ¶132 (Mayhew describing a "listening tour" with Ontrak customers). Indeed, these statements are more specific than the statement *Reese* found had "bridged the scienter gap." 747 F.3d 557, 573.[24] Thus, as in *Reese*, Defendants' own specific statements raise the inference of scienter.

Fourth, the temporal proximity of Preferred Stock offerings to fraudulent statements concerning Aetna supports a strong inference of scienter. Ontrak carried out an offering in August 2020, shortly after Aetna issued the CAP, a material threat to Ontrak's revenue, and Peizer, LaVerne, and Medeiros omitted the CAP and shutdown of the data feed from their August 5, 2020 disclosures. ¶73. They carried out a second offering in December 2020, shortly after learning that Aetna would not turn the data feed back on without a new contract. ¶94. In other words, Defendants twice got bad news from Aetna, hid it from investors, and raised money while Ontrak's stock was inflated. These facts raise an inference of scienter.[25]

Fifth, Peizer's insider sales raise a strong inference of scienter with respect

---

694, 702 (9th Cir. 2012) ("the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity").

[24] "[C]orrosion was seen in [a ruptured oil pipeline] but appeared to be occurring at a low manageable corrosion rate." *Reese*, 747 F.3d 557, 569. .

[25] The argument that the offerings do not demonstrate motive because Peizer, LaVerne, and Medeiros did not personally benefit is without merit. *See* Def. Br. at 22-23, citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). *Rigel* is inapposite because the Complaint does not rely on allegations of an improper financial motive to demonstrate scienter with respect to Aetna, but rather pleads that when getting bad news, these Defendants rushed to raise money before the news could come out. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (court would not draw an anti-scienter inference from the absence of stock sales that benefitted defendants where plaintiffs alleged that defendants were motivated to live up to unrealistic optimism); *Hanmi*, 621 F.Supp.3d 1075, 1089.

to his own failure to disclose the imminent loss of Cigna, which is imputed to Ontrak. "[A] corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. United States*, 445 U.S. 222, 227 (1980). At the time of his sales, Peizer was closely monitoring Ontrak and communicating with executives (including Mayhew) about Cigna. ¶¶107, 111-113, 146. Indeed, he formed his second Rule 10b5-1 plan on August 13, 2021, the same day an Ontrak executive told him that he believed Cigna was likely to formally terminate its contract, which would trigger public disclosure and an inevitable stock drop. ¶146. Thus, with actual knowledge, Peizer neither disclosed nor abstained from trading on material non-public information about Cigna. As Executive Chairman, his scienter can be imputed to Ontrak. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204–1205 (N.D. Cal. 2012); *In re Hienergy Techs., Inc.*, No. SACV04-1226DOC(JTLX), 2005 WL 3071250, at *8 (C.D. Cal. Oct. 25, 2005).

More, Peizer's scheme raises a strong inference of scienter with respect to omissions concerning Cigna by Mayhew and LaVerne. Defendants' argument that Peizer's sales do not raise an inference of scienter for Mayhew and LaVerne ignores his role as Executive Chairman and their roles in his scheme. Def. Br. at 23-24. Mayhew and LaVerne reported to the Board, which Peizer chaired. ¶107. Mayhew communicated with Peizer about Cigna. ¶111. In order to enter into his Rule 10b5-1 plans, Peizer had to certify to LaVerne that his "proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." ¶151. These facts support a strong inference that Mayhew and LaVerne knew that Peizer was selling stock to avoid personal losses resulting from a Cigna loss even as they omitted from investors that Cigna had throttled its referrals, halted discussion of expansion, and then told Ontrak that

it would terminate its services by the end of 2021.[26]

Nor does Defendants' argument regarding the removal of Peizer and Medeiros from their jobs raise an anti-scienter inference. Defendants cite *NVIDIA*, 768 F.3d at 1062-63, where the Court found that the fact that two executives who left the company soon after it disclosed product defects remained in advisory roles raised the inference that their departures were benign. *See* Def. Br. at 23. But unlike in *NVIDIA,* the retention of Peizer in some kind of role was not optional. Peizer is Ontrak's majority shareholder. That he had to give up day-to-day control is evidence that he was under pressure despite his position of power due to his conduct. ¶107. More, both Medeiros and Peizer were removed not just after losing Aetna's business, but after lying about the events that resulted in the loss. *See* ¶¶99-100, 102-106 (alleging that even as Ontrak disclosed the termination of the Aetna contract, Defendants lied about the reasons for the termination and when they learned about it). Unlike in *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (*see* Def. Br. at 23 n.14), these well-pled facts create far more reason for Ontrak's board of directors to change the Company's management than simply their role in the loss of Aetna's business.

**D. The Complaint Pleads Loss Causation**

To plead loss causation, the Supreme Court simply requires "some indication of the loss and the causal connection" to the alleged fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs need only allege that the decline in

[26] Mayhew's arguments that the Complaint fails to raise an inference of scienter against him (Mayhew Br. 6-7) are meritless. A company's CEO's duty to share information with its Executive Chairman does not include ignoring that Executive Chairman's insider trading on such information. As discussed *supra,* Mayhew's management role and his actual access to information contradicting what he told the public raise an inference of scienter. Nor should the Court accept Mayhew's argument based on the document that he submits with a Request for Judicial Notice (ECF No. 108-1). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018). *See* Lead Plaintiff's Response to Defendants' Requests for Judicial Notice, filed concurrently.

stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Lambert v. Baker Tilly Hong Kong Ltd.*, No. 2:14-cv-9959–CBM-(MANx), 2016 WL 6272465, at *2 (C.D. Cal. May 23, 2016). "[S]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). In fact, "[t]he misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *Id.* at 1055. A corrective disclosure need not be a mirror image of the earlier representation. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.3 (9th Cir. 2020). "The ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "A plaintiff may also establish loss causation by alleging that the defendant's misrepresentations concealed a risk that materialized and played some part in diminishing the value of the security." *In re Amgen Inc. Sec. Litig.*, No. CV072536PSGPLAX, 2014 WL 12585809, at *20 (C.D. Cal. Aug. 4, 2014).

The Complaint pleads both corrective disclosure and materialization of the risk. Plaintiff alleges the March 1, 2021 drop was caused by misrepresentations regarding Ontrak's billing and Aetna's response. On August 5, 2020, Peizer, LaVerne, and Medeiros misled investors by omitting that Aetna had turned off its data feed. *See, e.g.,* ¶52. On November 5, 2020, they stated that the data feed had been turned off because of a standard review, not because of Aetna's questions about Ontrak's billing. ¶¶80-81. Plaintiff alleges the August 19, 2021 drop was caused by misrepresentations regarding the impending loss of Cigna's business. On May 6, 2021, Mayhew and LaVerne misled investors by stating that they expected Cigna to fulfill its three-year contract. ¶122. On August 5, 2021, Mayhew touted

progress in the Company's growth initiatives based on a "listening tour" with Ontrak customers. ¶¶132, 134. Defendants thus have notice of Plaintiff's loss causation theory, how it is plausibly based in fact, and how it directly relates to each disclosure. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1054 (9th Cir. 2011) ("[p]laintiff need not allege facts identifying how much loss is attributable to its claim versus other factors so long as it alleges sufficient facts from which a reasonable fact-finder could find that some loss is attributable to the claim."). More, the Complaint alleges that Defendants misled investors about the risk of Ontrak's billing practices. ¶52, 55. Thus, not only does the Complaint allege a corrective disclosure, but it also pleads materialization of the risk.

### E. The Complaint Adequately Pleads Control Person Liability

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5 and the Individual Defendants controlled Ontrak, Plaintiff has adequately alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions. Alternatively, if any part of the Complaint is dismissed, Plaintiff respectfully requests leave to replead. *See* Fed. R. Civ. P. 15; *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

Dated: June 26, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for Lead Plaintiff

and

Brian Schall, Esq.
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

Additional Counsel for Lead Plaintiff

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On June 26, 2023, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 26, 2023 at Jenkintown, Pennsylvania.

/s/ Leah Heifetz-Li

Leah Heifetz-Li