UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

MICHAEL FARHAR,
Plaintiff,
v.
ONTRAK, INC., et al.,
Defendants.

Case No. 2:21-cv-01987-FLA (Ex)

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND [DKT. 100]**

## RULING

Before the court is Defendants Ontrak, Inc. ("Ontrak" or the "Company"), Terren Peizer ("Peizer"), Brandon LaVerne ("LaVerne"), Curtis Medeiros ("Medeiros"), and Jonathan Mayhew's ("Mayhew") (collectively, "Defendants") [1] Motion to Dismiss Plaintiff Michael Farhar's ("Plaintiff") Consolidated Second Amended Class Action Complaint (the "Motion"). Dkt. 100 ("Mot.").[2] Farhar

[1] Peizer, LaVerne, Medeiros, and Mayhew are collectively referred to as the "Individual Defendants."

[2] Defendants Ontrak, LaVerne, and Medeiros submitted a Motion to Dismiss (Dkt. 100), which Defendant Peizer joined (Dkt. 101).

opposes the Motion. Dkt. 109 ("Opp'n").

On July 24, 2023, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for July 28, 2023. Dkt. 117; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15. For the reasons stated herein, the court GRANTS the Motion, with fourteen (14) days' leave to amend.

## BACKGROUND

Plaintiff brings this putative class action suit against Defendants for alleged violations of federal securities laws. Dkt. 94 ("SAC"). Specifically, Plaintiff alleges Defendants knowingly or recklessly disseminated materially false and misleading statements about the Company's relationships with its two largest customers, Aetna and Cigna, from August 5, 2020, to August 19, 2021 (the "Class Period"). SAC ¶ 2. In considering the Motion, the court treats the following allegations as true.

### A. Ontrak

Ontrak markets itself as a healthcare company that uses predictive analytics to connect high-cost members of health insurance plans with cost-reducing programs. *Id.* ¶¶ 31, 42. As part of its programs, Ontrak recruited eligible health plan members—based on certain criteria set forth in its contracts with the individual health plan providers—who had a history of chronic medical conditions, and placed interested members in a 52-week program designed to reduce their healthcare costs. *Id.* Ontrak contacted potential members based on a list of names provided by the health plans, and assigned interested members to a "care coach." *Id.* ¶¶ 43, 46. Ontrak then billed the health plan provider for member interactions with the care coaches. *Id.* ¶ 49.

Peizer is the founder of Ontrak and served as its Chief Executive Officer ("CEO") from 2003 through 2021. *Id.* ¶ 23. LaVerne has been the Company's Chief Financial Officer since March 2020, and Medeiros served as President and Chief Operating Officer of the Company from December 2019 through April 2021. *Id.* ¶¶ 24, 25. On March 16, 2021, Ontrak announced the appointment of Mayhew as its

CEO, effective April 12, 2021. *Id.* ¶ 107. As a result, Peizer transitioned from his role as CEO to Executive Chairman. *Id.*

Plaintiff alleges each of the Individual Defendants directly participated in the management of the Company, were privy to confidential information, and were aware of or recklessly disregarded the fact that the Company issued allegedly false and misleading statements to its investors. SAC ¶ 27(a)-(g).

**B. Aetna**

Aetna was Ontrak's largest customer, accounting for 63.9% of its revenue for the three months ended September 30, 2020, and making up more than 85% of Ontrak's outreach pool. *Id.* ¶¶ 32, 47. According to a former employee, Aetna paid Ontrak $750 for each member enrolled in a program, and was deeply involved in Ontrak's strategy with its members. *Id.* ¶ 48. Plaintiff alleges that to incur more billing opportunities, Ontrak routinely enrolled ineligible members and billed Aetna for three months of services and for every member interaction with a care coach, despite knowing the members would eventually have to be unenrolled for failure to meet eligibility criteria. *Id.* ¶ 49.

Another former employee alleged Aetna eventually "turned off its data feed" in May 2020, which prevented Ontrak from receiving access to a list of potential new clients for recruitment. *Id.* ¶ 52. Aetna and Ontrak began engaging in weekly conference calls to discuss ongoing issues and suspicions on Aetna's end. *Id.* ¶¶ 53-54. In July 2020, Aetna asked Ontrak to complete a Corrective Action Plan ("CAP"), responding to questions about various billing issues and providing measures by which Aetna could determine the benefits of the services its members were receiving from Ontrak.[3] *Id.* ¶ 6. Plaintiff states Ontrak's responses to the CAP were materially incomplete. *Id.* ¶¶ 7, 78.

---

[3] Among other things, the CAP required Ontrak to provide evidence that its care coaches were using proper procedures to enroll and retain members and that members

Plaintiff's claims arise from several alleged misstatements and omissions made by Defendants in connection with Ontrak's relationship with Aetna. First, on August 5, 2020, after Aetna stopped supplying Ontrak with new members, Peizer issued a press release stating the Company had grown its "pipeline of potential new customers to its most robust level in the company's history." *Id.* ¶ 67. Ontrak's second quarter 2020 Form 10-Q report, filed the same day, omitted any mention of the CAP or any pending issues with Aetna, *id.* at ¶ 69, and on an earnings call with investors to discuss the Company's quarterly results, Peizer stated:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights.

*Id.* ¶ 71.

As a result of its second quarter results, Ontrak's stock significantly increased in value, and the Company then launched an offering of its preferred stock. *Id.* ¶ 8, 73. On August 26, 2020, Ontrak closed the preferred stock offering after raising net proceeds of approximately $39.3 million. *Id.* ¶ 74.

Next, on November 5, 2020, Ontrak announced its third quarter results and stated that "[n]ew compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak." *Id.* ¶ 77. Peizer reiterated this sentiment in a conference call that same day, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since

---

were able to meet with therapists. Aetna also sought to recoup money it had paid Ontrak for the enrollment of members who never received any services. SAC ¶ 57.

> July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak … Importantly, this is one of the plans for which we anticipate continued significant expansion.

SAC ¶ 79. Medeiros added that there was "a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year," and stated the Company had scheduled "multiple geography expansions that we hope to sign in the fourth quarter and roll out early in the year." *Id.* ¶¶ 81, 83.

Referring to potential expansions in coverage for potential new members suffering from depression and anxiety, Peizer noted he "would be surprised, and we would all personally be surprised and disappointed, if the expansions that we are alluding to don't happen in 2021." *Id.* ¶ 85. He further stated the outreach supply issue "really has nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is." *Id.* ¶ 87. Ontrak's third quarter 2020 Form 10-Q report omitted any mention of the CAP, but stated that while a substantial percentage of the Company's revenues were attributable to its four largest customers, any of these customers could terminate its services at any time. *Id.* ¶ 89.

Finally, on March 1, 2021, Ontrak issued a press release, stating Aetna was terminating its contract, effective June 26, 2021, based on its evaluation of Ontrak's "ability to achieve the lowest possible cost per medical visit, and not on [its] clinical outcomes data or medical cost savings." *Id.* ¶ 97. In a conference call that same day, Medeiros told analysts the Company was notified in December that the data feed was not going to be turned back on until a new contract was signed. *Id.* ¶ 102. Medeiros also stated that he was "surprise[d]" when he was notified of the termination because they "were working towards a new agreement and an expanded relationship." *Id.* ¶ 105. That same day, Ontrak's stock price fell 46%. *Id.* ¶ 11.

/ / /

/ / /

### C. Cigna

Cigna was Ontrak's second largest client, accounting for 13.6% of its revenue for the three months ended September 30, 2020. *Id.* ¶ 5, 32. Ontrak provided services to Cigna's insured patients pursuant to a $90 million, three-year contract, and Cigna maintained the right to terminate the contract upon 30 days' notice. *Id.* ¶ 5. By early 2021, Ontrak had billed Cigna approximately $42 million under this contract, and thereafter, Cigna began reducing the number of members it referred per month to Ontrak, and the parties began negotiating an alternative billing structure "because Cigna determined [the contract] was not resulting in the cost savings it had expected." *Id.* ¶¶ 5, 108, 109. By May 2021, Cigna had reduced the number of patients it referred from several thousand members per month to approximately 50 per month, and on May 18, 2021, Cigna informed Ontrak management of its intent to terminate their contract by the end of the year. *Id.* ¶¶ 14, 126. Plaintiff's claims arise from several statements and omissions made by Defendants during the Class Period and relating to Ontrak's relationship with Cigna.

First, Plaintiff alleges Mayhew stated in a May 2021 press release that the Company had expanded its network "of behavioral health providers to a total of over 15,000 clinicians, in anticipation of surging demand for outpatient care in the aftermath of the pandemic." *Id.* ¶ 116. On the same day, Ontrak filed its first quarter 2021 Form 10-Q report which omitted mention of Cigna's reduction in patient referrals, *id.* ¶ 118, and Mayhew held his first earnings call on which he told analysts, "we continue to have both revenue visibility and a robust pipeline as evidenced by the recent renewal of our customer contracts." *Id.* ¶ 120. LaVerne also stated the Company would not be commenting on the specifics of its individual customers, but that they believed and expected Ontrak would be within the "$90 million over three years range at least." *Id.* ¶ 122.

Next, on August 5, 2021—after Cigna had announced to Ontrak its intent to terminate the contract but had not yet done so—Ontrak issued a press release stating

the Company had made "important progress on [its] growth initiatives to expand [its] addressable market," and that "[c]ustomers … [had] provided encouraging feedback on our product roadmap and care pathways." *Id.* ¶ 128. The second quarter 2021 Form 10-Q report filed on the same day again made no mention of Cigna's reduction in referrals, nor did Mayhew address the issue in a conference call. *Id.* ¶ 130. He stated "we made important progress on our growth initiatives to expand our addressable market." *Id.* ¶ 132. More specifically, he told analysts:

- "Key account leaders within our customer organizations tell us that their major accounts value the Ontrak program. We're well positioned to heighten the value that health plans create for commercial populations by building trust, engagement and readiness with employees so that their employers experience higher enterprise loyalty and commitment levels. As we've begun testing receptivity to the growth initiatives, not only with our customers, but with prospects and providers, the feedback has been very positive. We've seen an increase in initial discussions in recent weeks in our sales pipeline. While it's still early, we're encouraged by dialogue we are having with health plans, provider groups and employer organizations."
- "[O]ur pipeline is growing, the quality of the pipeline is very good and it's very balanced."

SAC ¶¶ 134, 136. The contract was officially terminated on August 18, 2021, and Ontrak disclosed the termination to the SEC in a Form 10-K the next day. *Id.* ¶¶ 138-39. As a result, on August 19, 2021, the Company's stock price fell by 44%. *Id.* ¶ 139.

### D. Procedural History

Plaintiff filed the Class Action Complaint on March 3, 2021, asserting two claims: (1) violation of section 10(b) of the Securities Exchange Act and Rule 10b-5 against Ontrak, Peizer, LaVerne, and Medeiros; and (2) violation of section 20(a) of the Securities Exchange Act against Peizer, LaVerne, and Medeiros. Dkt. 1. On March 29, 2023, Plaintiff filed the operative Second Amended Complaint ("SAC") asserting the same claims, but adding Mayhew as an individual defendant, and

including additional factual assertions concerning Cigna and Peizer's stock sales. *See generally* SAC.

## REQUEST FOR JUDICIAL NOTICE

Defendants request the court take judicial notice of various documents submitted in connection with the instant Motion, including SEC filings, press releases, and transcripts of investor calls. Dkt. 100-1 ("RJN").[4]

A court may take judicial notice of any adjudicative fact that "is generally known within the trial court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "[A] court may take judicial notice of 'matters of public record,'" including filings made with regulatory entities. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

Ontrak's SEC filings are a matter of public record and, thus, are properly the subject of judicial notice. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir. 2018) (finding district court properly took notice of SEC filings). So too are the relevant press releases. *In re American Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 3d 1043, 1062 (C.D. Cal. 2012) ("Courts in the Ninth Circuit routinely take judicial notice of press releases" and compiling cases). Thus, the court GRANTS Defendant's request for judicial notice as to the SEC filings and press releases (RJN Exs. A-L).

"An investor call transcript submitted to the SEC generally qualifies as a 'source[] whose accuracy cannot reasonably be questioned.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (*citing* Fed. R. Evid. 201(b)). However, because accuracy is only one part of the relevant inquiry, a "court must also consider—and identify—which facts it is noticing from such a transcript. Just

[4] Defendant Mayhew also submitted a request for judicial notice. Dkt. 108-1. As the court does not rely on these documents, the request is DENIED as moot.

because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* Accordingly, the court GRANTS Defendant's request to judicially notice transcripts of investor calls, but only as to the sections containing cautionary language relating to forward-looking statements. *See* RJN, Ex. M at 367; Ex. N at 387; Ex. P at 424; Ex. Q at 484.[5]

## **DISCUSSION**

### I. Legal Standard

Under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to support a cognizable legal theory." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Id. (internal citations

---

[5] The court does not rely on RJN, Ex. O and thus DENIES the request as to this exhibit as moot.

omitted). Legal conclusions, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Additionally, it is well-established that "[a]t the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must … satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Fed. R. Civ. P. 9(b) "requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading ... about the statement and why the statements were false or misleading at the time they were made." *Id.* The PSLRA also requires "plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id.*

## II. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary[.]" 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) and states in relevant part, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading." 17 C.F.R. § 240.10b-5.

To state a claim for violation of Section 10(b), a plaintiff must prove: (1) a material misrepresentation or omission by the defendant (i.e., falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). A statement or omission is actionable under Section 10(b) only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 963 (C.D. Cal. 2017) (explaining statements amounting to "fraud by hindsight" are not actionable).

**A. Material Misrepresentations or Omissions**

**1. Puffery**

Defendants first argue several of the allegedly problematic statements are nonactionable under federal securities laws because they amount to puffery. Mot. at 21-22.[6] Specifically, Defendants point to two sets of statements: (1) Peizer's comments that the growth of the Company's pipeline was at its "most robust level," that he was "really excited to see the hard work, dedication, passion and grit of every Ontrak teammate as we proceed into new heights," and that he would be "personally surprised and disappointed if expansions did not occur" (SAC ¶¶ 67, 71, 85); and (2) Mayhew's comments that Ontrak anticipated "surging demand for outpatient care," continued to have a "robust pipeline," made "important progress on our growth initiatives," that customers "value" the Ontrak program, that Ontrak was "well positioned," that "feedback has been positive," and that the "quality of the pipeline is very good and it's very balanced" (*id.* ¶¶ 116, 120, 128, 132, 134, 136).

As an initial matter, Plaintiff addresses only two of aforementioned statements

---

[6] The court cites documents by the page numbers added by the court's CM/ECF system, rather than any page numbers that appear within the documents natively.

in his opposition,[7] arguing the statements are taken out of context, and cannot be characterized as puffery if viewed with the understanding that they were made after Peizer and Mayhew knew Aetna and Cigna were terminating their contracts. Opp'n at 24-25. His failure to address Defendants' arguments as to the remaining statements is itself a sufficient basis to dismiss his claim. *See Walsh v. Nevada Dep't of Hum. Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (finding plaintiff abandoned her claim after she failed to address issues raised in defendant's motion to dismiss); *Silva v. U.S. Bancorp*, Case No. 5:10-CV-01854-JHN, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011) ("[T]he Court finds that Plaintiff concedes his recordkeeping claim should be dismissed by failing to address Defendants' arguments in his Opposition."). Nevertheless, the court addresses the issue on its merits and finds the statements are not actionable.

Generally, puffery "concerns expressions of opinion, as opposed to knowingly false statements of fact." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "[V]ague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," are nonactionable under Section 10(b) because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). Conversely, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 606.

Here, both sets of statements constitute puffery and therefore are nonactionable under Section 10(b) and Rule 10b-5. First, Peizer's statements that Ontrak grew its pipeline of customers to its "most robust level" and will "proceed into new heights"

---

[7] Plaintiff contests only Peizer's statement that Ontrak's pipeline was at its most robust level and Mayhew's statement that Ontrak had made important progress on its growth initiatives. Opp'n at 25.

are puffery because they are not capable of objective verification. There are no objective means to measure a "new height," and these terms amount to nothing more than vague statements of optimism that reasonable investors would know how to devalue. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001) (finding descriptors such as "strong," "robust," "solid," and "improved" constituted nonactionable puffery). Similarly, Peizer's statement that he would personally be surprised if Ontrak did not expand its scope of coverage is nonactionable because it amounts to an expression of opinion, not fact. *See Police Ret. Sys. of St. Louis*, 759 F.3d at 1060 (finding statement that company was "reservedly optimistic" about sales constituted puffery).

Mayhew's statements, too, are not actionable because they do not offer any specific details or forecasts regarding the Company's performance, and instead are vague statements of optimism. *See id.*; *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (dismissing as nonactionable statements that the "overall credit quality of the loan portfolio is sound," the company's "metrics are superior to those of its peers," and the company "has limited its exposure to problem credits").

**2. Forward-Looking Statements**

Defendants next argue many of the statements at issue are forward-looking and are protected under the PSLRA's safe harbor provisions. Mot. 23-24. Statements addressing the "plans and objectives of management for future operations," as well as "any statement of the assumptions underlying or relating to" those plans and objectives are forward-looking. 15 U.S.C. § 78u-5(1)(B), (D). A statement cannot be considered forward-looking if it contains "sufficient facts to show that the statement goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific current or past fact." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (cleaned up).

The PSLRA protects forward-looking statements as nonactionable if they are "accompanied by meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the forward-looking statement," or (2) made without actual knowledge of the statement's falsity. 15 U.S.C. § 78u-5(c)(1)(A-B); *see In re Cutera Sec. Litig.*, 610 F.3d at 1108.

Here, Defendants claim the following statements are forward-looking and protected under the PSLRA under either prong of the safe harbor: (1) Peizer and Medeiros' statements that they expected a variety of "further expansions" with health plans, "anticipate[d] continued significant expansion" from a customer, had "scheduled multiple geography expansions" that they had hoped to sign and "roll out" later in the year, and would be "surprised and disappointed" if the expansions didn't happen (SAC ¶¶ 71, 79, 83, 85); and (2) LaVerne's statement that the Company "expect[s] . . . to be within [the $90 million over three years] range at least" in response to an analyst question asking for a "sense of how Cigna is tracking[.]" *Id.* ¶ 122. The court agrees.

First, Peizer's statement regarding potential for "further expansions" is a forward-looking statement because, taken with his other statements about an "impending launch" of an expansion, "enhancements" to Ontrak's algorithm, and "potential new logos and pilots," it relates to Ontrak's plans, objectives, and assumptions for the future. *See Wochos*, 985 F.3d at 1192. It does not describe a specific, concrete circumstance that has already occurred. Notably, Peizer's use of the word "whether" in discussing potential expansions with Aetna further supports the conclusion that the expansion was one of multiple *potential* objectives for future operations of the Company, and not a definitive event for investors to rely upon. SAC ¶ 71 ("*Whether* it be further expansions with Aetna … the impending launch … [or] enhancements … I'm really excited … as we proceed onto new heights.") (emphasis added). Similarly, his statement that the Company "*anticipated* continued significant expansion," is necessarily forward-looking because it relates to an assumption for the future, as is his statement about "multiple geography expansions *that we hope to sign*[.]" SAC ¶¶ 79, 83 (emphases added). Peizer's expression of disappointment if

the "expansions we are alluding to don't happen" is also forward-looking by definition, and confirmed by the fact that Peizer clarified that Ontrak was *not including* the expansion in its projections, but was instead hopeful of such expansion in the future. *Id.* ¶ 85.

Plaintiff also fails to allege facts suggesting Peizer made these statements with actual knowledge of their falsity. While the SAC alleges Peizer made the statement after Aetna shut off its data supply of members to Ontrak, no facts are alleged that Peizer actually knew Aetna would not renew its contract with Ontrak or further expand its relationship with the Company in the future. Plaintiff's allegations regarding the CAP raise a plausible inference that the relationship between Ontrak and Aetna was rocky, but does not sufficiently establish it was a foregone conclusion Aetna would not renew its contract with Ontrak after it submitted its responses to the CAP, such that Peizer knew his statement was actually false. Without such facts, Peizer's statements fall within the safe harbor and is nonactionable.

Similarly, LaVerne's statement that the Company was expected to meet the budgeted amount in the Cigna contract, *see* SAC ¶ 122, is forward-looking because it alluded to an anticipated expectation of future operations. His statement did not contain concrete assertions about a current or past fact, and instead explicitly stated the Company would not be commenting on the specifics of individual customers but rather that the Company "believe[d] and expect[ed]" it would be within a certain range. SAC ¶ 122; *see also Wochos*, 985 F.3d at 1192 ("[A]n unadorned statement that a company is 'on track' to achieve an announced objective, or a simple statement that a company knows of no issues that would make a goal impossible to achieve, are merely alternative ways of declaring or reaffirming the objective itself."). Plaintiff's only allegation supporting LaVerne's knowledge of falsity is that he "knew at the time of the conference call that Cigna had informed Ontrak that [the contract] would have to be renegotiated, on less favorable terms for Ontrak …" SAC ¶ 123.

/ / /

Additionally, many of the statements at issue are contained within SEC filings or were made during conference calls with investors. Mot. at 24. The SEC filings at issue contain sections titled "Forward-Looking Statements" that specifically note the Company's projections may be affected by several risk factors, including "the ability of [its] customer to terminate our contracts for convenience; … inability to execute our business plan; … lower than anticipated eligible members under our contracts; … [and] difficulty enrolling new members and maintaining existing members in our programs …" RJN, Exs. A-H. Investors, too, were similarly warned with such cautionary language, which explicitly advised that forward-looking statements made during the calls were not guarantees of future performance, and incorporated by reference the various risk factors outlined in the Company's SEC filings. *Id.*, Exs. M-Q.[8] Such accompanying cautionary language sufficiently identifies important factors that may have affected the ultimate results. *See* 15 U.S.C. § 78u-5(c)(1)(A-B).

**B. Falsity**

Defendants next argue Plaintiff fails to plead falsity sufficiently because the SAC relies heavily on statements from nine confidential, former Ontrak employees, but does not establish the reliability and personal knowledge of these witnesses. Mot. at 26-28. Under the PSLRA, a complaint relying "on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted). First, the source of the statements "must be described with sufficient

---

[8] The judicially noticed portions of the transcripts state: "All statements in this [] call other than historical facts are forward-looking statements. The words anticipate, believe, expect, intend, guidance, confidence, target, project and some other expressions typically are used to identify forward-looking statements. These forward-looking statements are not guarantees of future performance, but … are subject to certain risks and uncertainties and other factors that may … affect OnTrak's business, financial condition and other operating results, which include, but are not limited to, the risk factors described in the Risk Factors section of the Form 10-K and Form 10-Q as filed with the SEC." RJN, Ex. M at 367; Ex. N at 387; Ex. P at 424; Ex. Q at 450.

particularity to establish their reliability and personal knowledge." *Id.* Second, the statements "must themselves be indicative of scienter." *Id.*

First, the SAC generally provides the employment titles and roles of the various former employees, *see* SAC ¶¶ 29-37, but as to many of the employees, does not provide details discussing what the former employees worked on and how they would have obtained knowledge of the allegations attributed to them. *See Zucco*, 552 F.3d at 995. For example, it is alleged Former Employees 4, 5, 6, and 7 were member engagement specialists and quality assurance analysts, whose role was to reach out to customers, and "probe to see if they could help," and subsequently "figure out what each member might need." SAC ¶¶ 36-39, 45. While these allegations may be sufficient to establish that the Former Employees had personal knowledge with respect to enrolling ineligible members to Ontrak's plans, it does not establish that they had personal knowledge of Ontrak's ongoing negotiations or broader relationship with Aetna.

Second, the Former Employees' allegations alone do not support an inference of scienter. The allegations establish, at most, that the tone of the weekly meetings with Aetna had changed, an Aetna executive was "suspicious" and "skeptical," Ontrak did "the bare minimum to address Aetna's concerns," and "there were problems that needed to be fixed." SAC ¶¶ 54, 56, 60. Though these accusations may be indicative of poor management and tensions with Aetna, they do not support a strong inference that the Individual Defendants knew Ontrak could not resolve its issues with Aetna to preclude definitively contract renewal negotiations at the time the statements were made.

**C. Scienter**

Defendants also argue Plaintiff fails to allege facts sufficient to establish scienter, because the SAC makes no attempt to connect a speaker's knowledge of falsity to any individual statement alleged. Mot. 29. The court agrees. To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference

that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.").

As discussed, at the time Peizer and Medeiros made their respective statements, it is plausible negotiations between Ontrak and Aetna were tenable, and the prospect of expansion or restoration of the member data pool was feasible. An equally plausible opposing inference is that the Individual Defendants did not sufficiently appreciate the gravity of the issues with its customers before the contracts were ultimately terminated.

Additionally, where, as here, a complaint "relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short" of the PSLRA standard. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). The only descriptors of the Individual Defendants' roles at Ontrak are bare allegations of rank, and only two Former Employees are alleged to have met with one Individual Defendant (Medeiros), let alone to have reported to him or any of the other Individual Defendants. *Id.* at ¶¶ 2, 33-41. The SAC alleges Former Employee 2 participated in weekly conference calls between Ontrak and Aetna "to discuss ongoing issues," and that Aetna's Clinical Director of Behavioral Health Operations was "suspicious of Ontrak's billing and skeptical about whether Aetna was getting a return on its investment[.]" *Id.* ¶ 53.

The court does not determine at this point whether these facts alone are sufficient to render Medeiros' statements misleading, as the SAC does not make any allegations that Medeiros was even involved in these calls or that Former Employee 2 relayed the discussions to Medeiros. Indeed, the SAC specifically lists three other

Ontrak employees who participated in the weekly calls, none of them being Medeiros or any other Individual Defendant. *Id.* Though the SAC states Former Employee 2 voiced concerns to Medeiros about the Aetna relationship and stated the "billing model was bad," *see* SAC ¶ 56, these concerns were made almost a year prior to the beginning of the Class Period when Medeiros first joined the Company as President and COO in December 2019. Additionally, Former Employee 1 told another Company employee that "there were problems that needed to be fixed," but that the other employee "perhaps … knew more as the account representative." *Id.* The account representative, too, had told Former Employee 1 that "Aetna was just trying to scare Ontrak, and would not take any action." *Id.*

Accordingly, the SAC fails to offer facts establishing the Individual Defendants' exposure to the information which would render their statements intentionally misleading, and thus, fails to support an inference that the Individual Defendants acted with the intent to deceive or with deliberate recklessness. *See Berson*, 527 F.3d at 987.

Having found Plaintiff fails to plead sufficiently actionable statements or the requisite scienter, the court need not consider the parties' arguments as to reliance and loss causation. Accordingly, Defendants' Motion as to Plaintiff's Section 10(b) claims is GRANTED, with leave to amend.[9]

/ / /

/ / /

/ / /

---

[9] Plaintiff's second claim against the Individual Defendants, for violations of Section 20(a) of the Securities Exchange Act ("Section 20"), necessarily fails too as the provision provides for joint and several liability for individuals who aid and abet violators of the Securities Exchange Act. 15 U.S.C. § 78t. Having found no actionable violation based on the allegations in the SAC, the court need not analyze any potential liability under Section 20. Accordingly, Plaintiff's Section 20(a) claim is also DISMISSED with leave to amend.

**CONCLUSION**

For the foregoing reasons, the court GRANTS Defendants' Motion, with leave to amend. Plaintiff may file an amended complaint within fourteen (14) days of this Order.

IT IS SO ORDERED.

Dated: February 2, 2024

FERNANDO L. AENLLE-ROCHA
United States District Judge