Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL FARHAR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONTRAK, INC., TERREN S. PEIZER, BRANDON H. LAVERNE, CURTIS MEDEIROS, and JONATHAN MAYHEW,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Master Docket No. 2:21-cv-01987-FLA-E (consolidated with Case No. 2:21-cv-02460-FLA)<br><br>**CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

NATURE OF THE ACTION .....2

JURISDICTION AND VENUE .....8

PARTIES .....9

SUBSTANTIVE ALLEGATIONS .....12

Background .....12

Former Employee Witnesses .....13

Ontrak's Business Model .....15

Ontrak's Billing Practices Cause Aetna to Investigate and Issue the CAP .....17

Ontrak Loses Aetna's Business .....23

Ontrak Misleads Investors About Aetna Artificially Inflating Ontrak's Stock Price; To Capitalize, Ontrak Raises Money in Preferred Stock Offerings .....24

The Loss of the Aetna Contract Emerges But Defendants Continue to Lie .....33

Ontrak Misleads Investors Concerning the Loss of Cigna's Business .....38

The Loss of Cigna's Business Becomes Public .....48

Defendant Peizer's Criminal Insider Trading Scheme .....49

Additional Allegations Supporting Falsity and Scienter .....52

CLASS ACTION ALLEGATIONS .....55

APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .....57

NO SAFE HARBOR ....... 59

COUNT I ....... 60

Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....... 60

COUNT II ....... 64

Violations of Section 20(a) of the Exchange Act Against the Individual Defendants ....... 64

PRAYER FOR RELIEF ....... 66

DEMAND FOR TRIAL BY JURY ....... 67

Lead Plaintiff Ibinabo Dick ("Plaintiff"), by and through his attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings,[1] United States Department of Justice ("DOJ") filings, documents filed in connection with *United States v. Terren S. Peizer*, Court Docket: 2-23-CR-89, in the U.S. District Court for the Central District of California,[2] wire and press releases published by and regarding Ontrak, Inc. ("Ontrak" or "Company"), analysts' reports and advisories about the Company, interviews with and documents obtained from former employees of the Company, and information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[1] Plaintiff attaches and incorporates by reference SEC's March 1, 2023 Complaint against Defendant Peizer as Exhibit A hereto.

[2] Plaintiff attaches and incorporates by reference the DOJ's January 31, 2024 First Superceding Indictment against Defendant Peizer as Exhibit B hereto.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities that purchased Ontrak publicly traded common stock on public U.S. stock exchanges between August 5, 2020 and August 19, 2021, inclusive (the "Class Period"), against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the class are Defendants, the present or former officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, agents, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

2. Throughout the Class Period, defendants Ontrak, Terren S. Peizer ("Peizer"), its Chief Executive Officer ("CEO") until March 16, 2021 and again beginning August 12, 2022, Chairman of the Board of Directors, and majority shareholder, Brandon H. LaVerne ("LaVerne"), its Chief Financial Officer ("CFO"), Curtis Medeiros ("Medeiros"), its President and Chief Operating Officer ("COO"), and Jonathan Mayhew ("Mayhew"), its CEO from April 12, 2021 until August 12, 2022 (collectively, "Defendants") knowingly or recklessly disseminated

materially false and misleading statements about the Company's relationships with its two largest customers: Aetna and Cigna.[3]

3. Ontrak fraudulently billed Aetna, and when Aetna found out and began investigating, Ontrak's immediate response was to conceal the investigation and raise money through preferred stock offerings. Defendants repeatedly delayed the release of bad news so that the Company could sell preferred stock at artificially inflated prices. After Aetna terminated its contract with the Company, Ontrak then concealed for months that Cigna had terminated its own contract.

4. Ontrak is a healthcare company incorporated in Delaware and headquartered in Santa Monica, California. Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs.

5. Ontrak's most important and largest client was Aetna. Aetna accounted for 63.9% of Ontrak's its revenue for the three months ended September 30, 2020. Accordingly, Ontrak's business with Aetna was core to the Company's business and was closely monitored by Defendants Peizer, LaVerne, and Medeiros. Ontrak recruited Aetna health plan members who had a history of chronic medical

[3] For the convenience of the Court, an addendum listing the materially false and misleading statements and omissions can be found at the end of this Complaint. This addendum is incorporated to this Complaint as if fully set forth herein.

conditions, behavioral health issues, and high healthcare costs into a 52-week program designed to reduce their healthcare costs. The program could include appointments with psychiatrists, dietitians, counselors, or other specialists in Ontrak's network.

6. Cigna was Ontrak's second most important and second largest client. Beginning in or about July 2020, Ontrak provided services to Cigna's insured patients under a $90 million three-year contract. Cigna had the right to terminate that contract upon 30 days' notice. By August 2021, Ontrak had billed Cigna approximately $42 million under this contract. As the Company's second largest client, it was core to Ontrak's business, and after the loss of Aetna's business, Defendants Peizer, LaVerne, and Mayhew were laser-focused on Cigna.

7. Prior to the start of the Class Period, Aetna began questioning Ontrak's billing practices and its value. In May 2020, prior to the start of the Class Period, Aetna stopped providing Ontrak with names of new potential health plan members to enroll in its programs. By July 2020, Aetna asked Ontrak to complete a disciplinary process that it called a Corrective Action Plan ("CAP"), responding to questions about billing and providing meaningful measures of the benefits that Ontrak's services provided.

8. Ontrak submitted a materially incomplete response to the CAP that failed to fully answer Aetna's questions. Nevertheless, on August 5, 2020, the

Company issued a press release announcing its second quarter results that mentioned nothing about Aetna's investigation and the material risk that it posed to the Company's revenue.

9. After Aetna issued the CAP and the Company failed to disclose those details to investors and issued false reassurances that inflated Ontrak's stock price, the Company quickly acted to raise money. On August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of preferred stock, which closed on August 26, 2020 and, after a full exercise of the underwriters' over-allotment option in the offering, ultimately raised gross proceeds of $48.9 million and net proceeds of $45.3 million.

10. After Ontrak failed to satisfy Aetna's concerns and fully answer its questions in the CAP, negotiations to renew Aetna's contract stalled. Nevertheless, on November 5, 2020, Ontrak falsely told investors that universal compliance reviews for vendors that had nothing to do with Ontrak specifically were the reason that Aetna turned off the data feed that provided names of Aetna members for the Company to contact and potentially enroll in its programs. Defendants falsely reassured investors that they expected not only that the pipeline of names would resume flowing, but that the Company was on its way to expanding its business with Aetna.

11. While investors remained unaware that the relationship between Ontrak and Aetna was falling apart and Ontrak's securities remained artificially inflated, Defendants raised more money. On December 15, 2020, after Aetna told Ontrak that it would only turn the data feed back on under a new contract that would be less remunerative to Ontrak, Ontrak announced that it had commenced a follow-on offering of its preferred stock. That offering closed on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million for the Company.

12. In late January or early February, Ontrak learned that Aetna was terminating its contract, but concealed the news from investors.

13. On March 1, 2021, Ontrak shocked the market when it announced that Aetna had terminated its contract with Ontrak, effective June 26, 2021. This adverse news caused the Company's stock price to fall $27.32/share or 46%, to close at $31.62/share on March 1, 2021, devastating investors.

14. As a result of Aetna's termination of the contract, Ontrak lowered its revenue guidance for 2021 to $100 million from $165 million. Conveniently, the proceeds of the Company's offerings, carried out while the Company's stock was artificially inflated from Defendants' misstatements and omissions concerning Ontrak's ongoing problems with Aetna, made up for this shortfall.

15. In the wake of these disclosures, Defendants Peizer and Medeiros were both forced to step down from their management roles. On March 16, 2021, Ontrak announced that Defendant Mayhew would become Ontrak's CEO. While Peizer, who is Ontrak's majority shareholder, was forced to give up day-to-day control of the Company as CEO, he remained Chairman of the Board. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros.

16. By February 2021, Cigna was also reducing the number of its members that it referred per month to Ontrak for services. By April 2021, Cigna informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, meaning that Ontrak faced two possibilities: either a material reduction to the $90 million over three years that Ontrak had expected to realize from Cigna, or a total cancellation of the contract.

17. By May 2021, Cigna had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members per month. On May 18, 2021, Cigna informed Ontrak that it would terminate its contract by the end of the year.

18. Defendants knew that, after the loss of Aetna as a customer, the serious jeopardy facing Ontrak's relationship with its next biggest customer, Cigna, would be of particular importance to investors. Nevertheless, for months after Cigna told Ontrak that it was terminating the contract, they did not disclose this to investors.

Instead, Peizer used his insider knowledge to engage in a criminal insider trading scheme, fraudulently using two Rule 10b5-a trading plans to sell his Ontrak stock and avoid more than $12.5 million in losses. He has now been charged with insider trading by both the SEC and DOJ. His trial is scheduled for June 4, 2024.

19. On or about August 18, 2021, three months after notifying Ontrak that the termination was coming, Cigna gave Ontrak a formal notification of the termination of their contract. The next day, Ontrak filed a Form 8-K with the SEC disclosing for the first time the termination of its relationship with Cigna. This news caused the Company's stock price to fall $9.37/share or over 44%, to close at $11.68/share on August 19, 2021, materially harming investors.

## JURISDICTION AND VENUE

20. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

22. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

23. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

24. Plaintiff, as set forth in the certification filed with his Motion to Consolidate Related Actions, for Appointment as Lead Plaintiff, and Approval of Choice of Counsel (ECF No. 17-2), purchased Ontrak common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25. Defendant Ontrak, which is incorporated in Delaware and headquartered in Santa Monica, California, is a healthcare company. Its core business is providing national and regional health plans' high-cost members with services designed to reduce their healthcare costs. Ontrak common stock is listed on NASDAQ under the ticker symbol "OTRK."

26. Defendant Peizer is the founder of Ontrak. Peizer served as CEO and Chairman of the Board of Directors since the Company's inception in 2003 through April 11, 2021. Effective April 12, 2021, Peizer stepped down as CEO and was

appointed to serve as the Executive Chairman. He continues to serve as Chairman of the Company's Board of Directors. Upon information and belief, Peizer was forced to resign as result of the fraud.

27. Defendant LaVerne became the Company's Chief Financial Officer ("CFO") in March 2020, and served in that role throughout the Class Period. He is currently the Company's CEO and Chief Operating Officer.

28. Defendant Medeiros served as the Company's President and Chief Operating Officer from December 2019 until April 2021. Upon information and belief, Medeiros was forced to resign as a result of the fraud.

29. Defendant Mayhew served as the Company's CEO from April 2021 until August 2022.

30. Defendants Peizer, LaVerne, Medeiros, and Mayhew are sometimes referred to herein as the "Individual Defendants."

31. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

32. Ontrak is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

33. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Ontrak under *respondeat superior* and agency principles.

34. Defendant Ontrak and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

35. Ontrak is a healthcare company that connects its customer health plans' high-cost members to programs designed to reduce their healthcare costs. Ontrak claims that its technology platform organizes and automates healthcare data integration and analytics to engage members using a coaching model and enroll them in appropriate programs. Its clients are national and regional health plans in 31 states and in Washington, D.C.

36. Before the Class Period and until it terminated its contract with Ontrak, the Company's largest customer was Aetna. Ontrak's quarterly report, filed on Form 10-Q on November 5, 2020 for the period ended September 30, 2020 (the "3Q 2020 10-Q"), provided a table [summarizing] concentration of credit risk by customer revenues as a percentage of [Ontrak's] total revenue, showing that Aetna accounted for 63.9% of its revenue for the three months ended September 30, 2020. Its second largest customer, Cigna, accounting for 13.6% of its revenue for the same time period.

| | **Three Months Ended September 30,** | | **Nine Months Ended September 30,** | |
|---|---|---|---|---|
| **Percentage of Revenue** | **2020** | **2019** | **2020** | **2019** |
| Largest customer [Aetna] | 63.9 % | 45.6 % | 48.4 % | 33.6 % |
| 2nd largest customer [Cigna] | 13.6 | 15.2 | 15.1 | 20.1 |

| | | | | |
|---|---|---|---|---|
| 3rd largest customer | 9.6 | 14.4 | 11.9 | 16.3 |
| 4th largest customer | 7.8 | 10.0 | 9.7 | 12.8 |
| Remaining customers | 5.1 | 14.8 | 14.9 | 17.2 |
| | 100.0 % | 100.0 % | 100.0 % | 100.0 % |

**Former Employee Witnesses**

37. Former Employee 1 ("FE1") was Ontrak's Director of Quality and Organizational Performance from February 2017 until December 2020. FE1 was a member of the compliance team, and reported to Joshua Fischer ("Fischer"), the Company's Senior Vice President of Operations and Compliance. FE1 regularly met with Defendant Medeiros.

38. Former Employee 2 ("FE2") was the Director of Operations at Ontrak from January 2019 until July 2021. FE2 oversaw billing, claims, and accounts receivable. FE2 ran a team of 12 people who processed claims, both Medicare and commercial, for Aetna, as well as other Ontrak customers. FE2 regularly met with Defendant Medeiros.

39. Former Employee 3 ("FE3") was the principal design researcher and strategist at Ontrak from 2019 until March 2021. FE3's primary job was to develop a way to quantify the benefit that Aetna was receiving by using Ontrak's services. FE3 reported to Joanne Mendel, Ontrak's Senior Director of User Experience.

40. Former Employee 4 ("FE4") was Ontrak's Director of Member Engagement Specialists Training from September 2016 until March 18, 2021. FE4 reported to Greg Gilroy, Ontrak's Director of Training.

41. Former Employee 5 ("FE5") worked at Ontrak as a member engagement specialist from February 2020 until March 2021.

42. Former Employee 6 ("FE6") was a quality assurance analyst at Ontrak from August 2017 until March 2021. FE6 originally worked as a member engagement specialist until April 2020, before moving into the quality assurance function. FE6 reported to Julie Smith, a quality assurance supervisor.

43. Former Employee 7 ("FE7") was a member engagement specialist who worked at Ontrak from January 2018 until March 2021.

44. Former Employee 8 ("FE8") was a member engagement specialist at Ontrak for four years, until September 2019. FE8 reported to Wolfgang Berger, the Company's call center supervisor.

45. Former Employee 9 ("FE9") was the Company's Director of Community Care Training from July 2016 until March 18, 2021. FE9 was in a leadership role and trained care coaches, nutritional supervisors, and care coordinators within the Company. FE9 reported to Sara Armstrong, a Senior Vice President at Ontrak.

46. Former Employee 10 ("FE10") started at Ontrak as a clinical team manager in June 2016. FE10 became a product manager in December 2018 and remained in that role until August 2021. In that role, FE10, whose background was in nursing, was the clinical liaison to the sales team and acted as a member of the sales team. FE10 was involved in calls and meetings with each of Ontrak's health care plan customers and visited the offices of Aetna and Cigna, as well as others. FE10 reported to Julia Wright ("Wright"), the Company's Chief Medical Officer and Senior Vice President.

**<u>Ontrak's Business Model</u>**

47. Ontrak claims that it provides value to its customers, health insurance plans, by connecting their members who generate high healthcare costs with programs designed to reduce those costs. Ontrak markets itself as a technology-enabled healthcare company that combines predictive analytics with human engagement to treat health plan members with unaddressed behavioral health conditions.

48. In reality, Ontrak targets potential members by simply having member engagement specialists call names on lists provided by its customer health plans. FE4 explained that member engagement specialists would receive lists of names of people to contact that were generated by Ontrak's customer health plans. To qualify for a referral to Ontrak, members had to have a chronic medical condition, along

with some history of substance abuse or mental health problems. In addition, the member must have generated at least $7,500 in health plan benefits.

49. According to FE4, a member engagement specialist would reach out to the patient and tell them that there were some new benefits available to them, and that their insurer wanted to be proactive in regard to their health. A person who enrolled would be referred to as an "Ontrak member."

50. FE5 explained that because of medical privacy rules, the Company would provide each member engagement specialist with a list of people to contact, but could not reveal what kind of health problems they experienced or what kind of program might help. The member engagement specialists' job would be to call the people on the list and "probe" to see if they could help, by asking questions such as "Is there anything you are looking to improve in your life?" It was up to the member engagement specialists to figure out what each member might need.

51. If an Ontrak member was interested in a program, the member engagement specialist would refer them to a care coach, who was a nurse or certified health coach. The care coach would talk further with the member and create some type of plan. According to FE4, the next step was a referral to a clinical operations coordinator, who would set up appointments with a psychiatrist, dietitian, counselor, or other specialist in Ontrak's network, generally within the health plan customer's network. Ontrak members could not make their own appointments with

these specialists. If an Ontrak member did not have transportation, a community care coordinator would pick them up, provided there was one in the area. FE1 explained that Ontrak's program was 52 weeks long.

**Ontrak's Billing Practices Cause Aetna to Investigate and Issue the CAP**

52. According to FE4, the largest source of Ontrak members was Aetna. FE4 stated that Aetna made up more than 85% of Ontrak's outreach pool.

53. According to FE4, Aetna paid Ontrak $750 for each member that Ontrak enrolled in a program. Aetna was deeply involved in Ontrak's strategy with its Ontrak members. For example, Aetna was the only Ontrak customer that provided scripts for member engagement specialists to use with potential members.

54. According to FE6, a quality assurance analyst at Ontrak, Ontrak billed Aetna for every interaction that an Ontrak member had with a care coach, who would check in with each member once per month.

55. FE7, who worked as a member engagement specialist, explained that Ontrak member engagement specialists routinely enrolled members who were later determined to be ineligible. According to FE7, this was normally because the program that was appropriate for them would not be covered by their health insurance plan. But Ontrak would keep these members enrolled for 90 days or longer anyway. This practice enabled Ontrak to bill Aetna for three months of contacts with care coaches, even as Ontrak employees knew from the outset that the

member would eventually have to be unenrolled. In other words, Ontrak would enroll Aetna members who the Company knew were not actually eligible for programs in order to collect fees for their contacts with care coaches until Aetna made the final determination that they were not eligible.

56. FE8 confirmed that Ontrak was enrolling members who were not actually eligible for services. FE8 was appointed to a data algorithm team that was set up to find out why so many of Aetna's enrolled members were then deemed to be ineligible for services. According to FE8, this often happened because the Aetna Medicare plans did not include mental health coverage. FE8 learned that Ontrak was billing for services that patients were ineligible to receive because sometimes Aetna would still pay Ontrak after it submitted its first bill, even if there was no coverage, and that because of those payments, the Company's management did not want to fix this problem. FE8 raised this billing issue in a meeting directly to Defendant Peizer.

57. FE1 also confirmed that Ontrak was enrolling members who then quickly fell off the Company's radar. Based on personally reviewing and monitoring records and escalated complaints, FE1 saw that member engagement specialists and care coaches were enrolling people who would never complete programs, and who sometimes did not even consent to enrollment. Until they were

disenrolled, however, Ontrak would be able to temporarily collect payments from Aetna for contacts with care coaches.

58. FE3, whose job was to develop a way to quantify the benefit that Aetna was receiving by using Ontrak's services, explained that by May 2020, Ontrak's relationship with Aetna was in dire straits because Aetna had serious questions about the value that Ontrak provided.

59. According to FE3, in May 2020, Aetna turned off its data feed of records, which had been generating new potential contacts for member engagement specialists. This was a serious development. Without that data feed, member engagement specialists could not reach out to new potential members. Indeed, FE5 reported that he stopped receiving new Aetna members to contact by approximately September 2020, and was instead asked to recontact the same people over and over.

60. The shutdown of Aetna's data feed materially impacted Ontrak's revenue from Aetna.

61. FE2 participated in conference calls every Friday between Aetna and Ontrak personnel to discuss ongoing issues. Other Ontrak personnel who participated included Fisher and Charles Polatsek ("Polatsek"), the Company's Vice President of Sales and Strategic Partnerships.

62. FE2 reported that the tone of the Friday meetings changed after Dr. Bill Gillis ("Gillis") began joining them. Gillis, the Clinical Director of Behavioral

Health Operations and Program Design at Aetna, was suspicious of Ontrak's billing and skeptical about whether Aetna was getting a return on its investment in Ontrak's services. According to FE2, Gillis would regularly "tear us a new one" on the Friday calls.

63. According to FE2, the biggest problem that Aetna staff raised was that Aetna was being billed for months when services were not provided. Ontrak argued that the members did get to talk to care coaches, but Aetna started to request records and determined that Ontrak members were not contacted by care coaches for two or three months, even as the Company continued to bill Aetna. Gillis and his Aetna colleagues began raising this issue before Aetna issued the CAP to carry out a formal investigation of Ontrak's billing in July 2020.

64. FE2 suspected long before the CAP that Ontrak was in danger of losing the Aetna contract. When Medeiros joined the Company as President and COO in December 2019, FE2 met with him one-on-one weekly for his first two months. In those meetings, FE2 told Medeiros that the Aetna billing model was bad, and that Ontrak could not sustain it.

65. FE1, FE2, and FE3 confirmed that in July 2020, Aetna transmitted the CAP to Ontrak. The CAP was an unusual disciplinary action seeking meaningful measures of the benefits created by using Ontrak's services. The CAP asked Ontrak to answer questions about billing and required Ontrak to correct a list of things,

including providing evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members. Aetna was also seeking to recoup some of the money it had paid for the enrollment of Ontrak members who never received any services. According to FE2, Aetna gave Ontrak 60 days to answer the CAP.

66. After seeing the CAP, FE1 was convinced that Ontrak was going to lose the Aetna contract. FE2 stated that she considered the CAP the beginning of the end of Ontrak's relationship with Aetna.

67. In July 2020, FE1 participated in three days of Zoom meetings with the corporate executives to discuss Aetna's CAP. Defendant Medeiros ran the meetings from a hotel room in Florida. Ontrak put Wright, the Company's Chief Medical Officer and Senior Vice President, in charge of the CAP working group. The CAP working group also included senior executive vice president of product portfolio Bryan Kelly, Polatsek, vice president of provider network management Kim Moore, chief information technology officer Jeremiah Stoke, senior vice president Sara Armstrong, and customer success manager Aidan Koch.

68. According to FE1, the Company executives in the CAP working group decided to do the bare minimum to address Aetna's concerns, even though she, Fischer, and Christopher Cirigliano (the Company's Director of Compliance) told them that the CAP was serious. FE1 recalled that Polatsek said that Aetna was just

trying to scare Ontrak, and would not really take any action. FE1 told Polatsek that perhaps he knew more as the account representative, but that there were real problems with improper billing.

69. FE10 also worked on Ontrak's response to the CAP. FE10 was on email chains concerning with CAP with Polatsek and Wright. FE10 recalled that Polatsek kept Defendant Peizer informed concerning the CAP. Polatsek told FE10 that Polatsek was going to call Peizer and update him after a meeting concerning the CAP.

70. FE2 was responsible for nearly half of the deliverables required for Ontrak's CAP response. The CAP included 11 items, five from FE2's function. After providing Medeiros and Kelly with the needed data, she and her team were excluded from further work on the response.

71. According to FE1, Ontrak never fully completed the CAP or answered Aetna's questions, giving Aetna an incomplete response. FE2 stated that after Ontrak made its response, three months went by without Aetna even acknowledging it.

72. According to FE7, in the summer of 2020, Aetna began posting member engagement specialists position jobs on sites such as Indeed and Glassdoor. Member engagement specialists at Ontrak who saw these postings and knew that Aetna made up much of Ontrak's business, became concerned that Aetna was going

to replace Ontrak with an in-house department. The Company had monthly Zoom calls for all employees, and according to FE7, at an all-hands Zoom call in late summer or early autumn of 2020, an employee asked members of senior management during a question and answer session if they should be nervous about their jobs. Members of management did not answer the question.

73. FE3 stated that by the end of 2020, she was uneasy about the Aetna contract renewal, since the Company still had not satisfied the CAP. FE7 stated that in the Company's January or February monthly all-employees Zoom call, Defendant Peizer commented that he would "pray" that Aetna signed.

**Ontrak Loses Aetna's Business**

74. FE10, who was a member of the sales team attempting to keep Aetna, found out about the loss of the Aetna contract about a month before it was publicly announced. FE10 recalled that the sales team was told that Ontrak had lost Aetna's business, that it was going to be catastrophic for the Company, and that Ontrak had to work on the messaging before disclosing the news.

75. FE6 stated that in January or February 2020, Defendant Peizer sent a Company-wide email to say that he had just found out that Aetna was not going to be renewing its contract. In a follow-up meeting, Peizer told Ontrak employees that there were no plans to lay anyone off, and that Ontrak could recover.

76. FE9 also recalled the Company-wide meeting about the loss of the Aetna contract. FE9 stated that this was a Zoom meeting held in late January or early February. FE9 stated that Peizer was crying throughout his presentation, as he told employees that Ontrak would survive and there would be no layoffs.

77. FE10 also described this Company-wide meeting, several weeks before Ontrak publicly announced the loss of Aetna, when Peizer emotionally told employees that Ontrak would survive.

78. FE10, FE6, and FE9 each confirmed that Ontrak concealed the news that it had lost its largest customer for at least several weeks before disclosing it to investors.

**Ontrak Misleads Investors About Aetna Artificially Inflating Ontrak's Stock Price; To Capitalize, Ontrak Raises Money in Preferred Stock Offerings[4]**

79. On August 5, 2020, the beginning of the Class Period, Ontrak filed its quarterly report on Form 10-Q on August 5, 2020 for the period ended June 30, 2020 (the "2Q 2020 10-Q"). While the Company disclosed as a risk factor that a substantial percentage of its revenues were attributable to four large customers, any

[4] Plaintiff attaches and incorporates by reference the Ruling of Judge Stuart M. Rice in *Braun v. Ontrak*, No. 22STCV07174, Superior Court of California, Los Angeles County, overruling the defendants' demurrer to substantively similar allegations concerning materially false and misleading statements concerning Ontrak's relationship with Aetna and Cigna brought by a class of holders of Ontrak's Preferred Stock, as Exhibit C hereto.

of which could terminate its services at any time, it omitted that Aetna, the largest and most important, had turned off its data feed to Ontrak and issued the CAP. Defendants Peizer and LaVerne signed the 2Q 2020 10-Q.

80. Defendants had a duty to disclose the CAP and the shutdown of the data feed because the Company's affirmative statements were rendered false or misleading by virtue of the omissions. By disclosing to investors that one of its risk factors was that a substantial percentage of its revenues was attributable to Aetna, Defendants Ontrak, Peizer, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from Aetna had already materialized because Aetna had turned off the data feed and was investigating its billing practices and added value through the CAP.

81. Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP. SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303(a)(3) ("Item 303") requires registrants to disclose in management's discussion and analysis of a registrant's financial condition and results of operations ("MD&A") "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Item 303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required the disclosure because they

were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

82. Also on August 5, 2020, Defendants Peizer, LaVerne, and Medeiros held a conference call to discuss the Company's second quarter 2020 results. Defendant Peizer told investors that Ontrak's business with Aetna was actually growing, stating:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights.

83. Peizer's statement touting "enhancements to our algorithms feeding the outreach pool" was materially false and misleading because there were no algorithms feeding the outreach pool. Ontrak's outreach pool was lists of names of people to contact that were generated by Ontrak's customer health plans. More, by

discussing "further expansions with Aetna" and "enhancements to our algorithms feeding the outreach pool" without disclosing that the Company's largest customer, Aetna, which made up more than 85% of Ontrak's outreach pool, had actually stopped providing potential new members to Ontrak, Peizer materially misled investors about Ontrak's current and near-term business.

84. More, by touting "further expansions with Aetna" while omitting that Aetna had turned off its data feed of records to Ontrak in May and then transmitted the CAP to Ontrak, Peizer materially misled investors about the state of the Company's relationship with its largest customer.

85. These materially false statements and omissions inflated the value of Ontrak's stock. Ontrak's stock rose sharply in value, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020.

86. On August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of 1,700,000 shares of its 9.50% Series A Cumulative Perpetual Preferred Stock (the "Series A Preferred Stock") with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $25.00 per share. Ontrak announced on August 26, 2020 that it had closed the Series A Preferred Stock Offering, after raising gross proceeds of approximately $42.5 million and net proceeds of approximately $39.3 million.

87. In other words, the Series A Preferred Stock Offering was Ontrak's reaction to the CAP. The month after Aetna transmitted the disciplinary CAP to Ontrak and Ontrak issued false reassurances that sharply and artificially inflated Ontrak's stock price, Ontrak raised nearly $40 million from unknowing investors.

88. On August 31, 2020, Ontrak announced that its common stock, which had previously been traded on the NASDAQ Capital Market, had been uplisted on the NASDAQ Global Market.

89. On September 8, 2020, Ontrak announced that it had closed the full exercise of the underwriters' over-allotment option regarding its Series A Preferred Stock Offering, resulting in aggregate gross proceeds of $48.9 million and aggregate net proceeds of $45.3 million to the Company from the public offering.

90. On November 5, 2020, Ontrak issued a press release announcing its third quarter 2020 financial results. Defendants stated that "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak."

91. The statement that Aetna had no compliance issues or concerns with Aetna and the disruption to its data refreshes was due to reviews that Aetna was carrying out for all vendors was materially false. In fact, Aetna had turned off its data feed to Ontrak in May (not July), and then transmitted a disciplinary CAP to

Ontrak, seeking to investigate the Company's billing and looking for meaningful measures of the benefits of Ontrak's services.

92. Also on November 5, 2020, Defendants Peizer, LaVerne, and Medeiros held a conference call to discuss Ontrak's third quarter 2020 results. After telling analysts that the Company expected 2021 revenue growth in excess of 100%, Defendant Peizer specifically addressed the impact of "disrupted data refreshes" at Ontrak's largest customer, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak…. Importantly, this is one of the plans for which we anticipate continued significant expansion.

93. The statement that Aetna had no compliance issues or concerns with Ontrak and that routine compliance reviews had disrupted data refreshes since July was materially false and misleading. In fact, Aetna had turned off its data feed of records to Ontrak in *May,* not July, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Indeed, later on the call, Peizer said that Aetna had previously provided data "on a monthly refresh," but by November, it had not provided new data to Ontrak in five months. Aetna had also transmitted a disciplinary CAP to Ontrak, looking for meaningful

measures of the benefits of Ontrak's services. More, Peizer's statement that the Company anticipated "continued significant expansion" of its Aetna business was materially false. In fact, Aetna was questioning Ontrak's billing and investigating its added value, not discussing potential expansion. Finally, the statement that the Company expected 2021 revenue growth in excess of 100% was materially misleading because the shutdown of Aetna's data feed was materially impacting the Company's revenue, and its revenue projections were based on billing practices that Aetna was investigating as potentially fraudulent.

94. In response to a question from Charles Rhee, an analyst at Cowen and Company, LLC, Defendant Medeiros stated:

> So as far as timing with the expected data refreshes to be turned back on, we have a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year.

95. This statement was materially false and misleading because there was no such mutual agreement.

96. Peizer repeatedly stated that what he called the Aetna "data refresh" was not a performance issue. In response to a question from Richard Collamer Close of Cannacord Genuity Corp., Peizer stated that "it really has nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is."

97. This statement was false and misleading. Aetna had shut down the data feed in May precisely because of a performance problem. Aetna had turned off its data feed of records to Ontrak in May, after its Clinical Director of Behavioral Health Operations and Program Design repeatedly questioned Ontrak's billing practices and whether the Company provided a return on Aetna's investment. Aetna then transmitted a disciplinary CAP to Ontrak. By November, Ontrak had submitted a materially incomplete response to Aetna's CAP, Aetna had not turned the data feed back on, and negotiations to renew Aetna's contract were in dire straits, as Ontrak failed to provide proof of Ontrak's value.

98. Also on November 5, 2020, Ontrak filed its 3Q 2020 10-Q. The 3Q 2020 10-Q omitted any mention of the CAP. While the Company disclosed as a risk factor that a substantial percentage of its revenues were attributable to four large customers, any of which could terminate its services at any time, it omitted that Aetna was investigating its billing practices and added value. Defendants Peizer and LaVerne signed the 3Q 2020 10-Q.

99. Defendants had a duty to disclose the CAP because the Company's affirmative statements were rendered false or misleading by virtue of the omission. By disclosing to investors that one of its risk factors was that a substantial percentage of its revenues was attributable to Aetna, Defendants Ontrak, Peizer, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's

revenue from Aetna had already materialized because Aetna was investigating its billing practices and added value through the CAP.

100. Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP. Item 303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

101. The market accepted these false and misleading explanations for why Ontrak was not enrolling new Aetna members. In its November 5, 2020 report, Cannacord Genuity Corp. explained that the Aetna data delay was because "CVS [Aetna's parent company] required all 3rd party vendors, including those for Aetna, to be reviewed for compliance requirements," and wrote that despite this issue, Ontrak "continued to execute." In its November 5, 2020, Cowen and Company

wrote that it remained positive on Ontrak, since it had grown enrollment overall despite "a data feed issue from [Aetna]."

102. Defendants Ontrak, Peizer, LaVerne, and Medeiros then raised more money. On December 15, 2020, Ontrak announced that it had commenced a follow-on underwritten public offering of 1,730,000 shares of the Series A Preferred Stock with a liquidation preference of $25.00 per share. The next day, the Company announced that the Series A Preferred Stock would be priced at $24.75 per share.

103. Immediately prior to this follow-on offering, Aetna had explicitly told Ontrak that it would not turn on the data feed back on without a different contract. As a result, Ontrak faced two possibilities regarding its future with Aetna: either a material reduction to the revenue that it could realize from Aetna, or the loss of the contract entirely. Accordingly, Ontrak needed to raise money before investors found out.

104. Ontrak closed the follow-on Series A Preferred Stock offering on December 21, 2020, after raising gross proceeds of approximately $42.8 million and net proceeds of approximately $39.7 million.

**<u>The Loss of the Aetna Contract Emerges But Defendants Continue to Lie</u>**

105. On March 1, 2021 at 8:00 a.m., Ontrak issued a press release announcing preliminary financial results for fourth quarter and full year 2020. Therein, the Company stated that its largest customer had terminated its contract

with Ontrak, effective June 26, 2021. The Company stated that this customer "evaluated Ontrak on a provider basis" and "[a]s such, the customer evaluated [Ontrak's] performance based on [its] ability to achieve the lowest possible cost per medical visit, and not on [its] clinical outcomes data or medical cost savings." The Company also stated that "the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics." Specifically, the Company's press release stated, in relevant part:

> Mr. Peizer continued, "After a long process with our largest customer where we believed we were working towards an extended and expanded contract, we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021. We were advised to stop enrollment of new members for this customer and await guidance from the customer on transition plans for the 8,400 members who are currently benefiting from the Ontrak program. We remain fully committed to the health plan and to its members, and will ensure that every member receives quality care through the transition, so that pandemic-related anxiety is not heightened by the change in the member's care team."
>
> Mr. Peizer added, "The relationship with our Ontrak-A customer was unique, because they evaluated Ontrak on a provider basis, not as a vendor as do all of our other health plan partners. As such, the customer evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings, which were meaningful and significant. Unlike our other health plan partners, we interacted only with the behavioral health division, with no involvement from the medical division of the plan. We believe that the coaching model which Ontrak has pioneered for over a decade was seen by the customer to be less relevant to their performance metrics. We have consistently found that our care coaches have a tremendously positive impact on member experience and readiness to engage with the

healthcare system. This is the reason that many digital healthcare apps are now building care coaching into their products. We have a strategy in place to regain the Ontrak-A business and are currently in late stage discussions with other customers whose metrics align with our value proposition of an integrated approach to whole health that delivers an average ROI of 3.7, average cost savings of 40% to 50%, and durable clinical outcomes with exceptionally high program retention and member experience scores. Collectively, we have a market opportunity of over $30 billion."

106. As a result, Ontrak noted that it expected revenue of $100 million for 2021, rather than the $165 million it would have expected without the loss of Aetna as a customer. Conveniently, the preferred stock offerings that raised a total of $91.7 million while the Company's stock was artificially inflated from the alleged misstatements and omissions more than filled the shortfall of expected revenue.

107. In this statement, however, Defendants Ontrak, Peizer, LaVerne, and Medeiros continued to materially mislead investors. Defendant Peizer's statement that "we were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021" was false and misleading. Aetna had actually notified Ontrak approximately one month earlier.

108. Defendant Peizer's explanation that Aetna had decided to terminate the contract because it "evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings" was also materially false and misleading. Aetna terminated the contract with Ontrak after Ontrak failed to materially complete a CAP that 1)

required answers to questions about billing, including billing for members who had been improperly enrolled in programs for which they were not eligible, 2) provide evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members, and 3) provide meaningful measures of the benefits created by using Ontrak's services.

109. On this news, Ontrak's share price fell $27.32, or more than 46%, to close at $31.62 per share on March 1, 2021.

110. In a conference call held on March 1, 2020, Defendants LaVerne and Medeiros continued to mislead investors about the events that resulted in Aetna's termination of its contract. Medeiros told analysts:

> In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time.

111. This statement was false and misleading because Medeiros falsely told investors that in December, Aetna had completed the general audit of all its vendors that had caused the data feed to Ontrak to be shut down. But in reality, Aetna turned off the data feed to Ontrak in May 2020 because of problems with Ontrak, not a general audit of all vendors. In fact, in July 2020, Aetna had transmitted a CAP to Ontrak, which required Ontrak to justify its billing practices, demonstrate proper enrollment procedures, and provide meaningful measures of the benefits of

Ontrak's services before it renewed its contract. Ontrak submitted a materially incomplete response to Aetna. Aetna's refusal to continue its existing contract was a response to being dissatisfied with Ontrak's answers to its questions and skeptical of its billing practices and ability to add any value.

112. Indeed, if, as Medeiros claimed, Aetna told Ontrak in mid-December that it would have to immediately renegotiate its contract, that would mean that Ontrak's late-December follow-on Series A Preferred Stock offering was a direct response to Defendants' growing realization that Ontrak was about to lose the Aetna business.

113. Medeiros further stated that "when I received the call late Friday that talked about the termination, it was a surprise. We were working towards a new agreement and an expanded relationship."

114. This statement was false and misleading because Aetna had notified Ontrak that it was terminating its contract materially earlier. FE10 learned about the loss of the Aetna contract about a month before it was publicly announced. According to FE6, FE9, and FE10, Defendant Peizer told Ontrak employees that Aetna would not be renewing its contract in late January or early February 2021, first in a Company-wide email and then in a follow-up Zoom meeting.

115. Defendants Peizer and Medeiros were both forced out of their management roles as a result of this fraud. On March 16, 2021, Ontrak announced

that Defendant Mayhew would become Ontrak's CEO, while Peizer would instead become Executive Chairman. Then, on April 8, 2021, Ontrak announced the resignation of Defendant Medeiros.

**Ontrak Misleads Investors Concerning the Loss of Cigna's Business**

116. By February 2021, Cigna was also reducing the number of its members that it referred per month to Ontrak for services.

117. Cigna developed serious concerns about the Ontrak contract in March 2021. A Cigna internal business analysis determined that Ontrak had an unfavorable return on investment in two of its markets.[5]

118. By April 2021, Cigna informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, because Ontrak's services were not meeting Cigna's expectations. As a result, Ontrak faced two possibilities: either a material reduction to the $90 million over three years that Ontrak had expected to realize from Cigna, or a cancellation of the contract. Cigna also halted discussions on any potential expansion of Ontrak's services to Cigna.

---

[5] *See* April 18, 2022 FBI 302 memorandum of the FBI's April 1, 2022 interview of Jessica Kinowski, available at *United States v. Terren S. Peizer*, Court Docket: 2-23-CR-89, ECF No. 1114-9.

119. Between March and May 2021, Defendant Peizer learned that Cigna had raised numerous issues concerning its relationship with Ontrak and that Ontrak was in serious danger of Cigna terminating its agreement with Ontrak.

120. On or about March 31, 2021, Defendant Peizer described himself as "fixated" on Cigna in a text message to an Ontrak consultant. On or about April 2 and 14, 2021, Defendant Peizer wrote in text messages with the same consultant that Ontrak's management needed to "save Cigna." On or about April 15, 2021, Peizer wrote in a text message to Defendant Mayhew: "Please just save Cigna…then we will get back 'OnTrak.'"

121. On or about April 24, 2021, in response to an update on the relationship between Ontrak and Cigna, Defendant Peizer wrote that "This feels eerily like Aetna" and that "Baby is losing his hair from chemo," which was a reference to Ontrak's potential loss of Cigna as a customer.

122. On or about April 30, 2021, in response to another update on the Ontrak-Cigna relationship, Defendant Peizer wrote in a text message to the consultant, "Doesn't sound optimistic". The next day, he wrote in another text message to the consultant concerning Cigna, "What a nightmare."

123. By May 2021, Cigna had reduced the number of patients that it referred to Ontrak from several thousand members per month to approximately 50 members

per month. This reduction materially reduced Ontrak's billings to and revenue from Cigna.

124. By May 4, 2021, a meeting with Cigna's Chief Medical Officer had been scheduled for May 18, 2021, to discuss the status of the relationship.

125. On May 6, 2021, Ontrak filed a Form 10-Q quarterly report with the SEC ("1Q 2021 10-Q") for the quarterly period ended March 31, 2021, disclosing as a risk factor, among other things, that "[o]ur business currently depends upon four large customers; the loss of any one such customers would have a material adverse effect on us[,]" but omitting any mention of Cigna's material reduction of the number of patients it was referring to Ontrak or that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on materially less favorable terms for Ontrak. Defendants Mayhew and LaVerne signed the 1Q 2021 10-Q.

126. Defendants had a duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on materially less favorable terms for Ontrak because the Company's affirmative statements were rendered false or misleading by virtue of the omission. By disclosing to investors that one of Ontrak's risk factors was that a substantial percentage of its revenues was attributable to Cigna, Defendants Ontrak, Mayhew, and LaVerne rendered

themselves duty-bound to disclose that the risk to Ontrak's revenue from Cigna had already materialized because Cigna had materially reduced its referrals to Ontrak and informed the Company that its contract would have to be renegotiated, on materially less favorable terms for Ontrak.

127. Defendants also had an independent duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on materially less favorable terms for Ontrak. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertain[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

128. Also on May 6, Ontrak held a conference call to discuss its first quarter 2021 results. On the call, RBC Capital Markets analyst Thomas Keller asked for a

"sense of how Cigna is tracking me relative to the 40 million expected in the first year," as well for an update on timing of expansions of the Cigna business. Defendant LaVerne stated that while "we're not really commenting that specifics on individual customers….[we] ultimately expect that – believe and expect that we're going to be within [the $90 million over three years] range at least."

129. This statement was materially false and misleading. Cigna had already informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, and had already materially reduced the number of patients that it referred to Ontrak. This reduction materially reduced Ontrak's billings to and revenue from Cigna. Defendants Ontrak, Peizer, LaVerne, and Mayhew therefore already knew that Ontrak had no possibility of fulfilling the original $90 million three-year contract.

130. Also on the May 6, 2021 earnings call, Colliers Securities analyst Gene Mannheimer asked: "[H[ow much of the sequential decline in the outreach pool was driven by the loss of a large customer? Was it all of it?" Defendant Mayhew responded that "[i]t was nearly all of it."

131. This statement was materially false and misleading. Aetna was not responsible for all or nearly all of the decline in Ontrak's outreach pool. Cigna had also materially reduced the number of patients it referred to Ontrak, from several thousand members per month to approximately 50 members per month.

132. On May 18, 2021, Cigna informed Ontrak's management of its intent to terminate their contract by the end of the year. In an interview with Federal Bureau of Investigation ("FBI") agents on October 20, 2022, Defendant Mayhew stated that Cigna was "pretty firm" with the decision to cancel the relationship with Ontrak on May 18, 2021, and that he took the termination at face value. Mayhew believed that the decision maker at Cigna for the termination was an executive named Tim Brown. Because Brown had worked at Aetna right before Cigna, Mayhew felt that the situation did not look good.[6] Mayhew did not know whether there was a zero percent chance of saving the relationship with Cigna, but he did know that if the relationship could be salvaged, it would definitely be under a different, materially less remunerative contract.[7]

133. Defendant Mayhew told the FBI that he believed knowledge surrounding new contracts could be material information.

134. Defendants Ontrak, Peizer, LaVerne, and Mayhew did not disclose to investors that Cigna had told Ontrak that it would terminate its existing contract by the end of the year to investors and that if Ontrak was able to retain Cigna's business it would be under a materially less remunerative contract.

---

[6] Tim Brown left Aetna for Cigna on January 22, 2021.

[7] *See* November 4, 2022 FBI 302 memorandum of the FBI's October 20, 2022 interview of Jonathan Mayhew, available at *United States v. Terren S. Peizer*, Court Docket: 2-23-CR-89, ECF No. 1114-6.

135. Defendant Mayhew notified Defendant Peizer that Cigna told him that it intended to terminate its existing contract on May 18, 2021.

136. On May 25, 2021, Defendant Mayhew emailed executives at Cigna, proposing immediate changes to the contract that would materially reduce the cost per enrolled member to Cigna. This proposal would, in turn, materially reduce the revenue that Ontrak could realize from Cigna.[8]

137. Cigna continued to reduce the number of patients that it referred to Ontrak. For example, on or about July 15, 2021, an Ontrak consultant informed Defendant Peizer that Cigna was "really throttling members being sent to us. It's a trickle at this point."

138. Ontrak continued to make offers to Cigna with lower costs. On June 28, 2021, Bent Christiansen, the Company's senior vice president and general manager, customer strategy and solutions, emailed Richard Johnson, a vice president in the Cigna Medicare advantage program, stating that Ontrak would send a proposal with "significant program savings," and that the Company was "fully flexible to adjust to Cigna's ROI." Notably, Christiansen also wrote, "I think this covers what is needed for Cigna to feel satisfied from the program performance and

[8] *See* May 25, 2021 email thread from Aparna Abburi to Jonathan Mayhew, Matthew Manders, Gina Conflitti, and Timothy Brown, with the subject line: "Re: [External] Getting back Ontrak[,]" available at *United States v. Terren S. Peizer*, Court Docket: 2-23-CR-89, ECF No. 1114-10.

for Cigna to feel comfortable to ramp back up to productive operations."[9] This email confirms that "productive operations" on Cigna's contract had already stopped; that Ontrak was effectively no longer carrying out work for Cigna in any material way.

139. On August 5, 2021, Ontrak filed a Form 10-Q quarterly report with the SEC ("2Q 2021 10-Q") for the quarterly period ended June 30, 2021, listing as a risk factor, among other things, that "[o]ur business currently depends upon four large customers; the loss of any one such customers would have a material adverse effect on us[,]" but omitting any mention of Cigna's decision to terminate its existing contract or the material reduction of the number of patients it was referring to Ontrak. Defendants Mayhew and LaVerne signed the 1Q 2021 10-Q.

140. Defendants had a duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had told Ontrak that it had decided to terminate its contract because the Company's affirmative statements were rendered false or misleading by virtue of the omission. By disclosing to investors that one of Ontrak's risk factors was that a substantial percentage of its revenues was attributable to Cigna, Defendants Ontrak, Mayhew, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from

[9] *See* June 30, 2021 email thread from Richard Johnson to Bent Christiansen, copying Dena Lieberg, with the subject line: "Re: [External] RE: Ontrak," available at *United States v. Terren S. Peizer*, Court Docket: 2-23-CR-89, ECF No. 1114-12.

Cigna had already materialized because Cigna had told Ontrak that it had decided to terminate its contract and had materially reduced its referrals to Ontrak.

141. Defendants also had an independent duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had told Ontrak that it had decided to terminate its contract. Item 303 of Regulation S-K, 17 C.F.R. §229.303 required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required their disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."

142. Also on August 5, 2021, Ontrak held a conference call to discuss its second quarter 2021 results. Defendant Mayhew described in detail a "listening tour" with Ontrak customers. He did not disclose that Cigna had told Ontrak on May 18,

2021 that it would terminate their contract by the end of the year or that Cigna had essentially stopped referring new members to Ontrak.

143. That omission rendered Mayhew's statement materially false and misleading. Defendants Ontrak, Peizer, LaVerne, and Mayhew knew at the time of the conference call that Cigna had already decided to terminate its existing contract, and that Ontrak's only hope of retaining Cigna as a customer would require it to accept materially less payment for its services (in turn, materially impacting its revenue). They also knew that Cigna had materially reduced the number of members it was referring to Ontrak, to the point where Ontrak was essentially no longer carrying out work for Cigna. When Mayhew disclosed obtaining customer feedback, he rendered himself duty-bound to disclose this feedback from Cigna.

144. Even more specifically, Defendant Mayhew told analysts and investors:

> "Key account leaders within our customer organizations tell us that their major accounts value the Ontrak program. We're well positioned to heighten the value that health plans create for commercial populations by building trust, engagement and readiness with employees so that their employers experience higher enterprise loyalty and commitment levels.
>
> As we've begun testing receptivity to the growth initiatives, not only with our customers, but with prospects and providers, the feedback has been very positive. We've seen an increase in initial discussions in recent weeks in our sales pipeline. While it's still early, we're encouraged by dialogue we are having with health plans, provider groups and employer organizations."

145. This statement was materially false and misleading because it omitted that Cigna, Ontrak's largest customer, had determined that Ontrak had an unfavorable return on investment, and had told the Company on May 18, 2021 that it was terminating its existing contract by the end of the year. When Defendants Ontrak, Peizer, LaVerne, and Mayhew touted how Ontrak's key customers valued its program, they rendered themselves duty-bound to disclose that Ontrak's largest existing contract was ending, that Ontrak's only hope of retaining Cigna as a customer would require it to accept materially less payment for its services (in turn, materially impacting its revenue), and that Cigna had materially reduced the number of members it was referring to Ontrak, to the point where Ontrak was essentially no longer carrying out work for Cigna.

146. FE10 recalled that he learned at least three to four weeks before Ontrak announced publicly that Cigna was terminating its contract that the termination was definite, and Ontrak had no possibility of negotiating a new contract.

**The Loss of Cigna's Business Becomes Public**

147. On August 18, 2021, during a scheduled call, Cigna formally notified Ontrak that it was terminating its contract with the Company.

148. On August 19, 2021, Ontrak filed a form 10-K with the SEC disclosing, for the first time, the termination of its business with Cigna. On this

news, the Company's stock price fell by $9.37/share or over 44%, to close at $11.68/share on August 19, 2021, materially harming investors.

**<u>Defendant Peizer's Criminal Insider Trading Scheme</u>**

149. Between May 2021 and August 2021, Defendant Peizer carried out an insider trading scheme to avoid personal losses when the truth about Cigna would eventually be revealed to the market.

150. On or about May 4, 2021, in advance of Ontrak's May 18, 2021 meeting with Cigna, Defendant Peizer contacted a broker ("Broker A") to set up a Rule 10b5-1 plan in order to sell shares of Ontrak valued at approximately $19 million. After being informed that Broker A required the 10b5-1 plan to have a cooling-off period, Peizer contacted another broker ("Broker B)" instead. While Broker B did not require a cooling-off period, they did warn Peizer that not following the industry best-practice of a 30-day cooling-off period, together with "rapid transaction executions subsequent to plan adoption" might "create an appearance of impropriety and call into question whether a plan adopter had MNPI [material non-public question whether a plan adopter had MNPI [material non-public." Defendant Peizer insisted that the plan not have a cooling-off period and and that he be allowed to start selling his shares as soon as possible.

151. To obtain approval of the 10b5-1 plan, Defendant Peizer falsely certified that "this proposed dealing was not a result of access to, or receipt of

Material Nonpublic Information as described in the Company's Insider Trading Policy."

152. On or about May 10, 2021, eight days before Cigna told Ontrak that it would terminate their contract by the end of the year, Defendant Peizer entered into a Rule 10b5-1 plan (the "May Trading Plan") through Broker B. The May Trading Plan was in the name of Acuitas Group Holdings, an investment company wholly owned by Peizer, which he used to hold his interests in various companies, including Ontrak. As part of the May Trading Plan, Defendant Peizer falsely certified to Broker B that he was not in possession of material nonpublic information. Peizer directed Broker B to begin selling his Ontrak shares the next day.

153. Pursuant to the May Trading Plan, Defendant Peizer exercised approximately 686,000 Ontrak stock warrants on a cashless basis, resulting in his acquisition of approximately 585,000 shares. He then began selling these shares on or about May 11, 2021, and continued to do so until on or about July 20, 2021. The sales from on or about May 11, 2021, to on or about July from on or about May 11, 2021, to on or about July.

154. After learning on May 18, 2021 that Cigna would terminate its contract with Ontrak by the end of the year, Peizer continued to receive updates about the situation. For example, on or about July 15, 2021, an Ontrak consultant sent a text

message informing Defendant Peizer that Cigna was "really throttling members being sent to us. It's a trickle at this point."

155. On or about August 13, 2021, Ontrak's Senior Vice President and General Manager of Customer Strategy and Solutions, who was leading the contract renegotiations with Cigna, told Peizer that he believed Cigna was likely to formally terminate its relationship with Ontrak. Approximately one hour after that phone call, Defendant Peizer entered into a second Rule 10b5-1 plan (the "August Trading Plan") with Broker B to sell more of his Ontrak shares.

156. Prior to implementing the August Trading Plan, Defendant Peizer falsely certified to Defendant LaVerne the that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." He also falsely certified to Broker B that he was not in possession of material nonpublic information.

157. Like the May Trading Plan, Defendant Peizer began selling Ontrak shares the next trading day after the plan was implemented. He increased the daily number of shares sold pursuant to his plan to 15,000 per day from 11,000 shares per day under the May Trading Plan.

158. Prior to Ontrak's public announcement that Cigna had terminated its contract with Ontrak, Defendant Peizer sold approximately 45,000 Ontrak shares

over the course of three trading days, from on or about August 16 to on or about August 18, 2021, resulting in approximately $900,000 in proceeds.

159. Through the May Trading Plan, Defendant Peizer avoided approximately $12,069,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares. Through the August Trading Plan, Defendant Peizer avoided approximately $463,000 in losses from the exercise of his Ontrak warrants and sale of the resulting Ontrak shares.

160. The cooperation of Defendants Mayhew and LaVerne was a necessary part of Defendant Peizer's insider trading scheme. Defendant Mayhew regularly provided Peizer with updates on Ontrak's relationship with Cigna during the time that he was carrying out his scheme, and in order to enter into each of the trading plans, Defendant Peizer made certifications to Defendant LaVerne that "this proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." Mayhew and LaVerne permitted Peizer to carry out his plans, even as they knew that he knew that Cigna would terminate its contract with Ontrak by the end of 2021.

**Additional Allegations Supporting Falsity and Scienter**

161. Aetna was Ontrak's largest customer, and its contract was core to the Company's business. Defendants Peizer, LaVerne, and Medeiros closely monitored Ontrak's business with Aetna.

162. At the beginning of the Class Period, Cigna was Ontrak's second largest customer. After the loss of the Aetna contract, it became its largest. Cigna's contract was core to Ontrak's business, and especially after the loss of Aetna, Defendants Peizer, LaVerne, and Mayhew closely monitored Ontrak's business with Cigna.

163. The accounts of FE1, FE2, FE8, and FE10 show the flow of information concerning the CAP to the top of Ontrak's management. FE1 and FE2 met with Medeiros concerning the CAP and Aetna billing problems. FE8 was part of a team that was set up to investigate problems with the enrollment of Aetna members and raised Aetna's billing problems directly to Defendant Peizer. FE10 saw that Polatsek, the Company's Vice President of Sales and Strategic Partnerships, updated Peizer concerning the CAP.

164. More, FE6, FE9, and FE10 each confirm that Ontrak concealed the news that it had lost the Aetna contract for at least several weeks before disclosing it to investors.

165. It is therefore not plausible that Defendants Peizer, LaVerne, and Medeiros were unaware of the actual reason for Aetna's shutdown of the data feed and of the CAP. If they did not know, and they nevertheless spoke to investors about these topics without being informed, they were minimally severely reckless.

166. Twice, in response to bad news from Aetna that were not known to investors (first, the CAP, and then, the looming loss of the contract), Ontrak concealed the bad news, capitalized on the artificially inflated value of the Company, and immediately raised money in Preferred Stock offerings.

167. The departure of Medeiros and Peizer from their management roles additionally support an inference of scienter.

168. Defendant Mayhew told the FBI that he learned about the loss of the Cigna contract on May 18, 2021. He additionally told the FBI that he believed such knowledge could be material information.

169. It is therefore not plausible that Defendants Mayhew, LaVerne, and Peizer were unaware of the loss of Cigna's contracts or of the material reduction in Cigna's referrals to Ontrak. If they did not know, and they nevertheless spoke to investors about these topics without being informed, they were minimally severely reckless.

170. Defendant Peizer's criminal insider trading scheme additionally raises a strong inference of scienter with respect to his own failure to disclose the imminent loss of Cigna, which is imputed to Ontrak. As a corporate insider, Peizer was required to abstain from trading in the shares of his corporation unless he first disclosed all material inside information known to him. With actual knowledge that Cigna first materially reduced its referrals to Ontrak and then told Ontrak

management on May 18, 2021 that it was terminating its contract, Peizer neither disclosed nor abstained from trading on material non-public information about Cigna.

## CLASS ACTION ALLEGATIONS

171. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased Ontrak publicly traded common stock on U.S. Exchanges between August 5, 2020 and August 19, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

172. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ontrak's shares actively traded on the NASDAQ markets. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Ontrak shares were traded publicly during the Class Period on the NASDAQ markets. Record owners and other members of the Class may be identified from records maintained by Ontrak or its transfer agent and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

173. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

175. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ontrak; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

176. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

177. The market for Ontrak securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, Ontrak securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Ontrak securities and the market information relating to Ontrak, and have been damaged thereby.

178. During the Class Period, the artificial inflation of Ontrak stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ontrak's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Ontrak and its business and financial condition, causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Ontrak's securities at such artificially inflated prices, and each of them has been damaged as a result.

179. At all relevant times, the market for Ontrak securities was an efficient market for the following reasons, among others:

a) Ontrak stock met the requirements for listing, and was listed and actively traded on the NASDAQ Capital Market and the NASDAQ Global Market, highly efficient and automated markets;

b) As a regulated issuer, Ontrak filed periodic public reports with the SEC;

c) Ontrak regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or;

d) Ontrak was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were

distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

180. As a result of the foregoing, the market for Ontrak securities promptly digested current information regarding Ontrak from all publicly available sources and reflected such information in Ontrak's stock price. Under these circumstances, all purchasers of Ontrak securities during the Class Period suffered similar injury through their purchase of Ontrak securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

181. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

182. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

183. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

184. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ontrak securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Ontrak securities at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

185. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ontrak securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ontrak's business and operations.

186. By virtue of their positions at Ontrak, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

187. Defendants Ontrak, Peizer, LaVerne, and Medeiros were motivated to make false statements and omit material information necessary to make the statements between August 5, 2020 and March 1, 2021 not misleading in order to carry out an offering of preferred stock that raised gross proceeds of approximately $42.8 million for the Company.

188. Defendants Ontrak, Peizer, LaVerne, and Mayhew were motivated to make false statements and omit material information necessary to make the statements between March 1, 2021 and August 19, 2021 not misleading so that Peizer could carry out an insider trading scheme to avoid personal losses.

189. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Ontrak, the Individual Defendants had knowledge of the details of Ontrak's internal affairs.

190. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ontrak. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ontrak's businesses, operations, future financial condition and future prospects. As a result of the dissemination of

the aforementioned false and misleading reports, releases and public statements, the market price of Ontrak securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ontrak's business which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ontrak securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

191. During the Class Period, Ontrak securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ontrak securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ontrak securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ontrak securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

192. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

193. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been materially misleading investors about its relationship with Aetna.

## COUNT II

## Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

194. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

195. During the Class Period, the Individual Defendants participated in the operation and management of Ontrak, and conducted and participated, directly and indirectly, in the conduct of Ontrak's business affairs. Because of their senior positions, they knew the adverse non-public information about Ontrak's current and future business prospects.

196. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

with respect to Ontrak's business practices, and to correct promptly any public statements issued by Ontrak which had become materially false or misleading.

197. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ontrak disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ontrak to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ontrak within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ontrak securities.

198. Each of the Individual Defendants, therefore, acted as a controlling person of Ontrak. By reason of their senior management positions and/or being directors of Ontrak, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ontrak to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ontrak and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

199. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ontrak.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: March 5, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for Lead Plaintiff

and

Brian Schall, Esq.
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

Additional Counsel for Lead Plaintiff

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On March 5, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 5, 2024, at New York, New York.

/s/ Laurence Rosen

Laurence M. Rosen

**ADDENDUM TO**

**AMENDED COMPLAINT FOR VIOLATIONS OF**

**THE FEDERAL SECURITIES LAWS**

Master Docket No. 2:21-cv-01987-FLA-E

| Speaker | Document | Type | Statement | If Misstatement: Reason Why Statement is False or Misleading<br><br>If Omission: Duty to Disclose that Defendants Violated |
|---|---|---|---|---|
| Ontrak (Defendants Peizer and LaVerne signed) | August 5, 2020, Form 10-Q | Omission (¶¶79-81) | Ontrak omitted that Aetna had turned off its data feed to Ontrak and issued the CAP. ¶79. | • Defendants had a duty to disclose the CAP and the shutdown of the data feed because the Company's affirmative statements were rendered false or misleading by virtue of the omissions. By disclosing to investors that one of its risk factors was that a substantial percentage of its revenues was attributable to Aetna, Defendants Ontrak, Peizer, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from Aetna had already materialized because Aetna had turned off the data feed and issued the CAP. ¶80.<br><br>• Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP under Item 303 of Regulation S-K, 17 C.F.R. §229.303, which required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required the disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." ¶81. |

| | | | | |
|---|---|---|---|---|
| Defendant Peizer | August 5, 2020, 2nd Quarter Conference Call. | Misstatement (¶¶82-84) | "Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights." ¶82. | • Peizer's reference to "enhancements to our algorithms feeding the outreach pool" was materially false and misleading because there were no algorithms feeding the outreach pool. Ontrak's outreach pool was lists of names of people to contact that were generated by Ontrak's customer health plans. ¶83.<br><br>• By discussing "further expansions with Aetna" and "enhancements to our algorithms feeding the outreach pool" without disclosing that the Company's largest customer, Aetna, which made up more than 85% of Ontrak's outreach pool, had actually stopped providing potential new members to Ontrak, Peizer materially misled investors about Ontrak's current and near-term business. ¶¶83-84. |
| Ontrak | November 5, 2020<br><br>Company Press Release (3rd Quarter 2020 results). | Misstatement (¶¶90-91) | "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak." ¶90. | In fact, Aetna had turned off its data feed of records to Ontrak in May (not July) based on an investigation into Ontrak's billing practices, which had resulted in a disciplinary CAP. ¶91. |
| Defendant Peizer | November 5, 2020,<br><br>3rd Quarter Conference Call | Misstatements (¶¶92-97) | • Ontrak expected 2021 revenue growth in excess of 100%. ¶92.<br><br>• "[W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak…. Importantly, this is one of the plans for which we | • The statement that the Company expected 2021 revenue growth in excess of 100% was materially misleading because the shutdown of Aetna's data feed was already materially impacting the Company's revenue, and its revenue projections were based on billing practices that Aetna was investigating as potentially fraudulent. ¶93.<br><br>• The statement that the disrupted data feed was not the result of compliance issues or concerns that Aetna had with Ontrak was materially false because Aetna actually turned off its data feed of records to Ontrak in May (not July, as Peizer claimed) based on an investigation into Ontrak's billing practices, which had resulted in a disciplinary CAP. ¶93.<br><br>• The statement that the disrupted data feed "has nothing to do with us" was materially false because Aetna turned off the data feed |

| | | | | |
|---|---|---|---|---|
| | | | anticipate continued significant expansion." ¶92.<br><br>• Responding to an analyst question about the Aena data feed: "[I]t really has nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is." ¶96. | based on an investigation into Ontrak's billing practices, which had resulted in a disciplinary CAP. ¶97. |
| Defendant Medeiros | November 5, 2020,<br><br>3rd Quarter Conference Call | Misstatement (¶¶94-95) | "So as far as timing with the expected data refreshes to be turned back on, we have a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of the year." ¶94. | There was no such mutual agreement. ¶95. |
| Ontrak (Defendants Peizer and LaVerne signed) | November 5, 2020, Form 10-Q | Omission (¶¶98-100) | Ontrak omitted that Aetna had issued the CAP. ¶98. | • Defendants had a duty to disclose the CAP because the Company's affirmative statements were rendered false or misleading by virtue of the omissions. By disclosing to investors that one of its risk factors was that a substantial percentage of its revenues was attributable to Aetna, Defendants Ontrak, Peizer, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from Aetna had already materialized because Aetna had issued the CAP. ¶99.<br><br>• Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP under Item 303 of Regulation S-K, 17 C.F.R. §229.303, which required Defendants to disclose these facts as a "known trend[] or uncertain[y]" that Ontrak faced. Regulation S-K additionally required the disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant |

| | | | | |
|---|---|---|---|---|
| | | | | reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." ¶100. |
| Defendant Peizer | March 1, 2021,<br><br>Press Release | Misstatement (¶¶105-108) | • "[W]e were notified after market close on February 26, 2021 that our participation status with this customer will be terminated effective June 26, 2021." ¶105.<br><br>• "[Aetna] evaluated our performance based on our ability to achieve the lowest possible cost per medical visit, and not on our clinical outcomes data or medical cost savings[.]" ¶105. | • Peizer and Ontrak stated that Aetna notified the Company after market close on February 26, 2021 that it was terminating its contract, but Aetna had actually notified Ontrak approximately one month earlier. ¶107.<br><br>• Peizer and Ontrak stated that Aetna evaluated Ontrak's performance based on its ability to achieve the lowest possible cost per medical visit, and not on clinical outcomes data or medical cost savings, but this was false. Aetna actually terminated the contract with Ontrak after Ontrak failed to materially complete a CAP that 1) required answers to questions about billing, including billing for members who had been improperly enrolled in programs for which they were not eligible, 2) provide evidence that their care coaches were actually getting members in to see therapists and using proper procedures to enroll and retain members, and 3) provide meaningful measures of the benefits created by using Ontrak's services. ¶108. |
| Defendant Medeiros | March 1, 2020, Conference Call | Misstatement (¶¶110-111) | "In mid-December, we were notified that despite the data feed being complete, it wasn't going to turn back on until we signed a new contract. And so we put our heads down and had been working with the team on the Aetna side on a new contract since that time." ¶110. | This statement misled investors that in December, Aetna had completed the general audit of all its vendors that had caused the data feed to Ontrak to be shut down. In reality, Aetna had turned off the data feed because of problems with Ontrak, not a general audit, and Aetna's refusal to continue its existing contract was a response to being dissatisfied with Ontrak's answers to its questions and skeptical of its billing practices and ability to add any value. ¶111. |
| Defendant Medeiros | March 1, 2020, Conference Call | Misstatement (¶113-114) | "[W]hen I received the call late Friday that talked about the termination, it was a surprise. We were working towards a new | Aetna had notified Ontrak that it was terminating its contract approximately one month earlier. ¶114. |

| | | | | |
|---|---|---|---|---|
| | | | agreement and an expanded relationship." ¶113. | |
| Ontrak. (Defendants Mayhew and LaVerne signed) | May 6, 2021, Form 10-Q | Omission (¶¶125-127) | Ontrak omitted Cigna's material reduction of the number of patients it was referring to Ontrak or that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on materially less favorable terms for Ontrak. ¶125. | • Defendants had a duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had informed Ontrak that its contract with Ontrak would have to be renegotiated, on materially less favorable terms for Ontrak because the Company's affirmative statements were rendered false or misleading by virtue of the omission. By disclosing to investors that one of Ontrak's risk factors was that a substantial percentage of its revenues was attributable to Cigna, Defendants Ontrak, Mayhew, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from Cigna had already materialized because Cigna had materially reduced its referrals to Ontrak and informed the Company that its contract would have to be renegotiated, on materially less favorable terms for Ontrak. ¶126.<br><br>• Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP under Item 303 of Regulation S-K, 17 C.F.R. §229.303, which required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required the disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." ¶127. |
| Defendant LaVerne | May 6, 2021 Call | Misstatement (¶¶128-129) | "[W]e're not really commenting that specifics on individual customers….[we] ultimately expect that – believe and expect that we're going to be within [the $90 million | Ontrak already had no possibility of fulfilling the original $90 million three-year contract. Cigna had already informed Ontrak that its contract with Ontrak would have to be renegotiated, on less favorable terms for Ontrak, and had already materially reduced the number of patients that |

| | | | | |
|---|---|---|---|---|
| | | | over three years] range at least." ¶128. | it referred to Ontrak. This reduction materially reduced Ontrak's billings to and revenue from Cigna. ¶129. |
| Defendant Mayhew | May 6, 2021 Earnings Call | Misstatement (¶¶130-131) | In response to a question about how much of the sequential decline in the outreach pool was driven by the loss of a large customer, Mayhew replied "“[i]t was nearly all of it." ¶130. | Mayhew stated that decline in Ontrak's outreach pool was almost entirely driven by Aetna, but this was false because Cigna had also materially reduced the number of patients it referred to Ontrak, from several thousand members per month to approximately 50 members per month. ¶131. |
| Ontrak (Defendants Mayhew and LaVerne signed) | August 5, 2021, 2Q Form 10-Q | Omission (¶¶139-141) | Ontrak omitted that Cigna had told Ontrak that it had decided to terminate the contract as well as Cigna's material reduction of the number of patients it was referring to Ontrak. ¶139. | • Defendants had a duty to disclose Cigna's material reduction of the number of patients it was referring to Ontrak and that Cigna had told Ontrak that it had decided to terminate its contract because the Company's affirmative statements were rendered false or misleading by virtue of the omission. By disclosing to investors that one of its risk factors was that a substantial percentage of its revenues was attributable to Cigna, Defendants Ontrak, Mayhew, and LaVerne rendered themselves duty-bound to disclose that the risk to Ontrak's revenue from Cigna had already materialized because Cigna had materially reduced its referrals to Ontrak and informed the Company that it was terminating its contract. ¶140.<br><br>• Defendants also had an independent duty to disclose the shutdown of the data feed and the CAP under Item 303 of Regulation S-K, 17 C.F.R. §229.303, which required Defendants to disclose these facts as a "known trend[] or uncertaint[y]" that Ontrak faced. Regulation S-K additionally required the disclosure because they were, among other things: among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." ¶141. |

| | | | | |
|---|---|---|---|---|
| Defendant Mayhew | August 5, 2021, Conference Call | Omission (¶¶142-145) | • Mayhew described in detail a "listening tour" with Ontrak customers, but failed to disclose that Cigna had told Ontrak on May 18, 2021 that it would terminate their contract by the end of the year or that Cigna had essentially stopped referring new members to Ontrak. ¶142.<br><br>• "Key account leaders within our customer organizations tell us that their major accounts value the Ontrak program. We're well positioned to heighten the value that health plans create for commercial populations by building trust, engagement and readiness with employees so that their employers experience higher enterprise loyalty and commitment levels.<br><br>As we've begun testing receptivity to the growth initiatives, not only with our customers, but with prospects and providers, the feedback has been very positive. We've seen an increase in initial discussions in recent weeks in our sales pipeline. While it's still early, we're encouraged by dialogue we are having with health plans, provider groups and employer organizations." ¶144. | Mayhew knew that Cigna had told Ontrak it was terminating its contract and materially reduced the number of members it was referring to Ontrak, to the point where Ontrak was essentially no longer carrying out work for Cigna, but omitted this information even as he described obtaining customer feedback and other information about Ontrak's accounts. ¶¶143, 145. |