Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for the Class

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MICHAEL FARHAR, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ONTRAK, INC., TERREN S. PEIZER, BRANDON H. LAVERNE, CURTIS MEDEIROS, and JONATHAN MAYHEW,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Master Docket No. 2:21-cv-01987-FLA-E (consolidated with Case No. 2:21-cv-02460-FLA)<br><br>Hon. Fernando L. Aenlle-Rocha<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Date: April 19, 2024<br>Time: 1:30 p.m.<br>Courtroom: 6B<br><br>Complaint Filed: March 5, 2024 |

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 1

A. Aetna Starts Investigating Ontrak and Stops its Data Feed of Referrals, Materially Impacting Ontrak's Revenue ..... 2

B. The Class Period Begins As Defendants Mislead Investors ..... 3

C. Defendants Continue to Mislead Investors About Cigna ..... 5

III. ARGUMENT ..... 7

A. Legal Standard ..... 7

B. Defendants' Misrepresentations Are Material and Actionable ..... 8

i. No Statement Is Inactionable Puffery ..... 9

ii. The Safe Harbor Does not Apply ..... 10

iii. The Former Employees are Credible Witnesses ..... 12

iv. Defendants' Misstatements and Omissions Concerning Aetna and Cigna Are Actionable ..... 15

C. The Complaint Raises a Strong Inference of Scienter ..... 18

D. The Complaint Pleads Loss Causation ..... 24

E. The Complaint Adequately Pleads Control Person Liability ..... 25

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........ 18, 20

*Braun v. Ontrak, Inc.*,
2022 WL 5265052 (Cal.Super. Oct. 04, 2022) ........ 11, 12, 17

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........ 8

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
824 F.3d 1156 (9th Cir. 2016) ........ 14, 17

*Chiarella v. U.S.*,
445 U.S. 222 (1980) ........ 22

*Commc'ns Workers of Am. v. CSK Auto Corp.*,
525 F.Supp.2d 1116 (D. Ariz. 2007) ........ 19

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ........ 24

*Farrar v. Workhorse Group, Inc.*,
2021 WL 5768479 (C.D.Cal. Dec. 2, 2021) ........ 13

*Hemmer Grp. v. SouthWest Water Co.*,
527 F. App'x 623 (9th Cir. 2013) ........ 8

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ........ 18, 23

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ........ 16

*In re Amgen Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ........ 24

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ........ 24

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ........ 14

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ........ 10

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ........ 19

*In re Gilead Scis. Sec. Litig.*,
2009 WL 1561584 (N.D. Cal. June 3, 2009) ........ 15

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ........ 24

*In re Gilead Sec. Litig.*,
2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) ........ 13, 14

*In re Hienergy Technologies, Inc.*,
2005 WL 3071250 (Oct. 25, 2005) ........ 23

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........ 8

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ........ 17, 22

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 17974627 (N.D. Cal. Nov. 7, 2022) ........ 14, 17

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........ 11

*In re Questcor Sec. Litig.*.,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ........ 15

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ....................................................................................21

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ....................................................................22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)....................................................................................19

*In re Zillow Group, Inc. Sec. Litig.*,
2018 WL 4735711 (W.D. Wa. at Seattle, Oct. 2, 2018) ......................................13, 14

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) ....................................................................23

*Lambert v. Baker Tilly Hong Kong Ltd.*,
2016 WL 6272465 (C.D. Cal. May 23, 2016) ............................................................24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)......................................................................................7

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)....................................................................................24

*Longo v. OSI Systems, Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ............................................................20

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009)......................................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................................................7, 8, 15, 23

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008)...................................................................................8, 15

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................9, 10, 11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003)......................................................................................25

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004)....................19

*Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075 (C.D. Cal. 2022)....................10, 22

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598 (9th Cir. 2014)....................9

other grounds by *City of Dearborn Heights 345 Police & Fire Retirement Sys. v. Align Technology*, 856 F.3d 605 (9th Cir. 2017)....................19

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708 (9th Cir. 2001)....................25

*Reese v. Malone*, 747 F.3d 557 (9th Cir. 2014)....................19

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008)....................19, 20

*S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121 (W.D. Wash. 2005)....................11

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014)....................21

*Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115 (N.D. Cal. 2017)....................22

*Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015)....................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007)....................7, 18, 19

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)....................8

*Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902 (N.D. Cal. 2012)....................12

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) .......... 11

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
655 F.3d 1039 (9th Cir. 2011) .......... 25

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... passim

**Statutes**

15 U.S.C. § 78t(a) .......... 25

**Rules**

Fed. R. Civ. P. 15 .......... 25

**Regulations**

17 C.F.R. §229.303 .......... 17

Lead Plaintiff Ibinabo Dick ("Plaintiff") opposes Defendants'[1] motions to dismiss the Third Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint")[2] and states the following:

## I. INTRODUCTION

During the Class Period, Ontrak misled investors about its business with its largest customers, Aetna and Cigna. Defendants concealed that Aetna was conducting a disciplinary investigation of Ontrak's billing, including shutting down the flow of new business to Ontrak. They then concealed for months that Aetna told Ontrak that it would minimally require it to sign a new, less lucrative contract, and for one month that Aetna terminated its contract. Concealing these materialized risks, Ontrak raised over $85 million in offerings of preferred stock. Then, after the loss of Aetna finally became public, Ontrak concealed, for months, material adverse facts concerning Cigna, including the loss of its contract. Instead, Defendant Peizer criminally traded on that material non-public information, avoiding more than $12.5 million in losses when the loss of Cigna finally became public.

The Complaint sufficiently pleads that Defendants materially misled investors, raises a strong inference of scienter, and alleges loss causation. Defendants' motions to dismiss should be denied.

## II. STATEMENT OF FACTS

Ontrak claims to use predictive analytics to connect members of its customer health plans who generate high costs with cost-reducing programs. ¶35. In reality, its member

---

[1] Defendants are Ontrak, Inc. ("Ontrak" or "Company"), former Chief Executive Officer ("CEO") Terren S. Peizer ("Peizer"), Chief Financial Officer ("CFO") Brandon H. LaVerne ("LaVerne"), former President and Chief Operating Officer Curtis Medeiros ("Medeiros"), and former CEO Jonathan Mayhew ("Mayhew"). Peizer, LaVerne, Medeiros, and Mayhew are the "Individual Defendants." Plaintiff cites to Ontrak, Laverne, and Medeiros' Memorandum of Points and Authorities in Support of their Motion to Dismiss (Dkt. No. 128), which Defendant Peizer joined (Dkt. No. 129) as "DBr __." Plaintiff cites to Mayhew's Supplemental Memorandum in Support of Motion to Dismiss and Joinder (Dkt. No. 126) as "MBr. __."

[2] References to "¶__" are to the Complaint.

engagement specialists enroll members by simply calling them from lists provided by customers. ¶48. Ontrak relied on stock sales to finance its operations, and raised cash during the Class Period through offering shares of its 9.50% Series A Cumulative Perpetual Preferred Stock ("Preferred Stock"). ¶¶86, 102

At the beginning of the Class Period, Ontrak's largest customer was Aetna, which was responsible for more than 60% of its revenue. ¶36. According to Former Employee 4 ("FE4")[3], Aetna members were more than 85% of Ontrak's outreach pool. ¶¶40, 52. Aetna paid Ontrak $750 for each member that it enrolled in a program. ¶53. According to Former Employee 6 ("FE6")[4], Ontrak also billed Aetna for every interaction that a member had with a care coach. ¶¶42, 54.

### A. Aetna Starts Investigating Ontrak and Stops its Data Feed of Referrals, Materially Impacting Ontrak's Revenue

It was routine practice at Ontrak to enroll Aetna members that Ontrak staff knew were ineligible for the programs they were enrolled in, typically because the program would not be covered by their health plan. ¶¶55-57. Until these members were disenrolled, however, Ontrak would collect payments from Aetna. ¶¶55-57.

Due to this improper billing, by May 2020, Aetna was suspicious. ¶¶58, 61-63. In May 2020, Aetna turned off the data feed that provided names for Ontrak to call. Without that feed, Ontrak would soon start running out of people to enroll, and would not be able to make money. ¶59. This was a material development core to Ontrak's business. The shutdown materially impacted the Company's revenue, akin to Walmart closing a majority of stores. ¶60. Then, in July 2020, Aetna ordered Ontrak to complete a disciplinary investigation called a Corrective Action Plan ("CAP"), seeking answers about billing. ¶65. The CAP required Ontrak to show it was using proper procedures to enroll and retain members. *Id.* Aetna also sought to recoup some money it had paid to enroll members who

[3] FE4 was Ontrak's director of member engagement specialists training until March 2021.
[4] FE6 was a quality assurance analyst at Ontrak until March 2021.

never received services. *Id.*

Reflecting the materiality of the CAP, Ontrak's senior management convened three days of meetings to discuss it, led by Medeiros. ¶67. Former Employee 1 ("FE1")[5] participated, with Medeiros and other executives. Medeiros appointed a CAP working group, which ultimately failed to fully complete the CAP. ¶¶67-68, 71. Former Employee 10 ("FE10")[6] recalled that Charles Polatsek ("Polatsek"), Ontrak's Vice President of Sales and Strategic Partnerships and a member of the working group, kept Peizer informed concerning the CAP. ¶69.

Understanding that the data feed shutdown and CAP were material developments, Defendants took the receipt of the CAP as their sign to immediately raise cash before any adverse news became public. On August 20, 2020, Ontrak announced that it had commenced an underwritten public offering of its Preferred Stock, raising aggregate net proceeds of $45.3 million. ¶¶86, 89.

**B. The Class Period Begins As Defendants Mislead Investors**

The Class Period begins on August 5, 2020, when Ontrak announced its second quarter 2020 financial results, disclosing as a risk factor that a substantial percentage of its revenues were attributable to four large customers, but failing to disclose that risk from Aetna had materialized because it had turned off its data feed and issued the CAP. ¶79. On an earnings call that day, Defendant Peizer touted "enhancements to our algorithms feeding the outreach pool"—enhancements that did not exist. Ontrak's outreach pool was lists provided by customers—which Aetna cut off, removing 85% of the pool. ¶83.

Ontrak's stock rose sharply in response, closing at $56.47 per share on August 6, 2020, up from a $36.00 per share close on August 4, 2020. ¶85. Then, on August 20, 2020, Ontrak announced the Preferred Stock offering. ¶¶86-88.

On November 5, 2020, Ontrak announced its third quarter 2020 results. ¶90. Ontrak

---

[5] FE1 was Ontrak's director of quality and organizational performance until December 2020.

[6] FE10 was a product manager at Ontrak during the Class Period, and acted as the clinical liaison to the sales team and a member of the sales team working with Aetna.

disclosed that Aetna had stopped providing new outreach targets, but falsely reassured investors, claiming: "New compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak." *Id.* On an earnings call, Peizer doubled down and said that the shutdown ***was not a performance issue***. ¶¶92, 96. Medeiros stated that Ontrak and Aetna had a "mutual agreement" that the feed would be back on by the end of 2020. ¶94. These statements were false. Aetna was investigating Ontrak's improper billing, and there was no such agreement. ¶¶97, 94. Analysts accepted this false explanation, including it in their reports. ¶101.

Then, in mid-December, Aetna told Ontrak that it would not turn the data feed back on without a different contract—*i.e.,* one on materially reduced terms for Ontrak. ¶103. Rather than disclose this adverse material news, Ontrak, Peizer, LaVerne, and Medeiros immediately raised more money. On December 15, 2020, Ontrak announced that it had commenced a follow-on offering of 1,730,000 shares of Preferred Stock, raising net proceeds of approximately $39.7 million. ¶¶102, 104.

Ontrak was unable to secure a new contract with Aetna. Aetna notified Ontrak that it would not renew its contract in late January or early February 2021. ¶114. FE10 found out at that time as a member of the sales team, ¶146, and in late January or early February 2021, Peizer notified all Ontrak staff of Aetna's loss in a Company-wide email and a follow-up Company-wide meeting. ¶¶75-77, 114.

On March 1, 2021, Ontrak finally told investors in a press release that Aetna had terminated its contract. ¶105. On this news, Ontrak's share price fell $27.32, more than 46%, closing at $31.62 per share on March 1, 2021. ¶109.

On a call with analysts that day, Medeiros admitted that Aetna had told Ontrak in mid-December that it would not turn the data feed back on without a new contract. ¶110. But Medeiros tried to cover his tracks by falsely telling analysts that that Aetna had notified him that it would not renew on February 26. ¶113. In reality it was much earlier.

¶114. Peizer had told Ontrak employees about the loss in January or early February. ¶114. Ontrak noted that the loss of Aetna lowered its expected revenue to $100 million for 2021, rather than the previously expected $165 million. Conveniently, the offerings that raised a total of $85 million while the Company's stock was artificially inflated from Defendants' fraud more than filled the shortfall. ¶106.

In the wake of this news, Peizer and Medeiros were both forced to step down. On March 16, 2021, Ontrak announced that Mayhew would become Ontrak's new CEO. While Peizer, who is Ontrak's majority shareholder, became its Executive Chairman, he was forced to give up day-to-day control. On April 8, 2021, Ontrak announced the resignation of Medeiros. ¶115.

**C. Defendants Continue to Mislead Investors About Cigna**

After the loss of Aetna, Cigna became Ontrak's largest and most important customer. But by February 2021, Cigna was also reducing referrals to Ontrak. ¶116. By April 2021, Cigna informed Ontrak that its contract would have to be renegotiated, on less favorable terms to Ontrak. Ontrak faced two possibilities: either a material reduction to the $90 million over three years that Ontrak had expected to earn from Cigna, or losing the contract. Cigna also halted discussions on any potential expansion of Ontrak's services. ¶118. By May, Cigna had reduced the number of patients that it referred from ***several thousand members per month to approximately 50***, materially reducing revenues from Cigna. ¶123. This was another material development core to the Company. By May 4, 2021, Ontrak and Cigna scheduled a meeting for May 18, 2021 to discuss the relationship. ¶124.

On May 6, 2021, Ontrak filed its first quarter 2021 financial results, disclosing as a risk factor that a substantial percentage of its revenues were attributable to four large customers, but failing to disclose that risk from Cigna had materialized through its material reduction of referrals (***from thousands to 50***) or that Cigna had told Ontrak that its contract with Ontrak would have to be renegotiated. ¶125. On an earnings call that day, Defendant

LaVerne falsely stated that he "believe[d] and expect[ed] that we're going to be within [the $90 million established contract over three years] range at least[,]" even as he knew that Cigna had materially reduced its referrals and informed Ontrak that its contract would have to be renegotiated, on materially worse terms. ¶128. Defendant Mayhew falsely stated that the decline in Ontrak's outreach pool was "nearly all" due to the loss of Aetna, which was false, since Cigna had also drastically cut its referrals. ¶¶130-131.

On May 18, 2021, Cigna informed Ontrak's management that it would terminate its contract by the end of the year. ¶132. Mayhew stated in an interview with the Federal Bureau of Investigation ("FBI") on October 20, 2022 that Cigna was "pretty firm" with the decision to cancel the contract on May 18, 2021, and that he took the termination at face value. *Id.* Mayhew also told the FBI that he believed knowledge surrounding new contracts could be material information. ¶133.

Mayhew kept Peizer informed concerning the Cigna contract. ¶135. With that material non-public information, Peizer carried out a criminal insider trading scheme. On or about May 4, 2021, in advance of Ontrak's May 18, 2021 meeting with Cigna that had already been scheduled, Peizer contacted a broker to set up a Rule 10b5-1 plan to sell approximately $19 million of Ontrak shares. After learning that this broker required the plan to have a 30-day cooling-off period, Peizer turned to another broker who did not, and set up the plan on or about May 10. ¶¶150-152. Peizer used this plan to sell Ontrak shares. On or about August 13, 2021, an Ontrak executive told Peizer that he believed Cigna was likely to issue its formal termination notification. ¶155. Approximately one hour after that call, Peizer entered into a second Rule 10b5-1 plan to sell more shares. *Id.*

Between May 18, 2021 and August 18, 2021, Ontrak executives made several proposals to Cigna, proposing changes to its contract that would ultimately make it materially less remunerative to Ontrak, but at least in some form retain Cigna as a customer. ¶¶136, 138. Nevertheless, by August 2021, productive operations on Cigna's contract had stopped. ¶138. Also by August 2021, Ontrak employees learned that the loss

was certain. FE10, a member of the sales team, learned at least three to four weeks before August 19 that there was no longer any possibility of securing a new contract. ¶146.

Nevertheless, on August 5, 2021, Ontrak filed materially false and misleading financial results for the quarterly period ended June 30, 2021, failing to disclose Cigna's decision to terminate its existing contract or the cessation of productive operations. ¶139. On an earnings call that day, Defendant Mayhew misleadingly described a "listening tour" with Ontrak customers, as he reported supposedly positive feedback from other customers but failed to disclose that Cigna had told Ontrak on May 18, 2021 that it was terminating its contract or that it had essentially stopped referring new members to Ontrak. ¶142.

On August 19, 2021, Ontrak disclosed that Cigna had provided its formal termination notice to Ontrak. ¶148. Ontrak's stock price fell by $9.37/share, over 44%, closing at $11.68/share on August 19, 2021. *Id.* Peizer has been indicted for insider trading, and his trial is scheduled for June 4, 2024. ¶18.

## III. ARGUMENT

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To plead a plausible claim, "detailed factual allegations" are not required. *Id.* In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320–22 & n.4 (2007).

More, "[a] factual determination by the court is inappropriate in a Rule 12(b)(6) dismissal." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950 (9th Cir.

2005). "[T]he [Private Securities Litigation Reform Act of 1995 ("PSLRA")] in no way turns [Rule] 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008). Indeed, "when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

### B. Defendants' Misrepresentations Are Material and Actionable

Materiality depends on a contextual analysis of facts and circumstances. Information is material when "a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx*, 563 U.S. 27, 28. Materiality is a mixed question of law and fact. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449–50 (1976)). Materiality should be resolved on the pleadings in a defendant's favor "only if the omitted fact is so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the 'total mix' of information made available to stockholders." *Hemmer Grp. v. SouthWest Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013).

"[T]o properly allege falsity, a securities fraud complaint must… specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief… state with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, "statements literally true on their face may nonetheless be misleading in context." *Miller v. Thane Int'l, Inc.*,

519 F.3d 879, 886 (9th Cir. 2008).

The Complaint pleads that Defendants materially misled investors.

### i. No Statement Is Inactionable Puffery

Defendants argue that (1) Peizer's August 5, 2020 comment that "enhancements" had been made to Ontrak's algorithms and (2) Mayhew's August 5, 2021 comments about his listening tour were puffery. DBr. at 12-13. But the first is objectively untrue, and the second omits facts that render it materially misleading.

Generally, puffery "concerns expressions of opinion, as opposed to knowingly false statements of fact." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). By contrast, "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." *Id.* "Even a statement of opinion or an expression of corporate optimism may be deemed actionable in certain circumstances because there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

First, the Complaint pleads that there were no algorithms feeding Ontrak's outreach pool; the pool was lists provided by customers. ¶83. This verifiable information comes from FE4, who trained the member engagement specialists who called people from these lists and personally knew the contents of the lists and how they were generated. ¶48.[7]

Second, the Complaint pleads that Mayhew's statement that customers "value" the Ontrak program, that Ontrak was "well positioned" and that "feedback has been positive[]" was materially misleading because the feedback that Mayhew received from

[7] Defendants' argument in their Response to Addendum, DBr. at 2, that the Complaint "admit[s] that Ontrak had data algorithm teams" is specious. The Complaint acknowledges a data algorithm team that was set up to find out why so many of Aetna's enrolled members were then deemed to be ineligible for services. ¶56. A team engaged in after-the-fact data analysis does not negate the well-pled allegation that the ***outreach pool*** was not formed by data algorithms.

Cigna was negative. By August 5, 2021, Cigna had told Mayhew that it was terminating its contract and had reduced its referrals to Ontrak from thousands to 50, to the point where Ontrak was essentially no longer working for Cigna. While "investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers[]" to value corporations, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010), they can and do expect that when a CEO describes customer feedback from a "listening tour," he does not omit the feedback of its largest customer which was the opposite. Even if a statement includes superlatives that are often seen in "puffing" statements, the Court cannot "'pluck[] the statements out of their context to determine whether the words, taken *per se,* are sufficiently 'vague' so as to constitute puffery,' but rather will examine the entire statement and its circumstances to determine if it is actionable." *Impax*, 36 F.Supp.3d at 966. Because Mayhew spoke about conversations with "[k]ey account leaders within our customer organizations[,]" investors would reasonably have expected the feedback he described to include that from Cigna. Because of Cigna's importance to the company, the omission of its feedback rendered Mayhew's description of his "listening tour" misleading. *See Oh v. Hanmi Fin. Corp.*, 621 F. Supp. 3d 1075, 1087–88 (C.D. Cal. 2022) (statements touting "excellent" and "strong" asset quality metrics were not puffery in the context of objectively false statements concerning Hanmi's business).

### ii. The Safe Harbor Does not Apply

Defendants argue that (1) Peizer's August 5, 2020 statement that the Company expected "further expansions" with Aetna (¶82) and his November 5, 2020 statement that Ontrak "anticipate[d] continued significant expansion" from Aetna (¶92); and (2) LaVerne's statement that the Company "expect[s] . . . to be within [the $90 million over three years] range at least[]" with respect to its Cigna contract (¶128) are forward-looking and protected under the PSLRA's safe harbor. DBr. at 13-14. At the time these Defendants made these statements, however, they already materially misrepresented Ontrak's then-current business.

"[S]tatements about the future that also function as communications of current expectations… are actionable as such." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1133– 34 (W.D. Wash. 2005). In addition, "statements of past or present facts are not covered by the safe harbor provision—even when they are inextricably tied with forward-looking statements." *Impax*, 36 F.Supp.3d at 965. More, some statements about the future may combine non-actionable forward-looking statements with actionable, non-forward looking statements. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021) (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

Peizer's statements about future expansions with Aetna (¶¶82, 92) were not forward looking because, as the Ninth Circuit wrote in *Tesla*, they went "*beyond* the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contain[ed] an express or implied 'concrete' assertion concerning a specific 'current or past fact[].'" *Id.* at 1191. On August 5, 2020, Peizer referred to expansions even as he knew that Aetna had stopped its data feed. ¶83. On November 5, 2020, Peizer stated that Ontrak anticipated continued expansion with Aetna ***while falsely explaining the disrupted data feed.*** ¶92. By touting expansion at the same time that he lied about why Aetna had turned off the feed, Peizer led investors to believe that Aetna had no problem with Ontrak, which was false. *Id.* ***Peizer did not have to know that Ontrak would eventually lose Aetna for these statements to be materially misleading.*** He only needed to know that Aetna had shut off the feed for performance reasons and issued the CAP—both material developments by themselves. ¶93. *Braun v. Ontrak, Inc.*, 2022 WL 5265052, at *8 (Cal.Super. Oct. 04, 2022) (Sup. Ct. of Calif., Los Angeles County, Oct. 4, 2022) (the alleged fact that Ontrak's expansion had stalled with the customer responsible for more than half its revenue rendered statements concerning expansions materially misleading).

The Complaint pleads that LaVerne's May 6, 2021 statement that he expected that the Company would meet the $90 million amount in the existing Cigna contract, ¶128, was not forward-looking because Cigna had already told Ontrak that it would have to

renegotiate, on less favorable terms for Ontrak. ¶118. As a result, as of April 2021, Ontrak faced two possibilities: either a material reduction to $90 million over three years, or termination. *Id.* ***The fulfillment of the original $90 million contract was not one of those options***. More, by May 2021, Cigna had reduced its referrals to Ontrak from several thousand members per month to approximately 50, which was already materially impacting Ontrak's revenue from Cigna. ¶123. LaVerne's statement misled investors concerning those current facts because they could not co-exist with the fulfillment of the $90 million contract. *See Ontrak*, 2022 WL 5265052, at *8.

Because these statements misled investors concerning the relationships between Ontrak and its customers ***when they were made,*** they cannot be protected by the safe harbor. *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918–19 (N.D. Cal. 2012) (the safe harbor does not protect statements about a past or current fact).

**iii. The Former Employees are Credible Witnesses**

Defendants' attempt to discount the Complaint's well-pled allegations from ten former Ontrak employees fail. DBr. at 14-16. Under the PSLRA, a complaint relying "on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA requirements." *Zucco*, 552 F.3d at 995. First, the source of the statements "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* Second, the statements "must themselves be indicative of scienter." *Id.* *Zucco* does not require each individual witness to have personal knowledge of all facts alleged in the Complaint collectively. A complaint must simply describe each sufficiently to establish their reliability and personal knowledge concerning those facts that they personally report. The Complaint does this for each of the FEs, providing sufficient details to ensure that Defendants know their identities, and describing how they learned the facts they report. It also supports a strong inference that Defendants lied with requisite fraudulent intent.

FE1 personally saw how Ontrak improperly billed Aetna because FE1 reviewed

records and escalated complaints and saw that Ontrak was improperly enrolling people who sometimes did not even consent. ¶¶57. FE1 also participated in meetings with Medeiros concerning the CAP, and saw that Ontrak never fully responded. ¶¶67-68, 71. Former Employee 2 ("FE2") did not require insight into Ontrak's "broader" relationship with Aetna (DBr. at 15-16) (although, as Ontrak's director of operations until July 2021 and participant in weekly meetings with Aetna staff, the Complaint pleads that FE2 had deep insight, ¶¶61-63) to witness Aetna staff discovering and objecting to Ontrak's improper billing and recall discussing the problem with Medeiros. ¶64. FE9[8] did not require deep insight into the relationship with Aetna to remember personally learning about the loss of Aetna in a Company-wide Zoom meeting in late January or early February 2021. ¶76. FE6 and FE10 also remember this meeting. ¶¶75, 77. Former Employee 8 ("FE8")[9] did not require knowledge of negotiations to know that he told Peizer that Ontrak was improperly billing Aetna in advance of the Class Period—the improper billing that triggered the CAP—demonstrating the upward flow of information concerning Aetna's billing. ¶¶56, 163.[10]

Former Employee 3 ("FE3")[11] was the strategist in charge of quantifying Ontrak's benefit to Aetna—a role that afforded deep access and insight into the Company's work for Aetna.[12] ¶39. FE3 knew from her role addressing Aetna's concerns that Aetna turned off the data feed in May 2020.[13] ¶59. FE3 also knew that in July 2020, Aetna transmitted

---

[8] FE9 was Ontrak's Director of Community Care Training from July 2016 until March 18, 2021.

[9] FE8 was a member engagement specialist at Ontrak until September 2019.

[10] *See also Farrar v. Workhorse Group, Inc.*, 2021 WL 5768479 at *5 (C.D.Cal. Dec. 2, 2021) (an FE can have personal knowledge of facts even if they worked in a different department).

[11] FE3 was Ontrak's principal design researcher and strategist during the Class Period.

[12] Defendants' argument that the Complaint's description of FE3's job title and role is insufficient (DBr. at 15) is meritless. The Complaint states FE3's title (principal design researcher and strategist), describes her function, and names her supervisor. It sufficiently describes FE3 as someone whose position provided her with working knowledge of Aetna's evaluation of Ontrak. More, FE3's statements are corroborated by multiple other FEs. *See, e.g., In re Zillow Group, Inc. Sec. Litig.*, 2018 WL 4735711, at *12 (W.D. Wa. at Seattle, Oct. 2, 2018); *In re Gilead Sec. Litig.*, 2009 WL 3320492, at *3 (N.D. Cal. Oct. 13, 2009).

[13] Member engagement specialist Former Employee 5's ("FE5's") report that he stopped

the CAP to Ontrak, and that Ontrak never satisfied it. ¶¶65, 73. FE10 observed Polatsek explain that he was updating Peizer concerning the CAP (further establishing the flow of information, ¶163),[14] and learned that Ontrak lost the Aetna (¶74) and then Cigna (¶146) contracts approximately one month before Ontrak announced the news. FE10 was specifically told that Ontrak had lost Aetna, that it was going to be catastrophic for the Company, and that Ontrak had to work on messaging before disclosing the news. ¶74.[15]

Considered together, holistically, the personal knowledge of each of the FEs shows that from the time that Aetna shut down the data feed and issued the CAP and Cigna reduced its referrals and told Ontrak it would have to renegotiate (and then that it was cancelling), the risk to Ontrak from Aetna and then Cigna had materialized and, thus, there were material, undisclosed impacts on the Company's revenue that Defendants failed to disclose.[16] ***The loss of the contracts was not necessary for this to be true.*** Even if Defendants had managed to successfully save one or both contracts, they still had a duty to disclose these earlier facts. *See, e.g.,* ¶¶79-80, 98-99. By describing how Ontrak improperly billed Aetna, Aetna shut down the data feed and investigated, Aetna told

---

receiving new Aetna members to contact by approximately September 2020 does not contradict FE3's statement that the data feed was turned off in May. *See* DBr. at 15. FE3 knows when the data feed was turned off. FE5 knows when he noticed that he was calling the same prospective members over and over again.

[14] That FE10 heard Polatsek say that he would update Peizer, rather than seeing him do it, does not disqualify his statement from consideration by the Court. *In re Plantronics, Inc. Sec. Litig.*, 2022 WL 17974627, at *5 (N.D. Cal. Nov. 7, 2022) ("that alleged reports by [] confidential witnesses [] may have been based on hearsay does not preclude a finding that such reports are reliable, plausible, and coherent in light of the allegations in the [complaint].").

[15] Defendants' far-fetched theory that FE10 and other FEs' memories of learning about the losses of the contracts weeks before Ontrak publicly announced them are mistaken has no place in the Court's evaluation of this motion, as it "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). FE6, FE9, and FE10 all recall learning this information, with consistent details, corroborating each other. *See, e.g., Zillow*, 2018 WL 4735711, at *12.

[16] *See Gilead*, 2009 WL 3320492, at *2 (underlying fraud sufficiently alleged where confidential witnesses' allegations were combined); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) (rather than scrutinizing each FE's statements in isolation, the Court should draw inferences from all sources cited in the Complaint, including "public sources" and "corroboration furnished by… confidential witness accounts.").

Ontrak it was terminating approximately one month before Ontrak announced the news, and Cigna also issued a termination materially earlier than Ontrak told investors, the FEs' allegations, based on their personal knowledge, support the inference that Defendants committed fraud by concealing materialized risks to Ontrak's revenue.[17] *Zucco*, 552 F.3d at 995.

**iv. Defendants' Misstatements and Omissions Concerning Aetna and Cigna Are Actionable**

The Complaint pleads that material risks to Ontrak's revenue from its core customers Aetna and Cigna had materialized, but Defendants failed to disclose them. Because Aetna and Cigna generated the majority of the Company's revenue, Aetna's shutdown of its data feed, the CAP, its notice that it would require a new contract in December 2020, and its notice of termination to Ontrak in January or February 2021, and Cigna's throttling of its data feed, its notice by April 2021 that it would require renegotiation, its May 18, 2021 notice that it would terminate its contract by the end of 2021, and its July 2021 notice of termination to Ontrak were all material to investors regardless of whether Ontrak could have ultimately retained each customer's business in some form.

"Disclosure [of material information] is required… when necessary 'to make… statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. 27, 44. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller*, 519 F.3d at 886. *See, e.g., In re Questcor Sec. Litig.*., 2013 WL 5486762, at *13–14 (C.D. Cal. Oct. 1, 2013), (reported sales and forecasts, literally true, were materially misleading); *In re Gilead Scis. Sec. Litig.*, 2009 WL 1561584, at *3

[17] Section III(C), *infra,* discusses the Complaint's scienter allegations in detail.

(N.D. Cal. June 3, 2009) (rejecting argument that defendants had no duty to disclose off-label marketing when statements regarding sales and revenue were factually accurate because off-label marketing misled regarding true demand); *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1034 (C.D. Cal. 2008) (plaintiffs alleged falsity where, even though statements were literally true, defendants "promoted unapproved uses and increased per-patient dosages through improper means," "misled investors by implicitly and falsely warranting that there were no illegal practices contributing to that success," and thus "deceived investors as to the quality and nature of Amgen's earnings and revenues.").

Ontrak's own disclosures put the source of its revenues at issue.[18] Because Aetna was a material portion of Ontrak's revenues, Peizer, LaVerne, and Medeiros were obliged not to "deceive[] investors as to the quality and nature" of the revenues from Aetna, including that some resulted from enrolling members who were ineligible, and that Aetna had responded to this practice by stopping the data feed and issuing the CAP. *Amgen*, 544 F.Supp.2d at 1034 ("[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists."). Likewise, Cigna was a material portion of Ontrak's revenues, thus Mayhew and LaVerne were obligated not to "deceive[] investors as to the quality and nature" of the revenues generated by Cigna[19], particularly that by May 2021, Cigna had drastically reduced its referrals to Ontrak[20] and told Ontrak that to the extent it could retain Cigna, their contract would have to be renegotiated (materially reducing Ontrak's potential revenue from Cigna), and that on May 18, 2021, Cigna told Ontrak that it was terminating.

---

[18] For example, by disclosing how much of Ontrak's revenue Aetna and Cigna generated. ¶32.

[19] *Amgen*, 544 F.Supp.2d at 1034.

[20] Defendants ask the Court to infer that the reduction in Cigna's referrals to Ontrak was neither unexpected nor the result of anything besides the need to slow budget burn. DBr. at 18-19. But if that were the case, Defendant Peizer would not have been seeking updates on the Cigna data feed or sufficiently concerned about it to, in part based on those updates, engage in criminal insider trading. ¶¶154-155. Bent Christiansen, a senior vice president at Ontrak, would not have emailed Cigna offering to meet whatever terms it set in an attempt to "ramp back up to productive operations." ¶138. These facts show that the throttling of Cigna's data feed was a material problem for Ontrak—one that the Company concealed from investors.

¶¶125-129, 139.[21][22] *See Ontrak*, 2022 WL 5265052, at *5 and *8 (the shutdown of the Aetna data feed and CAP were material and their omissions were actionable in context of Ontrak's disclosures and the nature of its business). Accordingly, the Complaint pleads that each of these omissions is actionable.

Defendants' attempts to discount the reliability of the Complaint's allegations from FBI interviews fail. DBr. at 17-19. First, the notion that interview reports on Form 302 are "no more reliable and should not be given any more weight than witness interview notes or memoranda prepared by lead plaintiff's own lawyers or investigators[,]" DBr. at 18 n.9, is a red herring. Courts accept allegations based on interviews by plaintiffs' attorneys and investigators as true at the pleadings stage, even if they might include hearsay. *Caltex*, 824 F.3d at 1159; *Plantronics*, 2022 WL 17974627, at *5, *citing Zucco,* 552 F.3d at 998 n.4 ("the rigorous standards for pleading securities fraud do not require a plaintiff to plead

[21] Defendants' failure to disclose that Aetna had shut down the data feed and issued the CAP in Ontrak's August 5, 2020 Form 10-Q, ¶¶79-81, failure to disclose the CAP in Ontrak's November 5, 2020 Form 10-Q, ¶¶98-100, failure to disclose Cigna's reduction of referrals and requirement of a renegotiated contract in Ontrak's May 6, 2021 Form 10-Q, ¶¶125-127, and failure to disclose Cigna's reduction of referrals and its May 18, 2021 notice that it intended to terminate its contract by the end of 2021 in Ontrak's August 5, 2021 Form 10-Q, ¶¶139-141, also violated Item 303 of Regulation S-K, 17 C.F.R. §229.303, which required disclosure of any "known trend[] or uncertaint[y]" Ontrak faced. They also violated the requirement of Regulation S-K to disclose: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and (iii) "unusual or infrequent events or transactions or [] significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations." Defendants note that *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014) holds that Item 303's disclosure duty is not inevitably actionable under Rule 10b–5. DBr. at 14, n.4. This is the subject of a circuit split. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section 10(b)."). On January 16, 2024, the Supreme Court heard argument on this issue in *Macquarie Infrastructure Corporation et al. v. Moab Partners LP et al.*, No. 22-1165. Plaintiff's claim recognizes that the law is not clear-cut.

[22] Mayhew himself stated in an FBI interview that Cigna was "pretty firm" with the decision to terminate Ontrak's contract on May 18, 2021, and that he took the termination at face value. More, he knew that even if the relationship could be salvaged, it would definitely be under a different, materially less remunerative contract. Indeed, Mayhew also stated that he believed that knowledge surrounding new contracts could be material information. ¶¶132-133.

evidence")). Second, the supposed contradictions Defendants point to are nothing of the kind. The idea that Jessica Kinowski's statement that Ontrak provided services to Cigna on a nationwide basis means that a Cigna analysis showing unfavorable returns in two markets could not support an inference of falsity on Ontrak's part makes no sense. DBr. at 19. The Complaint does not attempt to plead that Ontrak misled investors concerning this analysis. ¶117. That Ontrak attempted to save the Cigna business even after its executives told Ontrak that it would be terminating, DBr. at 19, does not make that May 18, 2021 notification to Mayhew any less material or excuse Defendants from failing to disclose it for three months as investors bought Ontrak stock without knowing that its largest client had told its CEO that it was terminating its contract.

Finally, even if Ontrak executives genuinely believed that they could renegotiate with Cigna and save the relationship (and at least Mayhew did not, ¶132), they were still obligated to disclose that the risk of revenue loss due to such a renegotiation had materialized. The disclosure of the ***risk*** of a renegotiation of Cigna's contract, on less favorable terms to Ontrak, does not excuse omitting that ***it was (at best) actually happening.*** Warning of risks that might occur is misleading to a reasonable investor when a company knows that the risk has already materialized. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021).

### C. The Complaint Raises a Strong Inference of Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at

326. Although an evaluation of whether a "strong inference" of scienter has been pled "must take into account plausible opposing inferences," the only "opposing" inferences to be considered are those that "one could draw from the facts alleged." *Id.* at 323-24; *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 253–54 (5th Cir. 2009).[23]

The Court should "consider the totality of circumstances[.]" *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). "Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id.; In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698-99 (9th Cir. 2012) (a holistic review can support scienter even if in isolation any one allegation may not).

The Complaint sufficiently pleads Defendants' personal involvement with Aetna (Peizer, LaVerne, and Medeiros) and Cigna (Mayhew, LaVerne, and Peizer), including the fraudulent intent underlying their material omissions and false statements. "Allegations regarding management's role may help satisfy the PSLRA scienter requirement in three circumstances": the allegations (1) may be "viewed holistically, along with other allegations in the complaint, to raise a strong inference of scienter" under *Tellabs*; (2) "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," as in *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005), and *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004); and (3) "may be sufficient, without accompanying particularized allegations, where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 574–75 (9th Cir. 2014)[24]; see also *Zucco*,

---

[23] Following *Tellabs*, "a tie goes to the Plaintiff." *Commc'ns Workers of Am. v. CSK Auto Corp.*, 525 F.Supp.2d 1116, 1120 (D. Ariz. 2007).

[24] *Reese* was abrogated on other grounds by *City of Dearborn Heights 345 Police & Fire Retirement Sys. v. Align Technology*, 856 F.3d 605 (9th Cir. 2017). Its scienter analysis, however, remains Ninth Circuit law. *See, e.g., Longo v. OSI Systems, Inc.*, 2021 WL 1232678, at *9 (C.D. Cal. Mar. 31, 2021) (plaintiffs sufficiently alleged scienter through a core operations theory).

552 F.3d at 1000 ("falsity may itself be indicative of scienter" in circumstances (2) and (3) above). The Complaint raises a sufficiently strong inference of scienter in all three circumstances.

As an initial matter, Defendants' senior roles are sufficient to support scienter, because Aetna and Cigna were each of "such prominence" to the Company that the falsity of their statements regarding these customers is itself indicative of scienter. *Berson*, 527 F.3d at 987–88, held that the allegation that defendants were responsible for the company's day-to-day operations was sufficient to support the inference that they would have known about stop-work orders that allegedly halted tens of millions of dollars of the company's work, even without specific facts showing knowledge. "In *Berson*… only two government agencies made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company." *Killinger*, 542 F.3d at 785 n.3. Aetna alone comprised over 60% of Ontrak's revenue. ¶36.

As a result, not only is "absurd" to suggest that Peizer, LaVerne, and Medeiros were unaware of Ontrak's improper billing and the CAP, that Aetna had told Ontrak in December that it would minimally require a new contract, that Aetna had notified Ontrak that it was terminating its contract in January or February, or that Mayhew and LaVerne were unaware that Cigna had throttled its data feed, told Ontrak management by May that it would have to renegotiate, and then, on May 18, 2021, that it would terminate by the end of 2021, and finally that it was terminating approximately one month before the end of the Class Period, but the Complaint pleads their knowledge with additional evidence. For example, at least two FEs spoke to Defendants Peizer and Medeiros about Ontrak's improper billing of Aetna. ¶¶56, 64.[25] FE1 met with Medeiros concerning the CAP, ¶67, and FE10 recalled that Polatsek kept Peizer informed concerning the CAP, ¶69. Medeiros

[25] That these conversations took place before the Class Period is of no matter. The Class Period begins when Aetna turned off its data feed to Ontrak and issued the CAP, in response to Ontrak's improper billing. ¶79. As a result, Ontrak's improper billing (and, correspondingly, these Defendants' knowledge of it, must necessarily precede the Class Period.

admitted that Aetna told Ontrak in December that it would at the very least require a different contract, which would have been less remunerative to Ontrak. ¶110.[26] Mayhew acknowledged that Cigna told him on May 18, 2021 that it would terminate. ¶132.

More, Defendants' own public statements are specific and reflect their access to the disputed information. *See, e.g.,*¶¶92, 96 (Peizer addressing the cause and impact of the Aetna feed shutdown); ¶94 (Medeiros discussing the Aetna feed); ¶110 (Medeiros discussing the feed and December negotiations with Aetna); ¶130 (Mayhew addressing the impact of the Aetna feed shutdown while failing to disclose Cigna's material reduction); ¶128 (LaVerne discussing Cigna expectations); ¶142 (Mayhew describing feedback from a "listening tour" of Ontrak customers but omitting material feedback from Cigna). Indeed, these statements are more specific than the statement *Reese* found had "bridged the scienter gap."[27] Thus, as in *Reese*, Defendants' own statements raise the inference of scienter.

The temporal proximity of Preferred Stock offerings to the receipt of bad news from Aetna that Ontrak concealed also supports a strong inference of scienter. Ontrak carried out an offering in August 2020, after Aetna shut down the data feed and shortly after the CAP. ¶79. It carried out a second offering in December 2020, shortly after learning that Aetna would not turn the data feed back on without a new contract. ¶¶102-103. In other words, Defendants twice got bad news from Aetna, hid it from investors, and raised money. These facts raise the inference of fraudulent intent.[28]

---

[26] Instead of telling investors this material adverse news, Defendants immediately raised almost $40 million in a Preferred Stock offering. ¶¶102-104.

[27] "[C]orrosion was seen in [a ruptured oil pipeline] but appeared to be occurring at a low manageable corrosion rate." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 659, 572 (9th Cir. 2014).

[28] The argument that the offerings do not demonstrate motive because Peizer, LaVerne, and Medeiros did not personally benefit is without merit. *See* DBr. at 22, citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). *Rigel* is inapposite because the Complaint does not rely on allegations of an improper financial motive to demonstrate scienter with respect to Aetna, but rather pleads that when getting bad news, these Defendants rushed to raise money before the news could come out. *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (court would not draw

Nor does Defendants' argument regarding the removal of Peizer and Medeiros from their jobs raise an anti-scienter inference. Defendants cite *NVIDIA*, 768 F.3d at 1062-63, where the Court found that the fact that two executives who left the company soon after it disclosed product defects remained in advisory roles raised the inference that their departures were benign. DBr. at 23. But the retention of Peizer in some role was not optional because Peizer is Ontrak's majority shareholder. That he had to give up day-to-day control is evidence that he was under pressure despite this position of power due to his conduct. ¶115. In addition, the Complaint pleads that Medeiros and Peizer were removed not just after losing Aetna's business, but after lying about the events that resulted in the loss. *See* ¶¶105-114 (even as Ontrak disclosed the loss of Aetna, Defendants lied about the reasons for and timing of the termination). Unlike in *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (*see* DBr. at 23 n.12), these well-pled facts create far more reason for Ontrak's board to change the Company's management than simply the loss of Aetna's business.

Peizer's criminal insider trading scheme (which Defendants misleadingly describe as "sales of expiring warrants," DBr. at 23) additionally raises a strong inference of scienter with respect to his own failure to disclose material facts concerning Cigna, which is imputed to Ontrak. "[A] corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. U.S.*, 445 U.S. 222, 227 (1980). The Complaint details how Peizer fraudulently formed two Rule 10b5-1 plans to trade on material non-public information—avoiding over $12 million in losses that outside investors took on the chin. ¶¶18, 149-160.

At the time of his crimes, Peizer was closely monitoring Ontrak and communicating with executives (including Mayhew) about Cigna. ¶¶119-122, 135, 137. Indeed, he formed his second Rule 10b5-1 plan on August 13, 2021, the same day an Ontrak executive told

---

an anti-scienter inference from the absence of stock sales that benefitted defendants where plaintiffs alleged that defendants were motivated to live up to unrealistic optimism); *Hanmi*, 621 F.Supp.3d 1075, 1089.

him that he believed Cigna was likely to issue a formal termination notice, which would trigger public disclosure and an inevitable stock drop. ¶155. Thus, ***with actual knowledge,*** Peizer neither disclosed nor abstained from trading on material non-public information. As Executive Chairman, his scienter can be imputed to Ontrak. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1204–1205 (N.D. Cal. 2012); *In re Hienergy Technologies, Inc.*, 2005 WL 3071250, at *8 (Oct. 25, 2005).[29]

Finally, and critically, even if the Court considers it plausible that at the time the Individual Defendants spoke about Ontrak's relationships with Aetna and Cigna, negotiations with the customers were tenable, or that the Individual Defendants did not sufficiently appreciate the gravity of the problems with Aetna and Cigna before they terminated their contracts, these inferences cannot shield Defendants from liability from misleading investors concerning the state of Ontrak's most important customer relationships ***at the time that they were actually speaking. Whether Ontrak could have renegotiated is not the only issue material to investors.*** That each of the customers, in turn, materially reduced referrals and (before eventually terminating) insisted on renegotiations of their contract on less favorable terms to Ontrak was material as well, and Defendants concealed that information from investors. Because the Individual Defendants knew about these material facts and failed to disclose them (*see, e.g.,* ¶¶110, 132) the Court should find that the Complaint pleads scienter with respect to each. *Alphabet*, 1 F.4th 687 at 705-706.[30]

---

[29] Peizer could not have carried out his scheme without help from Mayhew and LaVerne. Mayhew updated Peizer concerning adverse news from Cigna (while concealing it from outside investors). ¶135. In order to enter into his criminal Rule 10b5-1 plans, Peizer had to certify to LaVerne that his "proposed dealing was not a result of access to, or receipt of Material Nonpublic Information as described in the Company's Insider Trading Policy." ¶¶151, 156, 160. At least LaVerne, therefore, knew what Peizer was doing, and did nothing to stop him or protect investors.

[30] Mayhew's arguments that the Complaint fails to raise an inference of scienter against him (MBr. 6-8) are also without merit. First, Plaintiff's claims are not "predicated on the contention that the Cigna relationship was doomed[,]" *id.* at 6, but on his repeated omission of material facts necessary to make his statements not misleading in context. *Matrixx*, 131 S.Ct. 1309, 1321. His words in his FBI interview speak for themselves, and support the inference that he materially misled investors. ¶¶132-133

### D. The Complaint Pleads Loss Causation

To plead loss causation, the Supreme Court simply requires "some indication of the loss and the causal connection" to the alleged fraud. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs need only allege that the decline in stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors. *Lambert v. Baker Tilly Hong Kong Ltd.*, 2016 WL 6272465, at *2 (C.D. Cal. May 23, 2016). "[S]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). In fact, "[t]he misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a 'substantial cause.'" *Id.* at 1055. A corrective disclosure need not be a mirror image of the earlier representation. *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 n.3 (9th Cir. 2020). "The ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "A plaintiff may also establish loss causation by alleging that the defendant's misrepresentations concealed a risk that materialized and played some part in diminishing the value of the security." *In re Amgen Sec. Litig.*, 2014 WL 12585809, at *20 (C.D. Cal. Aug. 4, 2014).

The Complaint pleads both corrective disclosure and materialization of the risk. Plaintiff alleges the March 1, 2021 drop was caused by misrepresentations regarding Ontrak's billing and Aetna's response. On August 5, 2020, Peizer, LaVerne, and Medeiros misled investors by omitting that Aetna had turned off its data feed and issued the CAP.

---

(Mayhew took the May 18, 2021 termination news "at face value"). His clarification that he believed a hypothetical new contract with Cigna with different terms would be material, MBr. at 6, does not help his argument, since Cigna told Ontrak ***before*** the May 18, 2021 meeting, and indeed, before Mayhew made numerous materially false statements on May 6, 2021 that its contract with Ontrak would have to be renegotiated. *See, e.g.,* ¶126. The Complaint does not allege that Mayhew personally benefited financially from his fraudulent statements and omissions, making that defense a red herring. *See* MBr. at 7. Finally, a CEO's duty to share information with a company's Executive Chairman does not include ignoring that Executive Chairman's insider trading on such information.

*See, e.g.,* ¶79. On November 5, 2020, they stated that the data feed had been turned off because of a standard review. ¶90. Plaintiff alleges the August 19, 2021 drop was caused by misrepresentations regarding Cigna. On May 6, 2021, Mayhew and LaVerne misled investors by omitting that Cigna had materially reduced referrals to Ontrak and informed Ontrak that its contract would have to be renegotiated, and stating that they expected Cigna to fulfill its existing contract. ¶¶125, 128. On August 5, 2021, Mayhew reported feedback from a "listening tour" with Ontrak customers but left out that Cigna had told Ontrak that it was terminating its contract and stopped productive operations. ¶¶142-145. Defendants thus have notice of Plaintiff's loss causation theory, how it is plausibly based in fact, and how it directly relates to each disclosure. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1054 (9th Cir. 2011) ("[p]laintiff need not allege facts identifying how much loss is attributable to its claim versus other factors so long as it alleges sufficient facts from which a reasonable fact-finder could find that some loss is attributable to the claim."). More, Plaintiff alleges that Defendants misled investors because the Company's risk from the loss of business from Aetna and Ontrak had materialized. *See, e.g.,* ¶¶80, 99, 126, 140. Thus, not only does the Complaint allege a corrective disclosure, but it also pleads materialization of the risk.

### E. The Complaint Adequately Pleads Control Person Liability

Because the Complaint adequately alleges a primary violation of §10(b) and Rule 10b-5 and the Individual Defendants controlled Ontrak, Plaintiff has alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motions. Alternatively, if any part of the Complaint is dismissed, Plaintiff respectfully requests leave to replead. *See* Fed. R. Civ. P. 15; *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

Dated: March 29, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim, Esq.
Leah Heifetz-Li, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
lheifetz@rosenlegal.com

Lead Counsel for Lead Plaintiff

and

Brian Schall, Esq.
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

Additional Counsel for Lead Plaintiff

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned, say:

I am not a party to the above case, and am over eighteen years old. On March 29, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 29, 2024 at Guilford, Connecticut.

/s/ Leah Heifetz-Li

Leah Heifetz-Li