JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL FARHAR,<br><br>        Plaintiff,<br><br>    v.<br><br>ONTRAK, INC., *et al.*,<br><br>        Defendants. | Case No. 2:21-cv-01987-FLA (Ex)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br>**[DKTS. 126, 128]** |

### RULING

Before the court is Defendants Ontrak, Inc. ("Ontrak" or the "Company"), Brandon LaVerne ("LaVerne"), Curtis Medeiros ("Medeiros"), Terren Peizer ("Peizer"), and Jonathan Mayhew's ("Mayhew") (collectively, "Defendants") Motion to Dismiss the Third Amended Complaint (the "Motion"). Dkts. 126, 128 ("Mot.").[1] Lead Plaintiff Ibinabo Dick ("Plaintiff") opposes the Motion. Dkt. 130 ("Opp'n").

On April 15, 2024, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for April 19, 2024. Dkt. 135; *see*

---

[1] Defendants Ontrak, LaVerne, and Medeiros submitted a Motion to Dismiss (Dkt. 128), which Mayhew and Peizer joined (Dkts. 126, 129).

Fed. R. Civ. P. 78(b); Local Rule 7-15. For the reasons stated herein, the court GRANTS the Motion.[2]

## BACKGROUND

This putative class action suit arises from Defendants' alleged violations of federal securities laws and is brought on behalf of all persons and entities that purchased Ontrak publicly traded common stock between August 5, 2020 and August 19, 2021 (the "Class Period"). Dkt. 123 ("TAC") ¶ 1. The Third Amended Complaint ("TAC") alleges Defendants "knowingly or recklessly disseminated materially false and misleading statements about the Company's relationships with its two largest customers[,] Aetna and Cigna," during the Class Period. *Id.* ¶ 2. In considering the Motion, the court accepts the following allegations as true.

### A.  Ontrak

Ontrak is a healthcare company that uses predictive analytics to connect high-cost members of health insurance plans with cost-reducing programs. *Id.* ¶¶ 35, 47. Ontrak's member-engagement specialists contacted eligible health plan members[3] by calling names on lists provided by health insurance plans. *Id.* ¶ 48. If a member expressed interested in participating, Ontrak's member-engagement specialists would refer the customer to a "care coach," who would "talk further with the member and create some type of plan." *Id.* ¶ 51.

Peizer is the founder of Ontrak and served as its Chief Executive Officer ("CEO") from 2003 through April 2021. *Id.* ¶ 26. Mayhew served as Ontrak's CEO from April 2021 until August 2022. *Id.* ¶ 29. LaVerne has been the Company's Chief Financial Officer since March 2020 (*id.* ¶ 27), and Medeiros served as President and

---

[2] The parties submitted requests for judicial notice. Dkts. 127, 128-2, 136. As the court does not rely on these documents, the requests are DENIED as moot.

[3] Eligible customers were those with a chronic medical condition and history of substance abuse or other mental health condition, and who had generated at least $7,500 in health plan benefits. TAC ¶ 48.

2

Chief Operating Officer of the Company from December 2019 through April 2021 (*id.* ¶ 28). The TAC alleges each of the Individual Defendants directly participated in the management and day-to-day operations of the Company, were privy to confidential information, and were aware of or recklessly disregarded "the fact that the false and misleading statements were being issued concerning the Company[.]" *Id.* ¶ 31 (a)–(g).

### B. Aetna

During the Class Period, Aetna members accounted for over 85% of Ontrak's outreach pool. *Id.* ¶ 52. According to a former employee, Aetna paid Ontrak $750 for each member who enrolled in a program, and was deeply involved in Ontrak's strategy with its members. *Id.* ¶ 53. Ontrak billed Aetna for each interaction between a care coach and an enrolled member. *Id.* ¶ 54. Former employees claim Ontrak "routinely enrolled members who were later determined to be ineligible" to "collect fees for their contacts with care coaches until Aetna made the final determination that they were not eligible." *Id.* ¶¶ 55–57.

Another former employee alleged Aetna eventually "turned off its data feed" in May 2020, which prevented Ontrak from receiving access to "new potential contacts for member engagement specialists," which "materially impacted Ontrak's revenue from Aetna." *Id.* ¶¶ 59–60. Aetna and Ontrak engaged in weekly conference calls "to discuss ongoing issues" and Aetna's suspicions about "Ontrak's billing[.]" *Id.* ¶¶ 61–62.

In July 2020, Aetna requested Ontrak complete a Corrective Action Plan ("CAP"), responding to questions about various billing issues and providing measures by which Aetna could determine the benefits of Ontrak's services. *Id.* ¶ 7. Former employees stated Ontrak submitted the CAP, but that Company executives working on the matter "did the bare minimum to address Aetna's concerns," and "never fully completed the CAP or answered Aetna's questions, giving Aetna an incomplete response." *Id.* ¶¶ 68, 71.

Plaintiff's claims arise from several alleged misstatements and omissions made by Defendants in connection with Ontrak's relationship with Aetna. First, on August 5, 2020, Ontrak filed its second quarter Form 10-Q, which disclosed as a risk factor that a substantial percentage of the Company's revenues were attributable to four large customers, any of which could terminate its services at any time, but did not disclose Aetna "had turned off its data feed … and issued the CAP." *Id.* ¶ 79. The same day, on an earnings call with investors to discuss the Company's quarterly results, Peizer stated:

> Whether it is further expansions with Aetna and other existing customers, the impending launch of our signed Cigna expansions, enhancements to our algorithms feeding the outreach pool or potential new logos and pilots, I'm really excited to see the hard work, dedication, passion and grit of every OnTrak teammate as we proceed onto new heights.

*Id.* ¶ 82. On August 6, 2020, Ontrak's stock increased in value, from $36.00 per share to $56.47 per share. *Id.* ¶ 85.

Next, on November 5, 2020, Ontrak announced its third quarter financial results and stated "[n]ew compliance reviews conducted by our largest customer for all of its vendors disrupted data refreshes from July, despite the customer having no compliance issues or concerns with Ontrak." *Id.* ¶ 90. Peizer reiterated this sentiment in a conference call the same day, stating:

> [W]e would also like to point out that our largest customer is conducting compliance reviews of all of their vendors. These reviews have disrupted data refreshes for the Ontrak program since July, putting further pressure on our outreach pool numbers despite the customer having no compliance issues or concerns with Ontrak … Importantly, this is one of the plans for which we anticipate continued significant expansion.

*Id.* ¶ 92. Medeiros added that there was "a mutual agreement with the client based on our current understanding that we expect the data to be turned back on by the end of

4

the year." *Id.* ¶ 94. Peizer stated Aetna's "data refresh" "ha[d] nothing to do with us. In fact, quite the contrary. Was just a gut punch because it really does impact our ability to optimize what our capability is." *Id.* ¶ 96. The Company's third quarter 2020 10-Q report again noted revenue was attributable to four large customers which could terminate Ontrak's services at-will, but omitted mention of the CAP or Aetna's investigation into Ontrak's billing practices. *Id.* ¶ 98.

On March 1, 2021, Ontrak issued a press release stating Aetna was terminating the contract, effective June 26, 2021. *Id.* ¶ 105. Peizer stated the Company was notified "after market close on February 26, 2021 that our participation status with this customer will be terminated," but the TAC alleges "Aetna had actually notified Ontrak approximately one month earlier." *Id.* ¶¶ 105, 107. On this news, Ontrak's stock price fell 46%. *Id.* ¶ 109.

### C. Cigna

Cigna was Ontrak's second largest client. *Id.* ¶ 6. Ontrak provided services to Cigna's insured patients pursuant to a $90 million, three-year contract, and Cigna maintained the right to terminate the contract upon 30 days' notice. *Id.* By February 2021, Cigna began reducing the number of members it referred per month to Ontrak. *Id.* ¶ 116. In April 2021, Cigna informed Ontrak the contract "would have to be renegotiated, on less favorable terms for Ontrak, because Ontrak's services were not meeting Cigna's expectations." *Id.* ¶ 118. During this time period, Peizer also learned "Cigna had raised numerous issues concerning its relationship with Ontrak and that Ontrak was in serious danger of Cigna terminating its agreement[.]" *Id.* ¶ 119.

On May 18, 2021, Cigna informed Ontrak of its intent to terminate the contract by the end of the year. *Id.* ¶ 132. Shortly thereafter, Mayhew emailed executives at Cigna to propose "immediate changes to the contract that would materially reduce the cost per enrolled member to Cigna," and Ontrak "continued to make offers to Cigna with lower costs." *Id.* ¶¶ 136, 138.

Plaintiff's claims similarly arise from various statements and omissions made by Defendants during the Class Period and relating to Ontrak's relationship with Cigna. First, Plaintiff alleges Ontrak's first quarter 2021 Form 10-Q report (filed May 6, 2021) disclosed various risk factors (including that Ontrak's business depended on its relationship with large customers, such as Cigna), but omitted mention of Cigna's reduction in patient referrals or intent to renegotiate the contract. *Id.* ¶ 125. On a conference call the same day, when asked for a "'sense of how Cigna is tracking,'" LaVerne stated the Company would not be commenting on the specifics of individual customers, but that they believed and expected Ontrak would be within the "$90 million over three years range at least." *Id.* ¶ 128.

Next, on August 5, 2021, Ontrak filed its second quarter 2021 Form 10-Q report, which included the same risk disclosures, but omitted mention of reduction in monthly patients and Cigna's stated intent to terminate the contract. *Id.* ¶ 139. Mayhew also omitted such information on a conference call held the same day, and stated:

> Key account leaders within our customer organizations tell us that their major accounts value the Ontrak program. We're well positioned to heighten the value that health plans create for commercial populations by building trust, engagement and readiness with employees so that their employers experience higher enterprise loyalty and commitment levels. As we've begun testing receptivity to the growth initiatives, not only with our customers, but with prospects and providers, the feedback has been very positive. We've seen an increase in initial discussions in recent weeks in our sales pipeline. While it's still early, we're encouraged by dialogue we are having with health plans, provider groups and employer organizations.

*Id.* ¶ 142.

/ / /

/ / /

On August 18, 2021, Cigna formally notified Ontrak it was terminating the contract, and Ontrak disclosed the termination the following day. *Id.* ¶¶ 147–48. On this news, the Company's stock price fell over 44%. *Id.* ¶ 148.

### D.     Procedural History

On February 2, 2024, the court granted Defendants' Motion to Dismiss the Second Amended Complaint with leave to amend. Dkt. 120 ("MTD Order"). In relevant part, the court found the statements challenged in the Second Amended Complaint were inactionable as puffery or forward-looking statements, and that Plaintiff failed to allege facts establishing falsity and scienter sufficiently. *Id.* at 11–19. On March 5, 2024, Plaintiff filed the TAC, which asserts claims for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and Rule 10b-5, and Section 20(a) of the Securities Exchange Act of 1934. Defendants now move to dismiss the TAC.

## LEGAL STANDARD

### I.     Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to support a cognizable legal theory." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations and brackets omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  Id. (internal citations omitted).  Legal conclusions "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.  "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

Additionally, it is well-established that "[a]t the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b-5 must … satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  Fed. R. Civ. P. 9(b) "requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading ... about the statement and why the statements were false or misleading at the time they were made." *Id*.  The PSLRA also requires "plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id*.

II. **Section 10(b) and Rule 10b-5**

Section 10(b) makes it unlawful "for any person … [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary[.]"  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements Section 10(b) and states in relevant part that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading."  17 C.F.R. § 240.10b-5.

8

To state a claim for violation of Section 10(b), a plaintiff must prove: (1) a material misrepresentation or omission by the defendant (*i.e.*, falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). A statement or omission is actionable under Section 10(b) only if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 963 (C.D. Cal. 2017) (explaining statements amounting to "fraud by hindsight" are not actionable).

## DISCUSSION

Defendants argue the TAC "cures none of the[] defects" identified in the MTD Order, and "continues to allege claims as to statements that are mere puffery and statements that are protected by the PSLRA's safe harbor provision for forward-looking statements." Mot. at 9. Defendants further argue Plaintiff "claims that various statements and omissions are false and misleading but fails to cite any reliable facts supporting *why* they are false or misleading." *Id.* (emphasis in original).

I.    **Material Misrepresentations and Omissions**

   A.    **Puffery**

Puffery "concerns expressions of opinion, as opposed to knowingly false statements of fact." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "[V]ague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers," are nonactionable under Section 10(b) because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)). Conversely, "[s]tatements by a company that are capable

9

of objective verification are not 'puffery' and can constitute material misrepresentations." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 606.

    Defendants contend the following statements are puffery: (1) Peizer's comment on the August 5, 2020 investor call touting "enhancements to our algorithms feeding the outreach pool" (TAC ¶ 82); and (2) Mayhew's comments that "major accounts value the Onktrak program," Ontrak was "well positioned to heighten value," and that "feedback has been very positive" (*id.* ¶ 144).

    In opposition, Plaintiff argues the first statement is objectively untrue because the TAC pleads "there were no algorithms feeding Ontrak's outreach pool[.]"[4] Opp'n at 16; TAC ¶ 83. The allegations in the TAC, however, do not support such a conclusion. The TAC alleges only that Aetna cut off Ontrak's access to Aetna's data feed, but does not assert there were *no* algorithms feeding Ontrak's outreach pool or that the outreach pool was generated solely by Aetna. Moreover, Peizer's use of the word "whether" in discussing potential enhancements implies Peizer was not making a concrete statement of fact. *See* TAC ¶ 82 ("Whether it is further expansions … [or] enhancements to our algorithms … I'm really excited … as we proceed onto new heights.").

    As to the second statement, Plaintiff argues the court took these statements out of context and the statements are in fact actionable because they omitted the "negative feedback" Mayhew received from Cigna. While Mayhew was aware of Cigna's intent to terminate the contract, his statements are not actionable. His statements that the Company was "well-positioned to heighten [its] value," and that he was "encouraged by dialogue [he was] having with health plans," lack specific details or forecasts regarding the Company's performance, and are only vague statements of optimism. *See Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (dismissing as

---

[4] Plaintiff claims "[t]his verifiable information comes from [Former Employee 4.]" Opp'n at 16. The TAC does not attribute such an allegation to Former Employee 4.

nonactionable statements that the "overall credit quality of the loan portfolio is sound," the company's "metrics are superior to those of its peers," and the company "has limited its exposure to problem credits"). Indeed, the TAC alleges Mayhew and Ontrak "continued to make offers to Cigna with lower costs" (TAC ¶ 138), after being notified of Cigna's intent to terminate the contract, which supports an inference that Mayhew believed termination could have been avoided.

The court, therefore, agrees with Defendants, as it previously found these statements constituted non-actionable puffery and dismissed claims based thereon. MTD Order at 12–13. The TAC does not include new allegations which would alter that holding.

### B. Forward-Looking Statements

Similarly, Defendants assert the TAC challenges protected, forward-looking statements. Mot. at 20. Statements addressing the "plans and objectives of management for future operations," as well as "any statement of the assumptions underlying or relating to" those plans and objectives are forward-looking. 15 U.S.C. § 78u-5(1)(B), (D). A statement cannot be considered forward-looking if it contains "sufficient facts to show that the statement goes beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific current or past fact." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (cleaned up). The PSLRA protects forward-looking statements if they are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or made without actual knowledge of the statement's falsity. 15 U.S.C. § 78u-5(c)(1)(A-B); *see In re Cutera*, 610 F.3d at 1108.

Defendants claim the following statements are forward-looking and protected under the PSLRA: (1) Peizer's statements that the Company expected "further expansions" with a variety of health plans and that the Company "anticipate[d] continued significant expansion" from a customer (TAC ¶¶ 82, 92); and (2) LaVerne's

statement that the Company "expect[s] … to be within [the $90 million over three years] range at least" (*id.* ¶ 128.).  As held previously, these statements are non-actionable forward-looking statements, as both statements speak generally to Ontrak's future plans and objectives, and do not refer to concrete factual assertions.  *See* MTD Order at 13–20.  Further, the TAC does not allege Peizer actually knew Aetna would not renew its contract or further expand its relationship with Ontrak in the future, or that LaVerne could not expect the Company to meet the budgeted amount for the Cigna contract, despite Cigna's indication that it wanted to renegotiate the contract.  *Id.* at 15.  Without such facts, these statements fall within the PSLRA's safe harbor and are nonactionable.  *Id.*[5]

### C.   Falsity

As to the remaining statements, Defendants argue Plaintiff fails to plead falsity sufficiently.

#### 1.   Statements Related to Aetna

Plaintiff's allegations regarding misstatements or omissions stemming from Ontrak's relationship with Aetna are predicated on claims that, by May 2020, Aetna "stopped providing Ontrak with names of new potential health plan members," and by July 2020, asked Ontrak to complete the CAP.  TAC ¶ 7; *see also id.* ¶¶ 79–81, 90–100, 105–14.

In support of these claims, the TAC relies on the statements of undisclosed former Ontrak employees.  Under the PSLRA, a complaint relying "on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted).  First, the source of the statements "must be described with

---

[5] Additionally, many of the statements at issue were contained within SEC filings or made during investor calls, and were accompanied by sufficient cautionary language identifying important risk factors which may have affected ultimate outcomes.  *See* MTD Order at 16, n. 8.

12

sufficient particularity to establish their reliability and personal knowledge." *Id.* Second, the statements "must themselves be indicative of scienter." *Id.*

As the court held previously (MTD Order at 17), Plaintiff fails to establish the reliability and personal knowledge of these witnesses as to Ontrak's broader relationship with Aetna, as the TAC provides the general titles and roles of the various former employees (TAC ¶¶ 37–46), but does not explain how each former employee would have obtained knowledge of the allegations attributed to them. *See Zucco*, 552 F.3d at 995. For example, allegations regarding Aetna's revocation of access to its data feed are attributed to Former Employees 3 and 5. Former Employee 3 stated that, by May 2020, "Ontrak's relationship with Aetna was in dire straights," and Aetna "turned off its data feed," which was a "serious development." TAC ¶¶ 58–59. Former Employee 5 claimed, "he stopped receiving new Aetna members to contact … and was instead asked to recontact the same people over and over." *Id.* ¶ 59.[6]

Former Employee 3 is described as a "principal design researcher and strategist … [whose] primary job was to develop a way to quantify the benefit that Aetna was receiving," (*id.* ¶ 39), while Former Employee 5 is described only as "a member engagement specialist" (*id.* ¶ 41). Without more, this is insufficient to establish how either former employee had personal knowledge of Ontrak's ongoing negotiations or broader relationship with Aetna. Neither employee details whether (or how) he or she was privy to contract negotiations with Aetna or knew with certainty the issues with Aetna could not be resolved, nor does either explain why the data feed was turned off or contradict Medeiros' statement that the feed was expected to be turned on again by the end of the year. Similarly, Former Employee 9 "confirmed that Ontrak concealed the news that it had lost its largest customer for at least several weeks before

---

[6] Additionally, Former Employees 3 and 5 contradict each other with respect to when Aetna allegedly terminated access to its data feed. Former Employee 3 alleges Aetna terminated access in May 2020, while Former Employee 5 reported he stopped receiving new contacts "by approximately September 2020[.]" TAC ¶ 59.

disclosing it to investors" (*id.* ¶ 78), but does not offer any personal knowledge of the Company's relationship with Aetna in his or her role as "Director of Community Care Training," which involved "train[ing] care coaches, nutritional supervisors, and care coordinators" (*id.* ¶ 45).

### 2. Statements Related to Cigna

With respect to Ontrak's relationship with Cigna, Plaintiff claims Defendants omitted material information—namely, that Cigna had notified Ontrack of its intent to terminate the contract and reduced the number of patients it was referring to Ontrak on a monthly basis. *Id.* ¶ 139. In *In re Rigel*, the Ninth Circuit stated that "not all adverse events [will] be material and, more importantly, [] not all adverse events [will] have to be disclosed." 697 F.3d at 880 n. 8. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose … by controlling what they say to the market." *Id.* Accordingly, "as long as the omissions do not make the actual statements misleading, a company is not required to disclose every [event] … even if investors would consider the omitted information significant." *Id.*

Here, Plaintiff's allegations regarding the falsity of Defendants' omissions are not sufficient, as the TAC does not "'specify the reason or reasons why the statements … were misleading or untrue," and instead alleges "simply why the statements were incomplete.'" *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) (citing *Brody*, 280 F.3d at 1006). The TAC alleges "the Company's affirmative statements were rendered false or misleading by virtue of the omission" (TAC ¶ 140), but does not support this statement with any specific allegation as to how the statements were untrue, rather than incomplete.[7] Plaintiff's allegations are further undermined by the fact that, as Plaintiff concedes, many of Defendants' statements

---

[7] In any event, the court has already determined that several of the statements Plaintiff claims were rendered "false and misleading by virtue of the omission" are inactionable.

14

were accompanied by cautionary language that the Company's "business [] depend[ed] upon four large customers [including Cigna]," and the "loss of any one such customer[] would have a material adverse effect on" the Company. TAC ¶ 139.

Having found Plaintiff fails to plead sufficiently actionable statements, the court need not consider the parties' arguments as to the remaining elements of a Section 10(b) claim. Accordingly, Defendants' Motion as to Plaintiff's Section 10(b) claims is GRANTED.[8]

## CONCLUSION

For the foregoing reasons, and because Plaintiff has previously been afforded multiple opportunities to amend, the court GRANTS Defendants' Motion, and DISMISSES the TAC without leave to amend.

IT IS SO ORDERED.

Dated: September 3, 2024

_____
FERNANDO L. AENLLE-ROCHA
United States District Judge

---

[8] Plaintiff's claim for violations of Section 20(a) necessarily fails too, as the provision provides for joint and several liability for individuals who aid and abet violators of the Securities Exchange Act. 15 U.S.C. § 78t. Having found no actionable violation based on the allegations in the TAC, the court need not analyze potential liability under Section 20(a). Accordingly, Plaintiff's Section 20(a) claim is also DISMISSED without leave to amend.

15